## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                  :        **Chapter 11**
                                        :
**WMC MORTGAGE, LLC,**                   :        **Case No. 19–_____ (      )**
                                        :
                                        :
            **Debtor.**[1]               :
------------------------------------------------------------ x

## DECLARATION OF MARK V. ASDOURIAN IN SUPPORT OF
## DEBTOR'S CHAPTER 11 PETITION AND FIRST-DAY RELIEF

I, Mark V. Asdourian, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.       I am the Chief Executive Officer, President, General Counsel, and Chairman of the Board of Directors of WMC Mortgage, LLC (the "**Debtor**" or "**WMC**"), and have served in each of these capacities since June 6, 2016.  I was hired by GE Capital US Holdings, Inc. ("**GECUSH**"), WMC's sole member, and seconded to WMC on June 6, 2016. From February 1, 2013 through June 6, 2016, I was retained directly by the Debtor on a monthly basis to act as the Debtor's General Counsel.  Prior to my retention as the Debtor's General Counsel in February 2013, I was an attorney in private practice and represented the Debtor in various litigation as well as business and finance related matters for over fifteen years.

2.       I am authorized to submit this declaration (this "**Declaration**") in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  To minimize the potentially adverse effects that the commencement

---

[1] The last four digits of the Debtor's federal tax identification number are 2008.  The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

of this chapter 11 case may have on the Debtor and to facilitate an orderly transition into chapter 11, the Debtor has filed certain motions and applications on the date hereof (the "**Commencement Date**") seeking "first day" relief (collectively, the "**First Day Pleadings**").

3.      I am generally familiar with the Debtor's day-to-day operations, books and records, and business and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my review of information contained in various databases maintained by the Debtor, my discussions with members of the Debtor's senior management and professionals reporting to me, information provided to me by employees working under my supervision, information provided to me by professionals retained by the Debtor, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations.  If called upon to do so, I can testify competently to the facts set forth in this Declaration.

4.      This Declaration is divided into four parts.  Sections I and II provide an overview of the Debtor's history, business, and prepetition organizational and debt structure. Section III describes the events and circumstances leading to the commencement of this chapter 11 case, and Section IV summarizes the relief requested in each of the First Day Pleadings.

## I.      Preliminary Statement

5.      WMC, directly and through various predecessors, was in the business of originating residential mortgage loans for more than sixty years.  The collapse of the housing and financial markets presaging the Great Recession decimated WMC's loan origination business. By the second quarter of 2007, WMC had essentially stopped originating new loans and focused on winding down its operations and resolving substantial liabilities associated with its mortgage business.  Over the past decade, WMC has been able to settle the gravamen of the litigation commenced against it, which primarily consisted of contract actions for breaches of

2

representations and warranties WMC made in mortgage loan sale agreements relative to the attributes of the loans sold.  These claims were asserted either by trustees of trusts that issued residential mortgage backed securities or by counterparties who otherwise purchased mortgage loans originated or acquired by WMC.  Over this period, and as a result of arm's-length, good faith bargaining, WMC paid over $1.5 billion in settlements of numerous third party claims. Approximately eighty-five percent (85%) of these settlements and other related costs, including substantial legal fees and operating expenses, have been funded through capital contributions made by GECUSH and, prior to December 2015, its predecessor, General Electric Capital Corporation ("**GECC**" and together with GECUSH, "**GE Capital**").

6.    In addition to these contract actions, over the last few years, WMC and GECC have been the subject of an investigation by the Civil Division of the United States Department of Justice (the "**DOJ**") in connection with potential violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 arising out of WMC's origination, purchase, or sale of residential mortgage loans ("**FIRREA Claims**").  On April 11, 2019, WMC, the United States of America (acting through the DOJ), and General Electric Company executed a settlement agreement (the "**FIRREA Settlement**"), which provides for General Electric Company's payment of $1.5 billion (the "**DOJ Payment**") in full and final satisfaction of all FIRREA Claims that may be asserted by the United States against WMC, General Electric Company, and their affiliates.  The DOJ Payment was paid entirely by General Electric Company on April 18, 2019.

