## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

----------------------------------------------------------- x

*In re:*                              :      **Chapter 11**

                                        :

**WMC MORTGAGE, LLC,**          :      **Case No. 19–_____ (     )**

                                        :

                 **Debtor.**[1]       :

----------------------------------------------------------- x

## MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) PAY CERTAIN PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION AND (B) MAINTAIN AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFIT PROGRAMS AND (II) GRANTING RELATED RELIEF

WMC Mortgage, LLC, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), respectfully represents as follows in support of this motion (the "**Motion**"):

### Background

1.      On the date hereof (the "**Commencement Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor is authorized to continue to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

2.      The Debtor commenced this chapter 11 case to develop a chapter 11 plan that will provide for an equitable distribution to its creditors, most of which hold contingent and unliquidated claims relating to the Debtor's former residential mortgage loan origination business.

---

[1]  The last four digits of the Debtor's federal tax identification number are 2008.  The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

3.     Information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this chapter 11 case is set forth in the *Declaration of Mark V. Asdourian in Support of the Debtor's Chapter 11 Petition and Related Requests for Relief* (the "**Asdourian Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

### Jurisdiction and Venue

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     Pursuant to rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### Relief Requested

6.     By this Motion, the Debtor requests entry of interim and final orders, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtor to (i) pay, in its sole discretion, all prepetition amounts owed under or related to, among other things, the Debtor's Compensation Obligations, Deductions, Payroll Taxes, ADP Service Fees, Employee Benefit Programs, and Other Employee Programs (each as defined below and, together with all fees, costs, and expenses incident thereto, collectively, the "**Employee**

**Obligations**") and (ii) maintain and continue to honor its prepetition practices, programs, and policies for its Employees (as defined below) (collectively, the "**Employee Wage and Benefit Programs**") as such Employee Wage and Benefit Programs were in effect as of the date hereof and as such may be modified, amended, or supplemented from time-to-time in the ordinary course of business and pay any related administrative costs and obligations arising thereunder.

7.    The Debtor further requests that the Court authorize all applicable banks and financial institutions (collectively, the "**Banks**") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the Employee Obligations to the extent directed by the Debtor in accordance with this Motion, provided that the Debtor has sufficient funds standing to its credit with such Banks, whether such checks were presented or electronic requests were submitted before or after the Commencement Date, and that all such Banks be authorized to rely on the Debtor's designation of any particular check or electronic payment request as appropriate pursuant to this Motion, without any duty of further inquiry and without liability for following the Debtor's instructions.

8.    A proposed form of order granting the relief requested by this Motion on an interim basis is attached hereto as **Exhibit A** (the "**Proposed Interim Order**").

**Debtor's Employees and Employee Obligations**

**I.    Debtor's Employees**

9.    As of the Commencement Date, the Debtor employs ten (10) full-time employees who are all in active status (the "**Employees**").  The Employees perform a variety of critical functions and services for the Debtor, including tasks pertaining to management, operations, human resources, information technology, legal, and finance and accounting.   As of the Commencement Date, none of the Employees is represented by a union.

10.     In addition to the Employees, the Debtor utilizes the services of one independent contractor and one individual seconded from GE Capital US Holdings, Inc. ("**GECUSH**").  The independent contractor is a former employee of the Debtor who currently is employed by CompuCom Systems Inc. ("**CompuCom**"), an information technology service management company.  The independent contractor assists the Debtor with IT-related matters and is available on-site to provide troubleshooting for the Employees.  The seconded individual is Mark V. Asdourian, the Debtor's President, Chief Executive Officer, General Counsel, and one of the Debtor's directors.  He receives his salary directly from GECUSH and participates in all employee benefits afforded to executive band employees of GECUSH.

## II.    Employee Obligations

11.     Each of the components of the Employee Obligations is described in further detail below.  The Debtor estimates that, as of the Commencement Date, the aggregate amount of prepetition Employee Obligations is approximately $12,700, all of which will come due within the first thirty (30) days of this chapter 11 case.  By this Motion, the Debtor is not seeking authority to pay any amount in excess of the statutory priority caps imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  The various components and approximate amounts of Employee Obligations, each of which are discussed in further detail below, are summarized in the following chart.