7.    Having concluded the FIRREA Settlement as well as the numerous RMBS related settlements, the remaining claims against WMC primarily consist of (a) one pending contract action for alleged breaches of representations and warranties relating to the Securitized

Asset Backed Receivables LLC Trust 2006-WM2 (the "**SABR-WM2 Trust**"), which, as is discussed in greater detail below, is stayed and subject to a proposed settlement, and (b) the potential for contingent, disputed and unliquidated unsecured claims, which generally are described in Section III below.  WMC has *de minimis* unsecured trade debt.

8.      As a result of the discontinuation of its mortgage origination business in 2007 and with the resolution of claims and causes of action asserted against it over the past decade, WMC has limited remaining assets.  These assets include potential claims and causes of action against WMC's affiliates, including General Electric Company and its affiliates (collectively, "**GE**") (the "**Potential Claims**"), limited cash on hand and certain other contingent claims, including, among other things, WMC's right to certain recoveries available under certain settlement agreements with certain counterparties.

9.      In accordance with WMC's duty to maximize the value of its remaining assets, including the Potential Claims, in July 2018, two independent directors (the "**Independent Directors**") were appointed to WMC's board (the "**Board**").  The Independent Directors are John S. Dubel of Dubel & Associates, LLC, and Michael E. Jacoby of Phoenix Management Services, LLC.  Neither Independent Director has served as a director of the Debtor, nor has been engaged by the Debtor, or its predecessor entities, or GE.  Accordingly, the Board now has three members consisting of myself and the Independent Directors.

10.      In July 2018, WMC also formed a special committee of the Board consisting of the Independent Directors (the "**Special Committee**").  As set forth in the Amended and Restated Limited Liability Company Agreement of WMC, dated July 13, 2018, the Special Committee's charter is to, among other things, investigate the Potential Claims and, as appropriate, prosecute and/or settle such claims.  WMC's legal counsel, Richards, Layton &

Finger ("**RLF**"), and financial advisor, Alvarez & Marsal Disputes and Investigations, LLC ("**A&M**"), assisted the Special Committee in the performance of its investigative responsibilities.

11.     I understand that, since its formation, the Special Committee engaged in a thorough investigation of the Potential Claims so that it may be in a proper position to negotiate a consensual resolution of such claims or, if appropriate, prosecute such claims.  As described in greater detail below, I understand that the Special Committee substantially completed its investigation in late March 2019, subject principally to the resolution of certain ongoing discovery matters.  I also understand that, around that time, WMC and GE commenced settlement negotiations and have reached an agreement in principle to resolve all of the Potential Claims, subject to definitive documentation (the "**Definitive Documentation**") and approval by this Court, that provides for, among other things, a release of GE in exchange for a cash payment (the "**GE Settlement**").  Once finalized, the Debtor intends to seek approval of the GE Settlement as part of the chapter 11 plan confirmation process, and, if approved, the proceeds of such settlement will be used to fund distributions to creditors pursuant to a chapter 11 plan, consistent with the Definitive Documentation.

12.     To fund the projected costs of this chapter 11 case and enable WMC to, among other things, pay salaries and benefits of its employees, other ordinary course post-petition obligations, conduct negotiations with key constituents, consummate the GE Settlement and confirm a chapter 11 plan, GECUSH has committed to provide up to $25 million of debtor-in-possession financing to WMC (the "**DIP Facility**").

13.     In view of the foregoing, the Board has determined that the commencement of this chapter 11 case, financed with advances from GECUSH pursuant to the

DIP Facility, will enable WMC to maximize the value of its remaining assets, resolve disputed and unliquidated claims that might be asserted against it, and make a fair and equitable distribution to its creditors in accordance with the Bankruptcy Code.

## II.    The Debtor's Corporate Structure and Business

### A.    *The Debtor's Organizational Structure*

14.    As depicted on the organizational chart attached hereto as **Exhibit A**, GECUSH is a Delaware corporation and the sole member of the Debtor, which is a Delaware limited liability company.  The Debtor does not have any subsidiaries.  GECUSH, in turn, is wholly-owned by GE Capital Global Holdings, LLC, which is a Delaware limited liability company.  GE Capital Global Holdings, LLC, in turn, is wholly owned by General Electric Company.  WMC is the only debtor in this chapter 11 case.