| Category | Prepetition Amount Debtor is Seeking Authority to Pay on Interim Basis | Prepetition Amount Debtor is Seeking Authority to Pay on Final Basis |
|---|---|---|
| Compensation Obligations | $9,500 | $9,500 |
| Deductions | $0 | $0 |
| Payroll Taxes | $3,200 | $3,200 |
| ADP Service Fees | $0 | $0 |
| Employee Benefit Programs | $0 | $0 |
| Other Employee Programs | $0 | $0 |
| **Total Employee Obligations** | **$12,700** | **$12,700** |

### A.    Compensation Obligations

12.    In the ordinary course of business, the Debtor incurs and pays obligations relating to the Employees' wages and salaries (the "**Compensation Obligations**").    As of the Commencement Date, all of the Debtor's Employees are paid an annual salary and receive wages in bi-weekly payments (*i.e.*, twenty-six (26) pay periods per year).    Additionally, the Debtor pays CompuCom $8,200 per month for the services of the independent contractor.    On average, the Debtor's gross payroll is $1,250,000 annually or approximately $104,167 per month.

13.    As of the Commencement Date, the Debtor estimates that the amount of accrued, but unpaid, Compensation Obligations is approximately $9,500.    By this Motion, the Debtor seeks authority to continue paying Compensation Obligations in the ordinary course of business and to pay any prepetition amounts owed in full.

### B.    Bonus Program

14.    In addition to paying Employees' wages and salaries, the Debtor has historically maintained an incentive bonus program for its Employees (the "**Bonus Program**").    The Bonus Program has varied annually and has generally been paid in the year following the year that the bonus was earned.    The Debtor does not owe any accrued and unpaid amounts on account of the Bonus Program and does not intend to continue the Bonus Program.

RLF1 21145693v.1

**C.** **Gross Pay Deductions, Government Withholdings, and Payroll Taxes**

15.     The Debtor routinely deducts certain amounts from each Employee's gross payroll, including deductions payable pursuant to certain of the Employee Benefit Programs (as defined herein), such as an Employee's share of medical, dental, and vision insurance premiums, 401(k) elected contributions and loan payments, and certain elected life insurance, and may also be required to deduct for various garnishments (collectively, the "**Deductions**").  The Deductions are taken from the Employees' bi-weekly paychecks and are either remitted by the Debtor to the appropriate third-party recipients or credited to the Debtor's operating account as a reconciliation of amounts pre-paid by the Debtor for the Employee Benefit Programs.  On average, the Debtor deducts approximately $7,500 in Deductions per bi-weekly pay period.  The Debtor may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Commencement Date.

16.     In addition to the Deductions, the Debtor is required by federal and state law to withhold from Employees' salaries and wages certain amounts related to federal, state, and local income taxes, Social Security taxes, and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit any such withheld amounts to the appropriate taxing authorities.  The Debtor is also required to make certain additional payments from its own funds in connection with the Withholding Taxes, which include matching payments on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll, additional amounts owed to taxing authorities for, among other things, state and federal unemployment insurance (the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Taxes**").  Approximately two business days before each bi-weekly payment of the Debtor's Compensation Obligations, the Debtor pre-funds all Payroll Taxes to Automatic Data Processing, Inc. ("**ADP**"), which remits such amounts directly to the appropriate taxing authorities.  In the aggregate,

6

including both the Employee and employer portions, the Payroll Taxes total approximately $16,000 per bi-weekly pay period.  As of the Commencement Date, the Debtor believes that it is in possession of two days' Payroll Taxes that will be due in the amount of $3,200.

17.     To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients, the Debtor seeks authority to forward prepetition Deductions and Payroll Taxes (and to continue to forward Deductions and Payroll Taxes on a post-petition basis whether or not related to the prepetition period) to ADP, for payment as described below, or the applicable third-party recipients in the ordinary course of business and consistent with past practice.

### D.     Payroll Servicers

18.     To efficiently manage the processing and payment of the various obligations described above, the Debtor uses ADP in the ordinary course of business to provide payroll processing, tax computation, payment preparation, and certain other administrative services related to payroll and employee plans, benefits, policies, and programs.  Each payroll period, the Debtor funds its disbursement accounts at Bank of America, N.A. with the amounts necessary to satisfy the Compensation Obligations and Payroll Taxes, respectively.  The Debtor's human resources and payroll manager then provides information to ADP with respect to all of the payroll obligations owed to the Employees in advance of each bi-weekly pay period, and ADP processes payments to the Employees via check or direct deposit based upon the Employees' elections, as well as to the appropriate third-party recipients of the Payroll Taxes.  Accordingly, ADP is responsible for ensuring that (i) the Employees are paid on time, (ii) appropriate Deductions are made, (iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to the applicable taxing authorities and other third-party payees.