15.    As noted above, pursuant to an amendment to WMC's organizational documents in July 2018, WMC formed the Special Committee to investigate the Potential Claims and take all actions that it deemed appropriate with respect to its investigation and, on behalf of the Debtor, to prosecute or settle, release, discharge, or enter into any other agreement relating to the Potential Claims.  For approximately eight months, the Special Committee conducted its investigation of the Potential Claims with the assistance of RLF and A&M.  The investigation focused primarily (but not exclusively) on events that took place between 2004 and 2007 when WMC was a wholly-owned subsidiary of GE Capital and operating its loan origination business.

16.    I understand that the Special Committee, through its advisors, obtained and reviewed over 1.9 million documents, including records of more than 400 custodians or data repositories at WMC or GE.  The Special Committee obtained these documents from two primary sources:  WMC and GE, the latter of which received numerous document requests from the Special Committee.  As noted above, the Special Committee has substantially completed its

6

investigation, subject principally to the resolution of certain discovery matters, and has reached an agreement in principle regarding the terms of the GE Settlement, subject to Definitive Documentation and approval by this Court.

B.      *The Debtor's History*

17.      The Debtor's predecessor was founded in 1955 as Pacific Western Mortgage Company, later renamed Weyerhaeuser Mortgage Company, a California corporation ("**Weyerhaeuser**").  For more than fifty years, Weyerhaeuser was in the business of residential mortgage lending.  Over time, Weyerhaeuser developed national retail and wholesale mortgage origination operations focused on originating single-family prime mortgage loans.  In May 1997, Weyerhaeuser was sold to WMC Finance Company, a Delaware corporation ("**WMC Finance**"), which, as is described in greater detail below, was a predecessor to WMC.

18.      From 2000 through the suspension of its mortgage loan origination operations in 2007, WMC did not maintain a full servicing platform for the residential loans it made.  Rather, WMC retained a third party to service the mortgage loans it originated on an interim basis until such time as the loans were sold, generally within a short period of time after origination.  Often times, counterparties that purchased mortgage loans from WMC would, generally through affiliates, deposit the loans into trusts that would hold the loans as collateral for the issuance of residential mortgage backed securities ("**RMBS**") sold to investors.

19.      On June 14, 2004, the consumer finance division of GECC acquired WMC Finance and its subsidiary, WMC Mortgage Corp. (formerly known as Weyerhaeuser), from affiliates of Apollo Global Management L.P. for aggregate net consideration of $645.3 million.  By the date of GECC's acquisition, WMC Mortgage Corp. had sold its prime mortgage lending business and was focused on originating subprime loans on a wholesale basis.  Following GECC's purchase, WMC Mortgage Corp. continued to sell loans shortly after

7

origination to purchasers, including financial institutions and investment banks, pursuant to loan sale agreements under which WMC Mortgage Corp. typically made various representations and warranties to the purchasers concerning certain attributes of the loans being sold ("**R&Ws**") and, in certain instances, acknowledged that its R&Ws would extend to any successor-in-interest to the purchaser of its mortgage loans.  After WMC Mortgage Corp. sold a loan, the initial loan purchasers would frequently transfer the loans to affiliated securitization entities who would then deposit the loans into RMBS trusts and transfer all rights and remedies under the sale agreements to the trustees, on behalf of the trusts.  Over the course of GECC's ownership, mortgage loans originated by WMC Mortgage Corp. were deposited into more than 130 different RMBS trusts.

20.     In January 2007, WMC Mortgage Corp., GECC, GE Money Bank, FSB ("**GEMB**"), and WMC-GEMB Mortgage Corp. entered into a series of agreements that effectively transferred WMC Mortgage Corp.'s origination business to GEMB.  After the transfer, GEMB would periodically sell the mortgages it originated to WMC Mortgage Corp., which would sell them in turn to third parties.  By April 2007, WMC Mortgage Corp. and/or GEMB substantially ceased originating mortgage loans due, primarily, to the collapse of the real estate market and the onset of the Great Recession.  In November 2007, the parties rescinded this arrangement, and the remaining business operations, assets, and employees were returned to WMC Mortgage Corp.