19.    The Debtor pays ADP approximately $1,700 per month for such services (the "**ADP Service Fees**").  The Debtor also pays ADP for recurring quarterly and annual tax reporting services.  Quarterly tax reporting services cost approximately $180 per quarter and are paid by the Debtor in the month following the end of each quarter for which the services were rendered.  Annual tax reporting services cost approximately $300 per year and are paid by the Debtor each January following the year for which the services were rendered.  As of the Commencement Date, the Debtor estimates that it does not owe any amounts on account of ADP Service Fees.

## III.    Severance Program

20.    In its normal course of operations, the Debtor had a general practice of paying severance to certain employees (the "**Severance Program**").  To be eligible for the Severance Program, Employees must have completed a minimum of six months of continuous service, have their employment be involuntarily terminated by the Debtor for reasons other than for cause (*e.g.*, job elimination, reduction in work force, or reorganization), and sign a general release agreement.  Eligible Employees (defined herein) receive severance payments based on the Debtor's benefits schedule in effect as of the date of the termination of their employment.  Since the year 2000, the benefits schedule in effect for the Severance Program has provided for the following: (i) for Employees who have been employed by the Debtor for at least six months but less than five years, severance equal to one-week's salary per year of employment; (ii) for Employees who have been employed by the Debtor for at least five years but less than 15 years, severance equal to two-weeks' salary plus one additional week per each year of employment; (iii) for Employees who have been employed by the Debtor for at least 15 years but less than 25 years, severance equal to five-weeks' salary plus one additional week per each year of employment; and (iv) for Employees who have been employed by the Debtor for 25 or more

8

years, severance equal to eight-weeks' salary plus one additional week per each year of employment.

21.      On December 3, 2018, the Employees entered into a letter agreement with GECUSH which provided that GECUSH fully pay an advance of all amounts that the Employees would be eligible to receive under the Severance Program through November 30, 2018, even though the Employees would not ordinarily have become entitled to such payments until the termination of their employment.   Thereafter, on December 4, 2018, the Debtor's board of directors terminated the Severance Program in light of the Debtor having no further obligations thereunder.   On January 9, 2019, GECUSH remitted the advance to all of the Employees. Accordingly, the Debtor does not seek any relief by this Motion with respect to the Severance Program.   Additionally, although the Severance Program payments were paid directly by GECUSH, GECUSH has waived any repayment obligation by the Debtor for such payments and, therefore, no intercompany liability otherwise exists as between the Debtor and GECUSH on account thereof.

## IV.      **Employee Benefit Programs**

22.      In the ordinary course of business, the Debtor maintains various employment benefit plans and policies.   These benefit plans and policies fall within the following categories: (i) medical, dental, and vision benefits; (ii) life insurance, accidental death and dismemberment ("**AD&D**") insurance, supplemental life insurance, and short-term disability insurance; (iii) 401(k) plan benefits; and (iv) certain other miscellaneous benefits (collectively, the "**Employee**

**Benefit Programs**").[2]  The Employee Benefits Programs are available to all Employees (the "**Eligible Employees**" and, with respect to each program they participate in, the "**Program Participants**").  The average annual cost for the Employee Benefits Programs is approximately $225,000.  As of the Commencement Date, the Debtor estimates that it does not owe any amounts on account of prepetition obligations under the Employee Benefit Programs.

23.     The Debtor seeks authority, in the exercise of its discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of business and consistent with past practice, relating to the Employee Benefit Programs, subject to the Debtor's rights, if any, to modify or discontinue any Employee Benefit Program to reduce applicable costs or the benefits provided thereunder.

### A.     Health Care Plans

24.     Eligible Employees can participate in Employee Benefit Programs providing medical insurance coverage (the "**Medical Plans**"), dental insurance coverage (the "**Dental Plans**"), and vision insurance coverage (the "**Vision Plan**" and, together with the Medical Plans and Dental Plans, the "**Health Care Plans**").