21.     In December 2007, WMC Mortgage Corp. sold a significant portion of its material assets, including nearly all of its remaining inventory of loans, real estate owned properties (REO) and intellectual property, to DLJ Mortgage Capital, Inc. for approximately $117 million (the "**DLJ Sale**").  WMC Mortgage Corp. retained all of the proceeds realized from the DLJ Sale.

22.    On December 28, 2007, after the DLJ Sale had closed, WMC Mortgage Corp. merged into WMC Finance.  Thereafter, on December 31, 2007, the surviving entity was converted into a Delaware limited liability company and renamed WMC Mortgage, LLC, which is the Debtor in this chapter 11 case.

23.    Finally, in 2015, as a result of an internal reorganization, GECC's U.S. operations were largely consolidated under GECUSH, a new Delaware corporation.  This resulted in GECUSH becoming the sole member of WMC.

C.    *The Debtor's Post-2007 Operations*

    i.    <u>Liability Management</u>

24.    During the course of the Great Recession, many homeowners faced immediate and ongoing difficulty making their mortgage payments, refinancing their mortgages or selling their homes to avoid foreclosure.  Consequently, the borrowers of many of the residential mortgage loans originated in the years prior to the Great Recession defaulted.  By reason of these defaults and continuing deterioration of the entire U.S. housing market, the collateral (*i.e.*, the mortgage loans) owned by RMBS trusts was substantially devalued.

25.    Since 2011, WMC was named as a defendant in fourteen lawsuits filed by trustees alleging breaches of R&Ws and seeking the repurchase of the allegedly breaching mortgage loans.  Thirteen of those lawsuits have been settled to date for an aggregate amount of $870 million, which resolved approximately $6.2 billion of asserted liabilities.  The one remaining lawsuit, which was filed in 2012 and was pursued by a separate trustee on behalf of the SABR 2006-WM2 Trust, is seeking damages in excess of $980 million.  However, as is discussed in greater detail below, such action has been stayed by agreement of the parties and is subject to a proposed settlement.

26.    The funding for the $870 million paid to settle the referenced lawsuits was made through capital contributions to WMC from GE Capital.  In addition, WMC has made other settlement payments to numerous counterparties in the aggregate amount in excess of $630 million.  The funding for these other settlement payments and related costs was made through a combination of (i) the proceeds of the DLJ Sale, (ii) funds borrowed by WMC under various intercompany financing agreements, and (iii) capital contributions made to WMC from GE Capital.

ii.    <u>Employees</u>

27.    As of the Commencement Date, WMC employs ten (10) full-time employees who perform a variety of critical functions and services for the Debtor, including tasks pertaining to management, operations, human resources, information technology, litigation management and support, legal, and finance and accounting.  Additionally, pursuant to a Services Agreement, dated as of December 27, 2007 (the "**Services Agreement**"), certain of WMC's employees render services on behalf of one of WMC's affiliates, GE Mortgage Holdings LLC, formerly GE Money Mortgage Holding Company ("**GEMH**"), related to residential mortgage loans originated, sold and securitized by GEMH (and its predecessors) well before GECC's acquisition of WMC.  The Services Agreement provides that GEMH is required to compensate WMC for services rendered on behalf of GEMH at a rate equal to WMC's cost plus five percent (5%) (the "**Servicing Fee**").  For services performed after the Commencement Date, GEMH will continue to pay WMC the Servicing Fee in cash, on a monthly basis.

D.    *Financing of WMC*

i.    <u>Intercompany Agreements</u>

28.    Since the acquisition of WMC in 2004, GE Capital (historically provided funding to WMC's mortgage loan origination operations through various intercompany financing

agreements, including term loans, cash management agreements and cash pooling agreements. This financing and any related repayments have been duly reflected on the books and records of GE Capital and WMC and have resulted in an outstanding intercompany payable balance currently owed by WMC to GECUSH and its affiliates in the amount of approximately $93 million.