25.     The Medical Plans are provided and administered by Blue Cross Blue Shield ("**Blue Cross**") and Kaiser Permanente ("**Kaiser**").  Blue Cross offers the choice of preferred provider organization ("**PPO**") or health maintenance organization ("**HMO**") health care plans, while Kaiser only offers an HMO plan.  The Debtor's contributions under the Medical Plans are generally remitted to Blue Cross and Kaiser on the first day of each month.  The Program

---

[2]  The Employee Benefit Programs that the Debtor seeks authority to continue do not include any paid vacation days or personal time off.  Prior to the Commencement Date, the Debtor switched from a system under which the Employees accrued vacation days and personal time off to a "permissive time off" policy (the "**PTO Policy**").  Under the PTO Policy, Employees may take as much paid time off as needed, subject to approval by the Debtor and satisfaction of their job duties.  Under this system, Employees do not accrue vacation days or personal time off, and no time off rolls over from year to year.  The Debtor intends to continue such policy in the ordinary course of business from and after the Commencement Date.

Participants' contributions are deducted from their bi-weekly payroll payments and transferred to the Debtor's operating account for remittance to the third-party insurance providers on the first of the following month, all as more fully described below.  In the aggregate, the Debtor pays approximately $17,000 per month for premium payments on account of the Medical Plans.

26.     The Dental Plans are fully insured and administered by Aetna.  The Program Participants' contributions are deducted from their bi-weekly payrolls and remitted to Aetna on a monthly basis.  Employees have two options for Dental Plans provided by Aetna.  The first option is the dental maintenance option ("**DMO**") plan.  Under the DMO plan, Employees have lower costs but more limited choices for dentists.  The second option is the PPO plan.  Under the PPO plan, Employees have higher costs but may choose any dentist.  The Dental Plans provide coverage for preventive, basic, and major dental procedures.  The Debtor pays approximately $1,200 per month for premium payments on account of the Dental Plans.

27.     The Vision Plan is fully insured and administered by Davis Vision.  The Debtor pays approximately $95 per month for premium payments on account of the Vision Plan.  Program Participants' contributions are deducted from their bi-weekly payroll and remitted to Davis Vision on a monthly basis.

28.     In the aggregate, the Debtor pays approximately $18,295 per month for premiums under the Health Care Plans, which includes the Debtor's contributions of approximately $15,295 and the Program Participants' contributions of approximately $3,000.  Such amounts are generally remitted on the first day of each month.  The Debtor estimates, based on historical obligations and withholdings that, as of the Commencement Date, it does not owe any amounts on account of prepetition premiums and funds in connection with the Health Care Plans.

29.     As required under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Debtor's Medical Plans and Dental Plans are also available to certain former Employees.  Any Employee who is enrolled in the Medical Plans, Dental Plans, and/or Vision Plans at the time such Employee's employment is terminated (other than for gross misconduct or whose coverage would end as a result of a reduction in hours so as to no longer qualify) is eligible to continue his/her Medical Plan and/or Dental Plan for up to 18 months provided that there are still Employees enrolled to support such plans.  If there are no longer active Employees, then the Medical Plans and/or Dental Plans automatically terminate and COBRA cannot be offered.  The Debtor provides payment directly to such Employees equal to two months of continued coverage under COBRA for the Employees' Medical Plans and/or Dental Plans should the Employees be terminated other than as excepted above, and the terminated Employees then pay the full cost of the continued coverage to the Debtor's third-party COBRA administrator for the continued coverage.  The Debtor's COBRA administration is provided by Zenith American Solutions, and the Debtor estimates that the two-month COBRA payment equals approximately $3,800 per employee.

30.     The Debtor has no former employees that are currently receiving COBRA benefits for which the Debtor would be obligated to pay.  The Debtor requests authority to continue its policy of paying for two months of COBRA benefits to any Employee whose employment is terminated without cause.

### B.      Life Insurance Plans and the Short-Term Disability Plan

31.     The Debtor provides Eligible Employees with basic life and AD&D insurance coverage, in each case equal to one times the Employees' annual earnings rounded up to the next

highest $1,000 (up to a maximum of $200,000)[3] (the "**Basic Life and AD&D Plan**"), at no cost

to the Employees.  Coverage under the Basic Life and AD&D Plan is reduced by 35% when

Employees reach the age of 65, and further reduced to 50% of the original coverage when

Employees reach the age of 70.  The Employees can also elect to purchase additional insurance

coverage plans (the "**Supplemental Insurance Plans**" and, together with the Basic Life and

AD&D Plan, the "**Life Insurance Plans**") for both themselves and their children and spouses.