29.     Additionally, on October 10, 2017, WMC entered in a Loan and Security Agreement with GECUSH, as amended (the "**Loan Agreement**"), pursuant to which GECUSH provided WMC with a loan in a principal amount equal to $73,534,867 in exchange for a security interest in WMC's right, title, and interest in certain recovery rights incorporated in the settlement agreements entered into by and between certain counterparties and WMC.  The principal under the Loan Agreement was fully repaid on February 28, 2018 from funds that constituted GECUSH's collateral.  The full repayment of principal left $435,865.21 in interest accrued through the date of repayment outstanding.  The Debtor has not investigated the validity and perfection of GECUSH's secured claim under the Loan Agreement.

      ii.      <u>Capital Contributions</u>

30.     After GECC's acquisition of WMC, GECC contributed over $800 million to WMC's mortgage loan origination operations in 2007 to satisfy regulatory capital requirements.  In addition, in 2014, GECC began making substantial capital contributions to WMC in connection with the settlement of outstanding claims asserted against WMC.  Over time, GECC and GECUSH (after December 2015) have made total capital contributions to WMC in the amount of approximately $1.3 billion relating to the settlement of these claims.  In September 2015, GECUSH also began to make capital contributions to WMC to be used for WMC's on-going operating expenses.   As of the Commencement Date, GECUSH had contributed a total of approximately $113 million for operating expenses.

iii.    <u>Other Intercompany Charges and Expenses</u>

31.    WMC currently has several insurance policies, including workers' compensation and various liability, property, and other insurance programs under a Commercial General Liability Policy issued by Electric Insurance Company ("**EIC**"), which is a subsidiary of GECUSH.   The Commercial General Liability Policy automatically renews every year on January 1.  Given that the insurance policies are managed by EIC, GECUSH receives a corporate allocation for the costs of insurance, which GECUSH historically charged back to WMC through intercompany accounts.   GECUSH has not charged back to WMC any insurance-related expenses since 2017.   Accordingly, there are no direct payments made from WMC to EIC relative to the insurance policies.

32.    WMC directly pays for items such as wages, rent (which includes utilities) for its corporate office in Woodland Hills, California, legal fees, and information service vendors.  There are minimal amounts outstanding as of the Commencement Date on account of such expenses.

E.    *The Debtor's Prepetition Indebtedness*

33.    Other than $435,865.21 in interest owing to GECUSH under the Loan Agreement, which remains subject to review by the Debtor, the Debtor does not currently have any secured, bank, or bond debt.  With the financial support that GE Capital provided WMC over the past decade, the Debtor has remained current on payment of all of its operating expenses such as wages, rent, and professional fees.  Accordingly, as of the Commencement Date, the Debtor's outstanding payables largely consist of approximately $93 million owed to GECUSH and its affiliates under various intercompany financing agreements, which includes the outstanding interest due under the Loan Agreement.  WMC has *de minimis* outstanding ordinary course payables.  In addition to these outstanding payables, parties might assert contingent,

unresolved liabilities relating to the operation of its mortgage origination business that are described generally below.

        F.     *The Debtor's Assets*

        34.     As of the Commencement Date, WMC has approximately $175,000 in cash or cash equivalents, which was funded by GECUSH to WMC pursuant to capital contributions. The majority of the Debtor's remaining assets consist primarily of the Potential Claims as well as WMC's right to certain recoveries available under certain settlement agreements entered into by and between WMC and certain counterparties.

**III.    Events Leading to the Chapter 11 Case**

        A.     *Outstanding Claims*

        35.     The possible claims that might be asserted in this case generally fall into three categories. *First*, there are claims made by trustees on behalf of RMBS trusts relating to alleged breaches of R&Ws for mortgage loans sold during the period from 2004 through 2007 (the "**RMBS Actions**"). As noted above, WMC has worked diligently to settle, and has settled, thirteen RMBS Actions during the past decade at a cost of approximately $870 million.[2] *Second*, WMC has received indemnification notices from certain trustees, purchasers, depositors, underwriters, and sponsors of RMBS ("**WMC Counterparties**") who have been sued or who believe they may be sued for (i) alleged misrepresentations in the securitization offering documents, (ii) mortgage loan repurchase claims made against RMBS sponsors, (iii) alleged breaches of contractual and/or statutory fiduciary duties of the RMBS trustees, and (iv) fees and costs arising from investigations by the DOJ. However, no lawsuit is pending on any such claim. *Third*, there are ongoing individual loan-level actions in which borrowers assert various claims