The Supplemental Insurance Plans include coverage equal to one times the Employees' annual

earnings rounded up to the next highest $1,000 for both life and AD&D (up to a maximum of

$500,000).  The Employees pay 100% of the premiums for all elected coverage under the

Supplemental Insurance Plans.

32.    The Life Insurance Plans are provided by Metropolitan Life Insurance Company

("**MetLife**"), and Employees must be active and working at least 25 hours per week to be

eligible for them.  The Debtor pays approximately $1,500 per month directly to MetLife in

premiums for the Basic Life and AD&D Plan.  Premiums for the Supplemental Insurance Plans

are deducted from the Program Participants' bi-weekly payroll payments and then transferred by

the Debtor to the insurance provider.  Approximately $900 per month is withheld in Employee

contributions for the Supplemental Insurance Plans.

33.    The Debtor also provides Eligible Employees with short-term disability coverage

(the "**Short-Term Disability Plan**") through Unum Life Insurance Company of America

("**UNUM**").  Eligibility for the Short-Term Disability Plan begins on the first day of an

Employee's employment.  When a valid claim is made, the Short-Term Disability Plan provides

---

[3]  Four Employees who elected their coverage amounts prior to 2001 were entitled to elect coverage in excess of
their annual earnings, up to a maximum of $1,000,000.  While Employees can no longer elect basic life and AD&D
coverage in excess of their annual earnings, the Debtor continues to honor and pay for the coverage amounts elected
by these four Employees prior to 2001.

60% of weekly earnings, up to a maximum benefit of $1,380 per week for a maximum payment period of 13 weeks. The Debtor pays for 100% of the monthly premium payments for the Short-Term Disability Plan, with no contribution from the Employees. The Debtor pays UNUM approximately $300 in monthly premium payments.

34.     As of the Commencement Date, the Debtor pays approximately $1,800 monthly in premiums, including $900 representing withheld Employee contributions, in connection with the Life Insurance Plans, the Supplemental Insurance Plans, and the Short-Term Disability Plan. The Debtor does not believe that it owes any amounts on account of prepetition premiums and Employee contributions in connection with the Life Insurance Plans and the Short-Term Disability Plan.

### C.     401(k) Savings Plan

35.     The Debtor maintains a defined contribution plan for the benefit of all Employees meeting the requirements of section 401(a) and 401(k) of the Internal Revenue Code  (the "**401(k) Savings Plan**"). Employees 21 years of age or older who work 25 hours or more per week and have completed at least one and a half (1.5) months of employment are eligible to participate in the 401(k) Savings Plan. In total, the 401(k) Savings Plan has 202 participants, ten of which are the Employees and 192 of which are former employees. The 401(k) Savings Plan held approximately $14,800,000 in contributions as of April 11, 2019.

36.     The 401(k) Savings Plan is primarily funded with withholdings from Employee wages and salaries, which the Debtor manages. The 401(k) Savings Plan is implemented pursuant to the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Employees contribute to the 401(k) Savings Plan on a pre-tax basis. Historically, the Debtor matched $0.50 per every $1.00 of the Employees' contributions up to 7% of eligible earnings, subject to regulations of the Internal Revenue Service. Under the 401(k) Savings Plan, the

14

Debtor's matching contribution is discretionary and was made on an annual basis in the first quarter of each year.  The Debtor does not expect to make any further discretionary contributions.

37.     Employees can request and receive distributions under the 401(k) Savings Plan after their employment with the Debtor has ended.  Further, active Employees may request a hardship distribution, which will be paid if the request satisfies certain criteria.

38.     The 401(k) Savings Plan is not guaranteed, but it does have a liability policy for $25,000,000 in coverage.  The liability policy is required under ERISA and insures against losses to the 401(k) Savings Plan caused by fraud or dishonesty of the administrators of the 401(k) Savings Plan.  The premium for the policy is funded by GECUSH.

39.     As of the Commencement Date, the Debtor does not believe that it has any obligation to make any prepetition 401(k) Savings Plan contributions.  Accordingly, the Debtor seeks authority to continue to honor its obligations under the 401(k) Savings Plan in the ordinary course of business.

**D.     Other Employee Programs**

40.     In addition to the foregoing, the Debtor has certain other practices, programs, and policies that provide benefits to its Employees, including leave pursuant to the Family Medical Leave Act (the "**Other Employee Programs**").  The Debtor intends to continue and honor such practices, programs, and policies after the Commencement Date, and such practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtor's business.