---

[2] As discussed in greater detail below, there is only one pending RMBS Action remaining against WMC which is stayed and subject to a proposed settlement.

against WMC alleging, among other things, that WMC made misrepresentations in connection with the origination of an individual mortgage, violated the Truth in Lending Act or the Real Estate Settlement Procedures Act, failed to properly assign, release or record a mortgage or deed of trust, and/or participated in improper foreclosures on homes.  Each category of claim is discussed in more detail below.

i.      Sole Remaining RMBS Action

36.     WMC is the sole defendant in litigation captioned *TMI Trust Company, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 (SABR 2006-WM2) v. WMC Mortgage LLC f/k/a WMC Mortgage Corp.*, No. 3:12-cv-01538-CSH (D. Conn. 2012), pending in the United States District Court for the District of Connecticut (the "**TMI Litigation**").  The complaint was filed on October 26, 2012.  Since that time, the TMI Litigation has consumed a substantial amount of the Debtor's time, focus, and limited resources.

37.     The TMI Litigation arises out of the securitization of a pool of approximately 5,000 mortgage loans deposited into the SABR-WM2 Trust.  The complaint, which has been prosecuted by TMI Trust Company in its capacity as separate trustee of SABR-WM2 Trust (the "**Separate Trustee**"), alleged that WMC had breached numerous R&Ws, failed to provide proper notification regarding the breaches of the R&Ws, and failed to repurchase the breaching loans despite due demand.  The Separate Trustee has asserted damages of approximately $980 million in the TMI Litigation.

38.     After several years of discovery and motion practice and multiple attempts at settlement, a bench trial began on January 16, 2018.  The presentation of evidence concluded on February 5, 2018, with closing arguments held on June 12, 2018.  After closing arguments, the Court took the matter under advisement.

14

39.     In January 2019, while the matter remained under advisement, WMC reached tentative agreement regarding a settlement supported by certificateholders owning 42% of the outstanding certificates in the SABR-WM2 Trust.  If accepted by the Separate Trustee, the settlement would resolve all of the claims in the TMI Litigation in exchange for a settlement payment of $198 million by WMC.  In February 2019, the Separate Trustee provided notice to all certificateholders of the proposed settlement amount and joined with WMC in requesting that the Court stay the proceedings to enable the parties to proceed with finalizing the settlement. The Court entered a stay which, after having twice been extended, will last until June 4, 2019, unless further extended.

40.     On April 4, 2019, WMC presented a proposed settlement agreement to the Separate Trustee for the Separate Trustee's review.  The Separate Trustee must accept or reject the proposed settlement on or before June 3, 2019 (unless that date is extended by WMC).  As part of its review process, the Separate Trustee provided a copy of the proposed agreement to all certificateholders and requested that holders who wish to express their views concerning whether the Separate Trustee should accept the proposed settlement do so no later than May 15, 2019. As set forth in the proposed settlement agreement, if the Separate Trustee accepts the proposed settlement agreement, WMC will be requesting that the Court enter certain findings concerning the settlement, which WMC intends to seek as part of the confirmation of the Debtor's chapter 11 plan.

ii.     <u>Indemnification Notices</u>

41.     WMC has also received indemnification notices from WMC Counterparties in connection with potential and actual lawsuits brought against such entities by RMBS investors.   In general, the indemnification notices arise from litigation and claims asserting alleged securities fraud, repurchase demands, and trustee breaches of duty.  The parties

15

who have asserted (or may assert) indemnification claims against the Debtor include large financial institutions that were engaged in the securitization business and were defendants in litigation regarding mortgage loans that were acquired from mortgage originators, including WMC. WMC believes that it has strong defenses to these indemnification demands, including defenses based upon the interpretation and application of the governing contracts, the failure of the parties to comply with contractual conditions including advance notification of such claims, strong public policy arguments that do not permit indemnification of such claims, and statutes of limitations. WMC intends to aggressively defend against any such indemnification claims filed in this chapter 11 case.

        iii.        <u>Loan-Level Litigation</u>

        42.      As of the Commencement Date, there were two loan-level cases pending where WMC is named defendant, seeking damages in the aggregate amount of approximately $3.65 million. These loan-level actions were filed by borrowers who allege, among other things, violations of the Truth in Lending Act, misrepresentation in connection with the origination process, unfair lending practices and related consumer protection acts, and wrongful foreclosure. Both actions were dismissed at the pleading stage. One action is currently on appeal and the other the subject of another motion to dismiss an amended complaint. Although WMC continues to successfully defend or otherwise settle numerous actions involving such claims over the past decade, litigation remains despite WMC's efforts to reach consensual settlements.