*i.       60-Day Working/Non-Working Payment*

41.     The Debtor also offers its Employees a 60-day transitional program, which provides that Employees must be given thirty (30) days' notice of their employment termination

15

and that any such Employees must be on call to work for an additional thirty (30) days following the initial thirty (30) day notice period.  Thus, Employees are typically notified well in advance of when they are being laid off and of when the sixty (60) day notice period will begin. Employees must provide the Debtor with notice of their intent to take advantage of this program, the purpose of which is to provide the Employees with time to begin their new job search and to shop for replacement insurance while they wind down their job responsibilities with the Debtor. At the end of the sixty (60) day period, employment is terminated and all benefits associated with the Employee's employment are cut off.

42.     As of the Commencement Date, the Debtor believes that there is no accrued but unpaid balance owing for 60-day transition payments (the "**Transition Payments**").  The Debtor requests authority to continue providing the Transition Payments in the ordinary course.

ii.     *Outplacement Services*

43.     The Debtor also offers certain outplacement services to its Employees who have lost or will be losing their jobs to help the Employees quickly find new jobs (the "**Outplacement Services**").  The Outplacement Services are paid for by the Debtor and provided by Lee Hecht Harrison, an independent provider who works directly and confidentially with the Employees. The program provides Employees with thirty (30) days of Outplacement Services such as resume assistance, career coaching, interview preparation, skill development, referral to hiring managers, and targeted job placement following employment termination or when employment termination is forthcoming.  In order to be eligible to receive Outplacement Services, Employees must have completed a minimum of six (6) months of continuous service, have their employment be involuntarily terminated by the Debtor for reasons other than cause (*e.g.*, job elimination, reduction in work force, or reorganization), and sign a general release agreement.

44.     As of the Commencement Date, the Debtor believes that there is no accrued but unpaid balance owing for Outplacement Services.  The Debtor requests authority to continue providing the Outplacement Services in the ordinary course of business.

iii.     *Retention Payments*

45.     In 2014 and 2015, the Debtor entered into retention letters with the Employees that entitled them to receive retention payments in several installments, the last of which was deemed earned and vested but would not be paid until the termination of the Employees' employment with the Debtor without cause.  Prior to the Commencement Date, GECUSH prepaid the remaining award payments, subject to each Employee's continued employment with the Debtor until November 30, 2019, and certain other terms and conditions.  Accordingly, the Debtor has no further obligations under the 2014 and 2015 retention letters.  Additionally, before the Commencement Date, GECUSH paid additional retention bonuses to certain Employees, subject to such Employees' continued employment with the Debtor through the chapter 11 case and other terms and conditions.

46.     GECUSH's prefunding of the retention payments is described herein for disclosure purposes only; the Debtor is not seeking any affirmative relief with respect to such payments.  Moreover, although the retention payments were paid directly by GECUSH, GECUSH has waived any repayment obligation by the Debtor for such payments and, therefore, no intercompany liability otherwise exists as between the Debtor and GECUSH on account thereof.

**Basis for Relief Requested**

**I.     Certain Employee Obligations are Entitled to Priority Treatment**

47.     Under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave

17

pay," that are "earned within 180 days before" the date on which a debtor's chapter 11 case is commenced are afforded priority unsecured status up to $13,650 per individual.  Similarly, section 507(a)(5) of the Bankruptcy Code provides that employees' claims for contribution to certain employee benefit plans are also afforded priority unsecured status to the extent of $13,650 per employee covered by such plans, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.

48.    The Debtor believes that a substantial portion of the Employee Obligations constitute priority claims under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  As priority claims, such Employee Obligations must be paid in full before any general unsecured obligations of the Debtor may be satisfied.  Additionally, the Employer Payroll Taxes generally give rise to priority claims under section 507(a)(8) of the Bankruptcy Code and, therefore, payment of such obligations would not prejudice other creditors.  Accordingly, the relief requested herein likely may affect only the timing of the payment of a substantial portion of the Employee Obligations and should not prejudice the rights of the Debtor's general unsecured creditors.

## II.    Payment of Certain Employee Obligations and Maintenance of Certain Employee Benefit Programs are Required by Law

49.    The Debtor also seeks authority to pay the Deductions and the Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Deductions, including contributions to the Employee Benefit Programs, are not property of the Debtor's estate because they have been withheld from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).  Further, federal and state laws require the Debtor and its officers to make certain tax payments that have been

18

withheld from its Employees' paychecks. *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between the debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich.* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and the Payroll Taxes are not property of the Debtor's estate, the Debtor requests that the Court authorize it to transmit such amounts to the proper parties in the ordinary course of business.