        B.      *Purpose of Chapter 11 Filing*

        43.      Since the discontinuation of its mortgage origination business approximately 12 years ago, WMC has made good faith efforts to resolve all of its liabilities. Despite exhaustive efforts to resolve its liabilities, it has become clear that there may be a number of disputed, contingent and unliquidated claims that parties might yet assert. In

16

addition, the proposed settlement of the TMI Litigation is a key aspect of this chapter 11 case. Given WMC's limited cash on hand and its inability to receive ongoing financial support from GECUSH to resolve these claims outside the confines of chapter 11 and the protections and finality it affords, WMC has determined that it is in its best interest to commence this chapter 11 case.  During the course of this chapter 11 case and with access to the DIP Facility, WMC expects, subject to this Court's oversight and approval, to resolve any disputed claims that may be filed, consummate the proposed settlement of the TMI Litigation and consummate the GE Settlement which will, among other things, provide for a distribution to WMC's creditors pursuant to a chapter 11 plan.

## IV.  First Day Pleadings

44.  Contemporaneously herewith, the Debtor has filed the following First Day Pleadings seeking orders granting various forms of relief intended to facilitate the efficient administration of this chapter 11 case:

- *Application of Debtor for Authority to Retain and Employ Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Commencement Date* (the "**Section 156(c) Application**")

- *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Continue (A) Maintaining Its Existing Bank Accounts and (B) Using Its Existing Business Forms; (II) Extending Time to Comply with 11 U.S.C. § 345(b); and (III) Granting Related Relief* (the "**Cash Management Motion**")

- *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Certain Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain and Honor Employee Medical and Other Benefit Programs and (II) Granting Related Relief* (the "**Wages Motion**")

- *Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtor to Obtain Post-petition Secured Super-Priority Financing, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* (the "**DIP Motion**")

I have reviewed each of the First Day Pleadings and the proposed orders together with the exhibits attached thereto, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings is vital to the Debtor to make the transition into, and operate in, the chapter 11 case with minimal disruption to its business or loss of productivity or value.  A description of the relief requested and the facts supporting each of the First Day Pleadings (other than the DIP Motion, which is addressed and discussed in detail in the *Declaration of Laureen M. Ryan in Support of the DIP Motion*) is set forth below.

A.    *Section 156(c) Application*

45.    By the Section 156(c) Application, the Debtor seeks entry of an order appointing Epiq Corporate Restructuring, LLC ("**Epiq**") as the claims and noticing agent for the Debtor in this chapter 11 case, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the chapter 11 case.  Epiq is an established chapter 11 administrator, with experience in noticing, claims administration, solicitation, balloting and other administrative aspects of chapter 11 cases.  Given the complexity of this case and the potential number of creditors and other parties in interest involved, I believe that appointing Epiq[3] as the claims and noticing agent in this chapter 11 case is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest.

B.    *Cash Management Motion*

46.    By the Cash Management Motion, the Debtor seeks entry of interim and final orders granting the Debtor (a) authority to continue using its existing bank accounts and business

---

[3] In accordance with this Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, Epiq was selected following the Debtor's competitive solicitation of three (3) separate proposals for potential claims and noticing agents.

forms, (b) a 30-day extension of time to comply with section 345(b) of the Bankruptcy Code, and (c) related relief.

47.    As detailed in the Cash Management Motion, prior to the Commencement Date, the Debtor maintained several bank accounts in the ordinary course of its business and an integrated cash management system (the "**Cash Management System**").    By the Cash Management Motion, the Debtor seeks authority to maintain its existing Cash Management System, including its existing bank accounts.  I believe that the Debtor's continued use of the Cash Management System will permit the Debtor to efficiently monitor and manage its cash receipts and disbursements and ensure a smooth transition into chapter 11.