### III. The Payment of Employee Obligations is Also Warranted Under Sections 105(a) and 363(b) of the Bankruptcy Code and the Doctrine of Necessity

50.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).   Under section 363(b) of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for so doing. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

51.    In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein under the doctrine of necessity.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

52.    Under section 105(a) and the doctrine of necessity, the bankruptcy court may exercise its broad grant of equitable powers to permit the payment of prepetition obligations when such payment is essential for the orderly administration of the debtor's chapter 11 case.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to the confirmation of a reorganization plan).

53.    The relief requested by this Motion represents a sound exercise of the Debtor's business judgment, is necessary to avoid immediate and irreparable harm to the Debtor's estate, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  Authorizing the Debtor to pay prepetition wages, employee benefits, and similar items will benefit the Debtor's estate and its creditors by allowing the Debtor to maintain the status quo while administering its chapter 11 case.

54.     Failure to satisfy the prepetition obligations set forth herein will jeopardize Employee morale and loyalty.  The majority of the Debtor's Employees rely exclusively on their compensation and benefits to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtor is not permitted to honor its Compensation Obligations and obligations related to the Employee Benefit Plans. Furthermore, if the Court does not authorize the Debtor to honor its various obligations under the Health Care Plans, Life Insurance Plans, or the Short-Term Disability Plan, the Employees will not receive appropriate coverage and, thus, may become obligated to pay certain health care and related claims.  The loss of such coverage will result in considerable anxiety for the Employees (and likely attrition) at a time when the Debtor needs such Employees to perform their jobs and maintain the status quo.

55.     Indeed, without the relief requested herein being granted, the Debtor's Employees may seek alternative opportunities.  The loss of Employees, who have critical historical information about the Debtor's past operations, would deplete the Debtor's already lean workforce, thereby hindering the Debtor's ability to orderly administer its chapter 11 case.  Such disruption may prolong the chapter 11 case, to the detriment of the Debtor's creditors.

## IV.    Cause Exists to Authorize Debtor's Financial Institutions to Honor Checks and Electronic Fund Transfers

56.     Under the Debtor's existing cash management system, the Debtor can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the obligations discussed herein.  Accordingly, the Debtor believes that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that the Court should authorize and direct all applicable financial institutions, when requested by the Debtor, to receive, process, honor, and pay any and all checks or wire transfer requests in

respect of the relief requested herein, solely to the extent that the Debtor has sufficient funds standing to its credit with such financial institution, and authorize such financial institutions to rely on the representations of the Debtor without any duty of further inquiry and without liability for following the Debtor's instructions.

57.      Based upon the foregoing, the Debtor submits that the relief requested herein is necessary, appropriate, and in the best interest of the Debtor's estate and its creditors and, therefore, should be granted.

## Reservation of Rights

58.      Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtor, (b) a waiver of the Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtor, (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtor and any third party under section 365 of the Bankruptcy Code.

## Bankruptcy Rule 6003(b)

59.      Bankruptcy Rule 6003(b) provides that, except to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court shall not issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the filing of the petition.  As described above and in the Asdourian Declaration, the Debtor would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtor submits that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003(b) is satisfied.

RLF1 21145693v.1

### **Bankruptcy Rule 6004(a) and (h)**

60.     To implement the foregoing successfully, the Debtor requests that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and that the Court waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As explained above and in the Asdourian Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and granting a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### **Notice**

61.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware (Attn: Linda Richenderfer, Esq.); (b) the holders of the twenty (20) largest unsecured claims against the Debtor; (c) the Securities and Exchange Commission; (d) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: William Barr); (e) the Internal Revenue Service; (f) the United States Attorney's Office for the District of Delaware; (g) attorneys for GECUSH, Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq. and Jacqueline Marcus, Esq.); and (h) any other party entitled to notice pursuant to Local Rule 9013–1(m) (collectively, the "**Notice Parties**").