48.    Additionally, the Debtor seeks authorization to continue using its correspondence and business forms, including, but not limited to, letterhead and checks, in the forms existing immediately prior to the Commencement Date, without reference to the Debtor's status as a debtor in possession.  However, in the event that the Debtor generates new checks during the pendency of this chapter 11 case other than from its existing stock of checks, the Debtor will include a legend on the new checks with the designation "Debtor-in-Possession" and the bankruptcy case number.  For checks that the Debtor or its agents print themselves, the Debtor will begin printing the "Debtor-in-Possession" legend and the bankruptcy case number on such checks within ten business days of the entry of the proposed interim order granting the Cash Management Motion.  I believe this relief is necessary in order to save the Debtor a potentially significant expense to order new business forms without any real attendant benefit to the Debtor and its stakeholders.

49.    The Debtor also seeks a 30-day extension of time to comply with section 345(b) of the Bankruptcy Code (to the extent that the Debtor is not already in compliance), without

prejudice to seek a further extension of time. Based upon the advice of counsel, I believe that the Debtor meets the factors for "cause" to extend the time to comply with such section; indeed, three of the four Bank Accounts are with Bank of America, N.A. which already is an authorized depository under the list maintained by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), and the other is with Deutsche Bank Trust Company Americas, a large, highly-rated financial institution. To ensure that there are no interruptions in the Debtor's ability to use its cash according to the Cash Management System, the Debtor requests a brief extension of the time to comply with section 345(b) so that the Debtor can work cooperatively with the U.S. Trustee.

50.     Accordingly, based on the foregoing as well as the additional reasons set forth in the Cash Management Motion, I believe that the relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest.

C.     *Wages Motion*

51.     By the Wages Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to (a) pay prepetition employee obligations, including wages, deductions, payroll taxes, and amounts owed under the Debtor's employee benefits programs, and (b) maintain and continue to honor the Debtor's prepetition employee wage and benefit programs as such programs were in effect as of the Commencement Date and as may be modified, amended, or supplemented from time-to-time in the ordinary course of business and pay any related administrative costs and obligations arising under such programs. Authorizing the Debtor to pay or honor prepetition wages, employee benefits, and similar obligations will benefit the Debtor's estate by allowing the Debtor to continue its business during this chapter 11 case without interruption.

52.     As discussed above, the Debtor currently employs ten full time employees.  In addition to such employees, the Debtor utilizes the services of one independent contractor.  The relief requested by the Wages Motion includes compensation for WMC's full time employees as well as the independent contractor, each of whom provides services related to the Debtor's operations and are vital to the Debtor's business.[4]  If the relief requested in the Wages Motion is not granted, the Debtor's employees and independent contractor may seek alternative opportunities.  The loss of any of the services provided by such individuals would hinder the Debtor's ability to meet its obligations, operate during the chapter 11 case, and carry out its chapter 11 strategy.

53.     The Debtor's employees rely on the Debtor's compensation and benefits to satisfy daily living expenses.  These employees will be exposed to significant financial difficulties and other distractions if the Debtor is not permitted to honor its obligations for any unpaid compensation and benefits, or costs related thereto.  Furthermore, if the Court does not authorize the Debtor to honor its various obligations under the employee benefit programs, the employees will not receive, as one example, health coverage and may become obligated to pay certain health care claims.  Additionally, employee attrition due to the loss of benefit programs would cause the Debtor to incur additional expenses to find appropriate replacements for lost employees, thereby potentially disrupting the Debtor's business at a critical juncture.

54.     Accordingly, based on the foregoing and the additional reasons set forth in the Wages Motion, I believe that the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest.

---

[4] As noted above, I was seconded from GECUSH to WMC in June of 2016.  As a seconded employee of GECUSH, I receive my salary and benefits directly from GECUSH.  Accordingly, by the Wages Motion, the Debtor is not seeking any relief with respect to the payment of my compensation and benefits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 23, 2019
       Woodland Hills, California

                                    */s/ Mark V. Asdourian*
                                    Mark V. Asdourian
                                    President, Chief Executive Officer, and General Counsel
                                    WMC Mortgage, LLC