62.     The Debtor respectfully submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice is required.

23

**No Prior Request**

63.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

WHEREFORE the Debtor respectfully requests entry of the Proposed Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: April 23, 2019
       Wilmington, Delaware

/s/ Russell C. Silberglied

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email: collins@rlf.com
       silberglied@rlf.com
       heath@rlf.com
       shapiro@rlf.com
       schlauch@rlf.com

*Proposed Attorneys for the Debtor
and Debtor in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

---------------------------------------------------------- x
*In re:*                                                :    **Chapter 11**
                                                        :
**WMC MORTGAGE, LLC,**                                  :    **Case No. 19–_____ (      )**
                                                        :
            **Debtor.**[1]                              :    Re: Docket No. _____
---------------------------------------------------------- x

### INTERIM ORDER (I) AUTHORIZING DEBTOR TO (A) PAY CERTAIN PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION AND (B) MAINTAIN AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFIT PROGRAMS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of WMC Mortgage, LLC, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, for the entry of an interim order (this "**Interim Order**") (i) authorizing the Debtor to (a) pay prepetition wages, salaries, and other compensation, taxes, withholdings, and related costs and (b) pay and honor obligations relating to employee health care, life insurance, and other benefits programs on a post-petition basis, and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties; and such notice having been adequate and appropriate under the circumstances and it appearing that no other or

---

[1] The last four digits of the Debtor's federal tax identification number are 2008. The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Asdourian Declaration, and the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtor, its estate, its creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtor is authorized, but not directed, to (i) pay, in its sole discretion, all prepetition amounts owed under or related to the Debtor's Compensation Obligations, Deductions, Payroll Taxes, ADP Service Fees**,** Employee Benefit Programs, and Other Employee Programs, (ii) maintain and continue the Employee Wage and Benefit Programs as such were in effect as of the Commencement Date and as such may be modified, amended, or supplemented from time-to-time in the ordinary course of business, and (iii) honor any related administrative costs and obligations arising thereunder; in each case, in an aggregate amount not to exceed $12,700 before the final hearing on the Motion for all amounts paid under this Interim Order relating to obligations incurred prior to the Commencement Date.

3.      For the avoidance of doubt, the Debtor is authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Employee Obligations.

2

4.      Notwithstanding any other provision of this Interim Order, pending entry of a final order, nothing in this Interim Order shall authorize the Debtor to make any payment to or on behalf of any Employee on account of wages and other compensation obligations in excess of the statutory caps set forth in sections 507(a)(4) and (5) of the Bankruptcy Code.

5.      Nothing in this Interim Order authorizes any payment subject to section 503(c) of the Bankruptcy Code including, for the avoidance of doubt, payment of any severance obligations to or on behalf of any "insider" (as defined by section 101(31) of the Bankruptcy Code).

6.      In accordance with this Interim Order (or other order of the Court), each of the financial institutions at which the Debtor maintains its accounts relating to the payment of the obligations described in the Motion is authorized to (i) receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtor related thereto, to the extent that sufficient funds are on deposit in those accounts and (ii) accept and rely on all representations made by the Debtor with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of the Court, whether such checks, drafts, wires, or transfers are dated prior to, on, or subsequent to the Commencement Date, without any duty to inquire otherwise.

7.      The Debtor is authorized, but not directed, to issue new post-petition checks, or effect new electronic funds transfers, on account of prepetition obligations and claims as set forth herein, and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtor's chapter 11 case.

8.      Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as

(i) an admission as to the validity of any claim against the Debtor, (ii) a waiver of the Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtor, (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtor and any third party under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

9.      The requirements of Bankruptcy Rule 6003(b) have been satisfied.

10.     Notice of the Motion meets the requirements under Bankruptcy Rule 6004(a), or such requirements are otherwise deemed waived.

11.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

12.     The Debtor is authorized to take all action necessary to implement the relief granted by this Interim Order.

13.     The Final Hearing to consider the relief requested in the Motion shall be held on _____, 2019 at _____ **(Prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (a) the proposed attorneys for the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn:  Russell C. Silberglied, Esq. and Zachary I. Shapiro, Esq.); (b) the Office of the United States Trustee for the District of Delaware (Attn: Linda Richenderfer, Esq.); (c) attorneys for GECUSH, Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq. and Jacqueline Marcus, Esq.); and

(d) counsel for any statutory committee(s) appointed in this chapter 11 case; in each case, so as to be actually received **prior to 4:00 p.m. (Prevailing Eastern Time) on _____, 2019**.

14.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

Dated: _____, 2019
         Wilmington, Delaware

                                        _____
                                        THE HONORABLE _____
                                        UNITED STATES BANKRUPTCY JUDGE

5