## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

*In re:*                                          :          **Chapter 11**
                                                  :
**WMC MORTGAGE, LLC,**                            :          **Case No. 19–_____ (     )**
                                                  :
**Debtor.**[1]                                    :
                                                  :
------------------------------------------------------------ x

### DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION SECURED SUPER-PRIORITY FINANCING, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF

WMC Mortgage, LLC, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), files this motion (this "**Motion**"), respectfully requesting entry of an interim order in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order (the "**Final Order**," and together with the Interim Order, collectively, the "**DIP Orders**"): (i) authorizing the Debtor to enter into that certain *Debtor-In-Possession Credit and Security Agreement* by and among the Debtor, as borrower, and GE Capital US Holdings, Inc., as lender ("**GECUSH**" or the "**DIP Lender**"), substantially in the form attached hereto as **Exhibit B** (the "**DIP Agreement**" and any other documents or instruments related to the DIP Agreement, collectively the "**DIP Documents**")[2] to obtain post-petition financing in an aggregate amount not to exceed $25 million, including an interim borrowing of up to $1.75 million (the "**DIP Facility**"); (ii) modifying the automatic stay; (iii) scheduling a hearing to consider the relief requested herein on a final basis (the "**Final Hearing**"); and (iv) granting related relief.

---

[1] The last four digits of the Debtor's federal tax identification number are 2008.  The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim Order, the DIP Documents, the Ryan Declaration (as defined below) or the Asdourian Declaration (as defined below), as applicable.

In support of this Motion, the Debtor submits the (i) *Declaration of Laureen M. Ryan in Support of Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 363 and 364 (I) Authorizing the Debtor to Obtain Post-Petition Secured Super-Priority Financing, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* (the "**Ryan Declaration**"), and (ii) *Declaration of Mark V. Asdourian in Support of the Debtor's Chapter 11 Petition and Related Requests for Relief* (the "**Asdourian Declaration**"), each filed with the Court contemporaneously herewith and incorporated herein by reference, and respectfully states as follows:

## Background

### A.    General Background

1.    On the date hereof (the "**Commencement Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor is authorized to continue to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

2.    Additional information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this chapter 11 case is set forth in the Asdourian Declaration.

### B.    The Debtor's Corporate Structure

3.    The Debtor is the only debtor in this chapter 11 case, and is a Delaware limited liability company.  GECUSH is a Delaware corporation and the sole member of the Debtor.  The Debtor does not have any subsidiaries.  GECUSH, in turn, is wholly-owned by GE Capital Global Holdings, LLC, which is a Delaware limited liability company.  GE Capital Global

Holdings, LLC, in turn, is wholly owned by General Electric Company (together with its affiliates "**GE**").

### C.    The Debtor's Prepetition Indebtedness

4.    Other than approximately $435,000 in interest owing under a 2017 loan and security agreement with GECUSH, which remains subject to review by the Debtor,[3] the Debtor does not currently have any secured, bank, or bond debt.  The Debtor is current on the payment of all of its operating expenses such as wages, rent, and professional fees.  Accordingly, as set forth in greater detail in the Asdourian Declaration, as of the Commencement Date, the Debtor's outstanding payables largely consist of approximately $93 million owed to GECUSH and its affiliates under various intercompany financing arrangements and a *de minimis* amount of outstanding ordinary course obligations.  In addition, as set forth in greater detail in the Asdourian Declaration, during the course of this chapter 11 case, parties might assert the claims described therein, including contingent, unresolved liabilities relating to the operation of the Debtor's former mortgage origination business.

### D.    The Debtor's Assets

5.    As of the Commencement Date, the Debtor has approximately $175,000 in cash or cash equivalents, which was funded by GECUSH to the Debtor pursuant to capital contributions.  The majority of the Debtor's remaining assets consist primarily of the Potential Claims described in the Asdourian Declaration, as well as the Debtor's right to certain recoveries available under certain settlement agreements entered into by and between the Debtor and certain counterparties.

---

[3] As described in the Asdourian Declaration, the principal on this loan has been paid in full, and the Debtor has not investigated the validity and perfection of the interest claim.  The DIP Facility does not purport to prime this claim if it is a perfected secured claim.

**E.**    **Debtor's Liquidity Needs and Marketing Efforts**

6.    Prior to the Commencement Date, given the state of the Debtor's operations and the limited amount of cash on hand, the Debtor and its advisors determined that the Debtor would require post-petition financing to support its chapter 11 activities to pay (a) salaries and benefits of its employees, (b) other ordinary course post-petition obligations, and (c) professionals' fees to, among other things, conduct negotiations with key constituents, consummate the GE Settlement and confirm a chapter 11 plan.  During the Debtor's discussions with GECUSH, GECUSH made an offer to provide post-petition financing to the Debtor.

7.    As is set forth in greater detail in the Asdourian Declaration, pursuant to the Amended and Restated Limited Liability Company Agreement of the Debtor, dated July 13, 2018 (the "**LLC Agreement**"), the Debtor formed a special independent committee of the board of directors (the "**Special Committee**"), which consists of two independent directors.  Neither independent director had previously served as a director of, nor had been engaged by, the Debtor or its predecessor entities or GE.  The LLC Agreement provides that the Special Committee has the power and authority to, among other things, exercise sole oversight, negotiation, and decision-making authority with respect to any Conflict Issue (as defined therein).  Pursuant to the LLC Agreement, any lending arrangement between the Debtor, as borrower, and GECUSH, as lender, constitutes a Conflict Issue. As such, any proposed DIP financing to be provided by GECUSH constitutes a Conflict Issue and, pursuant to the LLC Agreement, the Special Committee was charged with negotiating the terms thereof.  The Special Committee (a) directed A&M to assist it in evaluating GECUSH's proposed financing in comparison to financing from alternative sources, and (b) utilized A&M and Richards, Layton & Finger, P.A. ("**RLF**") to assist it in negotiating and documenting the terms of any such financing.

8.      As such, A&M evaluated the Debtor's options for obtaining financing.  A&M determined, based on its experience in the capital markets and the Debtor's financial situation leading up to the filing of this chapter 11 case, including the state of the Debtor's operations and its limited assets to serve as collateral for a loan, that a third party lender would not provide the Debtor with financing on terms that were superior to the DIP Facility.  Accordingly, in light of the Debtor's imminent liquidity needs, the Debtor, acting through the Special Committee, determined that the DIP Facility was the only viable financing option available at this time.

## **Jurisdiction and Venue**

9.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

RLF1 21145712v.1

## Relief Requested

11.     By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the

Bankruptcy Code, Rules 2002, 4001, 6003, and 6004 the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), and Local Rule 4001-2, the Debtor seeks entry of Interim and Final

Orders providing for:

   i.      authority to obtain the DIP Facility in an aggregate principal amount of up
           to $25,000,000, of which up to $1,750,000 shall be available upon entry of
           the Interim Order, pursuant to the terms and conditions of the DIP
           Agreement;

   ii.     authority to execute and enter into the DIP Documents, and to perform
           such other and further acts as may be required under or in connection
           therewith;

   iii.    authority to grant the DIP Lender security interests, liens, and super-
           priority claims (including super-priority administrative claims pursuant to
           section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections
           364(c)(2) and 364(c)(3) of the Bankruptcy Code), and related protections
           to secure all obligations of the Debtor under and with respect to the DIP
           Facility as provided in the DIP Orders, the DIP Agreement, and the DIP
           Documents;

   iv.     authority to use the proceeds from the DIP Facility, pursuant to section
           363 of the Bankruptcy Code and Bankruptcy Rule 6004, for working
           capital and general corporate purposes only, including payment of
           professional fees and expenses, and other items in accordance with the
           Budget, subject to the Permitted Variance;

   v.      modification of the automatic stay imposed under section 362 of the
           Bankruptcy Code to the extent necessary to permit the Debtor and the DIP
           Lender to implement the terms of the DIP Orders, the DIP Agreement, and
           the DIP Documents;

   vi.     waiver of any stay otherwise applicable pursuant to the Bankruptcy Rules
           and providing for the immediate effectiveness of the DIP Orders;

   vii.    scheduling of a final hearing (the "**Final Hearing**") on the Motion no later
           than thirty-five (35) calendar days' after the entry of the Interim Order to
           consider entry of the Final Order authorizing the balance of the
           borrowings under the DIP Agreement and the DIP Documents on a final
           basis and approval of notice procedures with respect thereto; and

   viii.   grant of related relief.

## Summary of Terms of the DIP Facility[4]

12.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.

| Summary of the DIP Facility | | Reference |
|---|---|---|
| **Borrower**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Debtor | DIP Agreement, Preamble |
| **Lender**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | GECUSH | DIP Agreement, Preamble |
| **DIP Facility**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | A secured post-petition credit facility in an aggregate principal amount of $25 million. | DIP Agreement Recitals; Interim Order Recitals |
| **Borrowing Limits**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Upon entry of the Interim Order, up to $1.75 million. Following entry of the Final Order, and subject to the terms of the DIP Agreement, up to an additional $23.25 million.<br><br>In addition, in no event will Advances be made more frequently than once every two (2) weeks, through and until (but not including) the DIP Termination Date in an aggregate amount not in excess of the lesser of (i) $2,000,000 or (ii) the Advance line item amount set forth in the Budget for the calendar month during which the applicable Advance is requested to be made, provided, however, that at no time shall the aggregate amount of Advances exceed the Maximum Line Amount on the applicable date of determination. | DIP Agreement §§ 1.1 "Maximum Line Amount;" 2.1; Interim Order ¶ 2 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Usual and customary for financings of this type, including, but not limited to, entry of the Interim Order, no existing events of default or breaches of representations and warranties, and compliance with the Budget, subject to the Permitted Variance. | DIP Agreement §§ 4.1–2 |

---

[4] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the DIP Orders, as applicable.

| | | |
|---|---|---|
| **Budget Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local rule 4001-2(a)(ii) | At all times the Debtor shall perform in accordance with the Budget such that the Debtor's cumulative disbursements from the Petition Date through and including the last day of the most recently ended Test Period shall not be more than the Permitted Variance unless the Debtor requests and the DIP Lender approves in writing.<br><br>The Test Period is a calendar month; provided, that the first Test Period includes the Commencement Date through May 31, 2019<br><br>The Permitted Variance is one hundred fifteen percent (115%) of the cumulative disbursements permitted pursuant to the Budget from the Petition Date through and including the last day of the most recent Test Period. | DIP Agreement §§ 1.1 "Approved Budget," "Permitted Variance," "Test Period," 6.1; Interim Order, Ex. 1 |
| **Interest Rates**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | LIBOR plus 5.00% per annum | DIP Agreement §1.1 "Interest Rate" |
| **Fees and Expenses**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-1(a)(ii) | None. | N/A |
| **Maturity Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The earliest of (a) January 23, 2020; (b) the consummation of a Chapter 11 Plan approved by the Bankruptcy Court, which provides for the indefeasible payment in full of the Obligations; (c) the date the DIP Lender accelerates the Obligations following the occurrence of an Event of Default subject to compliance with the Interim Order and the Final Order, as then applicable; and (d) the date of filing of any Chapter 11 Plan by the Debtor which is not an Acceptable Plan. | DIP Agreement §1.1 "DIP Termination Date;" Interim Order ¶ 2 |
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | • Usual and customary Events of Default for financings of this type.<br>• Any litigation that is commenced, and is not dismissed, stayed or withdrawn within seventy five (75) days of commencement, against the DIP Lender or any of its Affiliates by any person or entity in any court other than the Bankruptcy Court seeking to hold the DIP Lender or any of its Affiliates liable for any claims or obligations relating to the Debtor on any legal grounds.<br>• The Debtor fails to utilize best efforts in accordance with Section 6.13 of the DIP Agreement or does not receive payment pursuant to the Clawback Rights under any Settlement Agreement within sixty five (65) days of the date of a WMC Trust Payment (as defined in the applicable Settlement Agreement). | DIP Agreement, § 7.1; Interim Order ¶ 20 |

| | | |
|---|---|---|
| **Carve-Out**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(5) | The "Carve-Out" means collectively: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code; (ii) in the event the Debtor's chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $25,000; and (iii) following the delivery of a Carve-Out Trigger Notice, (x) all accrued and unpaid fees and expenses incurred by Estate Professionals incurred in accordance with the Budget prior to the Business Day following delivery of the Carve-Out Trigger Notice, plus (y) up to $500,000 in aggregate unpaid fees and expenses of Estate Professionals incurred on or after the date of delivery of the Carve-Out Notice, in each case with respect to clauses (x) and (y) to the extent such fees and expenses are allowed at any time by order of the Bankruptcy Court and regardless of whether allowed by interim order, procedural order, or otherwise; <u>provided</u> that the Carve-Out shall not be available to pay fees and expenses incurred for any purpose specified in Paragraph 4 of the Interim Order. | Interim Order ¶ 13 |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | The Interim Order does not contain any stipulations regarding pre-petition claims. Accordingly, there is no challenge period. | N/A |
| **Priority and Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i)<br><br>**Liens on Avoidance Actions**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(D) | The DIP Lender is granted, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out, DIP Liens on the DIP Collateral senior to all other security interests in and liens now existing or hereafter arising in favor of any other creditor or any other person whatsoever in the DIP Collateral and junior only to the Prior Liens.<br><br>The DIP Collateral does not include Excluded Property, which is defined to include, among other things, any claims or causes of action (including Commercial Tort Claims) that the Debtor may have against the DIP Lender or any of its current or former Affiliates and any of its or their successor or assigns, or any of its or their current or former officers, directors, employees, agents, advisors, controlling persons, managers or members.<br><br>The DIP Collateral does not include Avoidance Actions, but subject only to and effective upon entry of the Final Order, the DIP Collateral does include all proceeds of Avoidance Actions, whether by judgment, settlement or otherwise. However, the defined term "Avoidance Actions" does not include claims or causes of action against the DIP Lender and its Affiliates.<br><br>Given that certain of the DIP Collateral consists of the Debtor's clawback rights under certain settlement | DIP Agreement §§1.1 "Avoidance Actions," "DIP Collateral," "Excluded Property," 3.1-3.2; Interim Order ¶ 9 |

| | agreements, the DIP Documents include a form of Assignment Agreement that assigns such rights to the DIP Lender in accordance with the terms of the DIP Documents upon an Event of Default. | |
|---|---|---|
| **Use of DIP Proceeds** Fed. R. Bankr. P. 4001(c)(1)(B)(ii) Local Rule 4001-2(a)(ii) | The Debtor shall (a) use the proceeds of Advances for working capital and general corporate purposes only, including the funding of the Debtor's post-petition operations, professional fees and expenses, and other items all in accordance with the allowed disbursement line item(s) set forth in the Budget but subject to the Permitted Variance and (b) not use any proceeds of Advances for any purpose adverse to or otherwise against the rights, remedies or interests of the DIP Lender or any of its Affiliates (including, without limitation, any preparation, initiation or prosecution of any causes of action of any nature whatsoever against the DIP Lender or any of its Affiliates); provided, however, that if the Debtor initiates or prosecutes causes of action against the DIP Lender or any of its Affiliates in the Bankruptcy Court, the DIP Lender shall continue to make Advances but only in such amount as necessary to pay the Debtor's operating expenses and the administrative expenses of the Chapter 11 Case, but not, for the avoidance of doubt, any amounts related to the initiation, or prosecution of any such causes of action against the DIP Lender and any of its Affiliates.  Notwithstanding the foregoing, nothing limits the Debtor's use of proceeds of Advances by the special committee of the Debtor's board of directors or the Creditors' Committee, to investigate (but not to initiate or prosecute) any causes of action of any nature whatsoever against the DIP Lender or any of its Affiliates, subject to the Budget. | DIP Agreement § 2.5; Interim Order ¶¶ 3, 4 |
| **Adequate Protection** Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv) | None. | N/A |
| **Debtor's Stipulations to Prepetition Liens and Claims** Fed. R. Bankr. P. 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i)(B) | None. | N/A |
| **Waiver or Modification of the Automatic Stay** Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Agreement and the DIP Documents and to take any or all of the following actions without further order of or application to this Court:  (i) immediately cease making any Advances to the Debtor; (ii) immediately declare all DIP Obligations to be immediately due and payable; and (iii) take any other actions or exercise any other rights or remedies permitted | Interim Order ¶ 22 |

RLF1 21145712v.1

| | | |
|---|---|---|
| | under the DIP Orders, the DIP Agreement, the DIP Documents or applicable law to effect the repayment of the DIP Obligations, in each case, in accordance with and subject to the rights, limitations, and priorities set forth in the DIP Orders, the DIP Agreement, and the DIP Documents; provided, however, that, other than with respect to Section 7.1(o) of the DIP Agreement, the DIP Lender shall provide seven (7) calendar days written notice (by facsimile, electronic mail, or overnight mail) to counsel to the Debtor, counsel to the Creditors' Committee, and the U.S. Trustee prior to exercising any lien enforcement rights or remedies with respect to the DIP Collateral (the "**Remedies Notice Period**").  During the Remedies Notice Period, the Debtor and any other party in interest may seek an emergency hearing before the Bankruptcy Court to prevent the DIP Lender from exercising such rights and remedies; provided, however, that, subject to entry of the Final Order, the Debtor may only contest whether an Event of Default has occurred and/or is continuing. | |
| **Waiver or Modification of Right to File a Plan** Fed. R. Bankr. P. 4001(c)(1)(B)(v) | The commitment of the DIP Lender to provide Advances terminates if the Debtor files a Chapter 11 Plan that is not an Acceptable Plan.<br><br>Acceptable Plan is defined to mean a Chapter 11 Plan which provides for an effective date no later than thirty (30) days after the date of entry of the Confirmation Order with respect to such Chapter 11 Plan, and which plan provides for the indefeasible payment in full of the Obligations on such effective date. | DIP Agreement §§ 1.1 "DIP Termination Date," "Acceptable Plan," 2.1, Interim Order ¶ 12 |
| **Plan Milestones** Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | None. | N/A |
| **Releases** Bankruptcy Rule 4001(c)(1)(B)(vii) | Subject only to and effective upon entry of the Final Order, the Debtor, on behalf of itself and its successors and assigns, including a chapter 7 or chapter 11 trustee, has stipulated and is deemed to: (i) release and discharge the DIP Lender (solely in its capacity as a post-petition lender pursuant to the DIP Orders and the DIP Documents), together with its current and former agents, attorneys, employees, advisors, heirs, executors, administrators, officers, directors, affiliates, successors, and assigns (in each case, solely in their capacities as such), from any and all claims, causes of action, and remedies (whether under the Bankruptcy Code or other applicable law) arising out of, based upon or related to the DIP Agreement, the DIP Documents, the DIP Obligations, the DIP Collateral, and the DIP Liens; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, amount, and nonavoidability (under the Bankruptcy Code or otherwise) of the DIP Agreement, the DIP Documents, DIP Obligations, the DIP Liens, or the DIP Collateral. | Interim Order ¶ 14 |

| | | |
|---|---|---|
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | Consistent with such terms customary for transactions of this type. | DIP Agreement § 8.5; Interim Order ¶ 5 |
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x) Local Rule 4001-2(a)(i)(C) | Subject only to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lender. | Interim Order ¶ 29 |
| **Section 552(b) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B) Local Rule 4001-2(a)(i)(H) | Subject to entry of the Final Order, the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. The "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, products, offspring, or profits of any of its prepetition collateral or the DIP Collateral. | Interim Order ¶ 28 |
| **Provisions that Deem Prepetition Debt to be Post-petition Debt** Local Rule 4001-2(a)(i)(E) | None. | N/A |

## BASIS FOR RELIEF

### I.    The Debtor Should Be Authorized to Obtain Post-petition Financing through the DIP Documents

#### A.    Entry into the DIP Facility Is an Exercise of the Debtor's Sound Business Judgment

13.    The Court should authorize the Debtor, as an exercise of its sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a post-petition

12

loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

14.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

15.     Further, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed

post-petition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for

the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  **Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.**  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

16.    Here, the Debtor's determination, by and through the Special Committee, to move

forward with the DIP Facility is an exercise of its sound business judgment following an arm's-

length process and a careful analysis of the Debtor's options for obtaining financing.

Specifically, the Debtor and its advisors determined that the Debtor would require post-petition

financing to support its chapter 11 activities to pay (a) salaries and benefits of its employees, (b)

other ordinary course post-petition obligations, and (c) professionals' fees to, among other

things, conduct negotiations with key constituents, consummate the GE Settlement and confirm a

chapter 11 plan. *See* Ryan Decl. ¶ 6.  The Debtor, acting through the Special Committee,

negotiated the DIP Agreement and other DIP Documents with the DIP Lender in good faith, at

arm's-length, and with the assistance of its advisors.  *Id.* at ¶¶ 7-9, 12. In addition, the proposed

DIP Facility is the best possible financing under the circumstances.  *Id.* at ¶ 11.  Accordingly, the

Court should approve the DIP Facility and authorize the Debtor's entry into the DIP Documents,

as it is a reasonable exercise of the Debtor's business judgment.

14

**B.**      **Entry into the DIP Facility Also Satisfies an Entire Fairness Analysis**

17.      The DIP Facility should be approved under the business judgment rule notwithstanding the fact that the DIP Lender is also the Debtor's sole member because it was negotiated and approved by the Special Committee, not the Debtor's full board.  However, even if the Court were to apply the heightened "entire fairness" standard to its analysis of the DIP Facility, the Debtor's actions in reviewing and approving the DIP Facility more than satisfy this standard.

18.      The entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).  Ordinarily, the party seeking to consummate the challenged transaction bears the burden of proving entire fairness.  *See Kahn v. Lynch Comm'ns Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994).  The burden of proving unfairness "shifts . . . entirely" to the challenging party, however, where the challenged transaction was approved by an independent committee of directors.  *Rosenblatt*, 493 A.2d at 937.  Where a controlling shareholder did not dictate the terms of the transaction and an independent negotiator had real bargaining power which was exercised on an arm's-length basis, the burden to prove unfairness falls to the challenging party.  *Kahn*, 638 A.2d at 1117.  Indeed, the business judgment rule is set aside only upon a showing that the debtor's directors were uninformed, grossly negligent, or lacking independence.  *See Dodgers*, 457 B.R. at 313; *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) ("To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

19.      Here, there can be no doubt that the Debtor went to great lengths to ensure the independence, transparency, and fairness of the DIP financing selection process.  <u>First</u>, once

GECUSH offered to provide the Debtor with DIP financing, in accordance with the terms of the LLC Agreement, the Special Committee, which consists of two independent directors who had not previously served as a director of, nor been engaged by, the Debtor or its predecessor entities or GE, was charged with evaluating any proposed financing from GECUSH and examining whether a third party lender would provide superior financing. *See* Ryan Decl. ¶ 7. <u>Second</u>, the DIP Facility was the result of arm's-length and good faith negotiations between the Special Committee, on the one hand, and the DIP Lender, on the other hand, related to, among other things, the Debtor's financing needs, including the Budget, the scope of the collateral securing such facility and the goals of this chapter 11 case. *Id.* at ¶¶ 7-9, 12. It was only after the conclusion of those arm's-length negotiations that the Special Committee, with the assistance of A&M and RLF, finally determined that the DIP Facility presented the best financing option available for the Debtor. *See generally* Ryan Decl. <u>Third</u>, both the Debtor and the DIP Lender were advised by separate counsel and other professionals in connection with negotiating the terms of the DIP Facility. *Id.* at 12. <u>Fourth</u>, the arm's-length negotiations resulted in concessions by the DIP Lender. *Id.* <u>Fifth</u>, and most importantly, the proposed DIP Facility, which includes a reasonable interest rate at the low end of the market and no fees, simply could not be replicated in the marketplace. *Id.* at ¶ 11, 13.

20.     In sum, the process that led the Debtor, acting through the Special Committee, to agree to the DIP Facility was conducted in good faith and at arm's length, the terms of the DIP Facility are likewise fair and favorable, and entry into the DIP Facility is in the best interest of the Debtor's estate. Accordingly, the Debtor's entry into the DIP Facility satisfies the entire fairness standard to the extent such standard applies.

C.      **The Debtor Should Be Authorized to Grant Liens and Super-Priority Claims**

21.      The Debtor proposes to obtain financing under the DIP Facility by providing super-priority claims, security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtor proposes to provide to the DIP Lender with super-priority claims pursuant to section 364(c)(1) of the Bankruptcy Code and perfected security interests in the DIP Collateral pursuant to section 364(c)(2), (c)(3) of the Bankruptcy Code.

22.      The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    i.      the debtor is unable to obtain unsecured credit under Section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    ii.     the credit transaction is necessary to preserve the assets of the estate; and

    iii.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

23.      As described above and as set forth in the Ryan Declaration, the Debtor and its advisors determined that the Debtor would require post-petition financing to support its chapter 11 activities.  *See* Ryan Decl. ¶ 6.  Due to the nature of the collateral available to secure any

post-petition financing, the Special Committee, in consultation with its advisors, concluded that no third party lender would provide the Debtor with DIP financing on superior terms. *See generally* Ryan Decl. Absent immediate access to the DIP Facility, which will provide certainty that the Debtor will have sufficient liquidity to administer this chapter 11 case, the Debtor will be unable to bear the costs of the chapter 11 case. *Id.* at ¶ 13. Given the Debtor's circumstances, the Debtor believes that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable, and adequate. For all these reasons, the Debtor submits that it has met the standard for obtaining post-petition financing.

24.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtor is unable to obtain unsecured credit. Therefore, approving a super-priority claim and granting liens and security interests, subject to prior perfected liens, in favor of the DIP Lender is reasonable and appropriate.

**D.     No Comparable Alternative to the DIP Facility Is Reasonably Available**

25.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that Section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)).

26.     As noted above and in the Ryan Declaration, given the Debtor's financial situation leading up to the filing of this chapter 11 case, no third party lender would provide the Debtor with financing on superior terms on a secured, administrative, or unsecured basis.  *See* Ryan Decl. ¶ 10.  Therefore, the Debtor submits that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor is satisfied.

## II.     The DIP Lender Should Be Deemed a Good-Faith Lender Under Section 364(e)

27.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith,

whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

28.   As explained herein and in the Ryan Declaration, the DIP Documents are the result of: (a) the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital post-petition financing and (b) arm's-length, good-faith negotiations between the Debtor and the DIP Lender.  *See* Ryan Decl. ¶¶ 7-9, 12.  The Debtor submits that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**III.    The Automatic Stay Should Be Modified on a Limited Basis**

29.   The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default and after the expiration of the Remedies Notice Period, all rights and remedies provided for in the DIP Agreement and the DIP Documents and to take any or all of the following actions without further order of or application to the Court:  (i) immediately cease making any Advances to the Debtor; (ii) immediately declare all DIP Obligations to be immediately due and payable; and (iii) take any other actions or exercise any other rights or remedies permitted under the Interim Order, the DIP Agreement, the DIP Documents or applicable law to effect the repayment of the DIP Obligations, in each case, in accordance with and subject to the rights, limitations, and priorities set forth in the Interim Order, the DIP Agreement, and the DIP Documents.

30.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this chapter 11 case.  *See, e.g., In re Checkout Holding Corp.*, Case No. 18-12794 (KG) (Bankr. D. Del. Dec. 13, 2018) (modifying the automatic stay as necessary to permit remedies in an event of default); *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) (automatic stay is vacated and modified upon the occurrence of an event of default); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (modifying the automatic stay as necessary upon the occurrence of any termination event); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event).

## IV.    Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm

31.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

32.    The Debtor requests that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtor requires the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to pay their

administrative expenses and implement the relief requested in the Debtor's other "first day" motions. This relief will enable the Debtor to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing. *See* Ryan Decl. ¶ 13.

## REQUEST FOR FINAL HEARING

33.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is no later than thirty-five (35) days after entry of the proposed Interim Order.

## NOTICE

34.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware (Attn: Linda Richenderfer, Esq.); (b) the holders of the twenty (20) largest unsecured claims against the Debtor; (c) the Securities and Exchange Commission; (d) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: William Barr); (e) the Internal Revenue Service; (f) the United States Attorney's Office for the District of Delaware; (g) attorneys for the DIP Lender, Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq. and Jacqueline Marcus, Esq.); and (h) any other party entitled to notice pursuant to Local Rule 9013–1(m) (collectively, the "**Notice Parties**").

35.     The Debtor respectfully submits that, in view of the facts and circumstances, such notice is sufficient and no further notice is required.

## NO PRIOR REQUEST

36.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim

and Final Orders granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

Dated: April 23, 2019
     Wilmington, Delaware

/s/ Russell C. Silberglied

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email: collins@rlf.com
     silberglied@rlf.com
     heath@rlf.com
     shapiro@rlf.com
     schlauch@rlf.com

*Proposed Attorneys for the Debtor
and Debtor in Possession*

# **EXHIBIT A**

**Interim Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                    :    Chapter 11
                                          :
WMC MORTGAGE, LLC,                        :    Case No. 19–_____ (     )
                                          :
                                          :
               Debtor.¹                   :
------------------------------------------------------- x
```

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED SUPER-PRIORITY FINANCING, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated April 23, 2019 (the "**Motion**")² of WMC Mortgage, LLC,

as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"),

pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Rules 2002, 4001, and

9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware, for entry of an interim order (this "**Interim Order**") and a final

order (the "**Final Order**") authorizing the Debtor to:

(i)     obtain secured postpetition financing on a superpriority basis (the "**DIP Facility**") in an aggregate principal amount of up to $25,000,000, of which up to $1,750,000 shall be available upon entry of this Interim Order, pursuant to the terms and conditions of that certain Debtor-in-Possession Credit and Security Agreement, dated as of April [●], 2019 (as amended, supplemented, restated, or otherwise modified from time to time, the "**DIP Agreement**"), by and among the Debtor and GE Capital US Holdings, Inc. (solely in its capacity as a post-petition lender pursuant to this Interim Order, the Final Order and the DIP Documents, "**Lender**"), substantially in the form attached to the Motion as Exhibit B;

---

¹ The last four digits of the Debtor's federal tax identification number are 2008. The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

(ii)     execute and enter into the DIP Agreement and any related documents or instruments (collectively, the "**DIP Documents**"), and to perform such other and further acts as may be required under or in connection therewith;

(iii)    grant Lender security interests, liens, and superpriority claims (including superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code), and related protections to secure all obligations of the Debtor under and with respect to the DIP Facility as provided in this Interim Order, the DIP Agreement, and the DIP Documents;

(iv)     use the proceeds from the DIP Facility, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for working capital and general corporate purposes only, including payment of professional fees and expenses, and other items in accordance with the budget annexed to this Interim Order as **Exhibit 1** (as the same may be modified from time to time with the consent of Lender, the "**Budget**"), subject to the Permitted Variance (as defined in the DIP Agreement);

(v)      modify the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor and Lender to implement the terms of this Interim Order, the DIP Agreement, and the DIP Documents;

(vi)     waive any stay otherwise applicable pursuant to the Bankruptcy Rules and providing for the immediate effectiveness of this Interim Order; and

(vii)    schedule a final hearing (the "**Final Hearing**") on the Motion no later than thirty five (35) calendar days' after the entry of this Interim Order to consider entry of the Final Order authorizing the balance of the borrowings under the DIP Agreement and the DIP Documents on a final basis and approve notice procedures with respect thereto;

all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties (as defined below); and such notice having been adequate and appropriate under the circumstances and it appearing that no other or further notice need be

provided; and the Court having reviewed the Motion, the Asdourian Declaration and the Ryan Declaration; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Interim Hearing**"); and upon the Asdourian Declaration, the Ryan Declaration, and the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate as contemplated by Bankruptcy Rule 4001(c)(2) and is in the best interests of the Debtor, its estate, its creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

      A.    <u>Commencement Date</u>.  The Debtor commenced the chapter 11 case (the "**Chapter 11 Case**") on April 23, 2019 (the "**Commencement Date**").  The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

      B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      C.    <u>Notice</u>.  The Debtor has provided notice of the Motion and the Interim Hearing to (i) the Office of the United States Trustee for the District of Delaware (Attn:  Linda Richenderfer, Esq.), (ii) the holders of the twenty (20) largest unsecured claims against the Debtor, (iii) the Securities and Exchange Commission, (iv) the Office of the United States Attorney General, U.S. Department of Justice, (v) the Internal Revenue Service, (vi) the United States Attorney's Office for the District of Delaware, (vii) attorneys for Lender, (viii) all

financial institutions at which the Debtor maintains deposit accounts; (ix) all known parties with liens of record on assets of the Debtor as of the Commencement Date; and (x) any other party entitled to notice pursuant to Local Rule 9013–1(m) (collectively, the "**Notice Parties**").

D.    Under the circumstances, the foregoing notice (i) was, in the Debtor's good faith belief, the best available under the circumstances; (ii) constitutes due and sufficient notice of the Motion and the Interim Hearing; and (iii) complies with Bankruptcy Rule 4001(c). No further or other notice of the relief sought at the Interim Hearing is necessary or required.

E.    Committee Formation.  As of the date hereof, the U.S. Trustee has not appointed an official committee of unsecured creditors in the chapter 11 case pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

F.    Findings Regarding DIP Facility.

(1)    The Debtor has an immediate and critical need to obtain postpetition financing on an interim basis under the DIP Facility in order to, among other things, provide the Debtor with sufficient working capital to finance the administration of the Chapter 11 Case.  The Debtor's access to sufficient working capital and liquidity through the incurrence of the postpetition financing under the DIP Facility, pursuant to the terms of this Interim Order, is vital to the Debtor's orderly transition into chapter 11 and wind-down of existing operations. Consequently, without interim access to the DIP Facility as provided in this Interim Order, the Debtor and its estate would suffer immediate and irreparable harm.

(2)    The Debtor is unable to obtain adequate credit on an unsecured basis or solely on the basis of an administrative expense claim under section 503(b)(1) of the Bankruptcy Code.  Further, the Debtor is unable to obtain adequate credit secured by (x) a senior lien on unencumbered assets of its estate under section 364(c)(2) of the Bankruptcy Code and/or (y) a

4

junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, from any source other than Lender on terms more favorable than the terms of the DIP Facility. The Debtor requires financing under the DIP Facility pursuant to the terms of this Interim Order to satisfy its postpetition liquidity needs.

(3)     Lender has indicated a willingness to provide the Debtor with certain financing commitments on an interim basis, but solely on the terms and conditions set forth in this Interim Order, the DIP Agreement, and the DIP Documents. After considering all of their alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the financing to be provided by Lender pursuant to the terms of this Interim Order, the DIP Agreement, and the DIP Documents represents the best and, likely, only financing available to the Debtor.

(4)     The DIP Facility has been negotiated in good faith, and all of the Debtor's obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility, the DIP Agreement, the DIP Documents, and this Interim Order shall be deemed to have been extended by Lender in "good faith" (as that term is used in section 364(e) of the Bankruptcy Code) and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and Lender (and its successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(5)     The security interests and liens granted to Lender pursuant to this Interim Order are appropriate under section 364(c) of the Bankruptcy Code because, among other things, such security interests and liens do not impair the interests of any holder of Prior Liens (as defined in the DIP Agreement).

(6)     Good cause has been shown for entry of this Interim Order pursuant to

Bankruptcy Rule 4001(c)(2).  In particular, the relief granted under the terms of this Interim

Order, which authorizes the Debtor to execute the DIP Agreement and the DIP Documents and

to obtain interim financing on the terms and conditions set forth in the DIP Agreement and the

DIP Documents, is necessary to avoid immediate and irreparable harm to the Debtor and its

estate.

(7)     Entry of this Interim Order is in the best interest of the Debtor, its estate,

and its creditors.  The terms of the DIP Agreement and the DIP Documents are fair and

reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment

consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair

consideration.

G.     Based on the foregoing and upon the record made before this Court at the

Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     <u>Approval of Motion</u>.  The Motion is approved on the terms and conditions

set forth in this Interim Order.  This Interim Order shall become effective immediately upon its

entry.  To the extent the terms of the DIP Agreement or the DIP Documents differ in any respect

from the terms of this Interim Order, this Interim Order shall control.

2.     <u>Approval of DIP Agreement and DIP Documents; Authority Thereunder</u>.

The Debtor is authorized to enter into the DIP Agreement, the DIP Documents, and such

additional documents, instruments, and agreements as may be reasonably required by Lender to

implement the terms or effectuate the purposes of the DIP Agreement, the DIP Documents, and

this Interim Order.  The Debtor is authorized to borrow money under the DIP Facility on an

interim basis up to an aggregate principal amount not to exceed $1,750,000, in accordance with, and subject to the terms of, this Interim Order, the DIP Agreement, and the DIP Documents.

3.       Use of Proceeds of DIP Facility.  The Debtor is hereby authorized to use the proceeds of the DIP Facility during the Interim Period in accordance with the Budget, the DIP Agreement, the DIP Documents, and this Interim Order, (i) to fund working capital and for the general corporate needs of the Debtor in the ordinary course of business, (ii) for the payment of chapter 11 expenses, including the fees and expenses of professionals retained by the Debtor or a Creditors' Committee, if appointed, to the extent such fees and expenses are allowed by an order of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and (iii) for the payment of any prepetition payments authorized by the Bankruptcy Court pursuant to orders approving "first day" motions filed by the Debtor.

4.       Restrictions on Use of Proceeds of DIP Facility.  Notwithstanding anything herein to the contrary, no portion of the Carve-Out (as defined in Paragraph 13 below), any DIP Collateral (as defined in Paragraph 9 below), or any proceeds of the DIP Facility (including any disbursements set forth in the Budget or obligations benefitting from the Carve-Out) may be used by the Debtor, any Creditors' Committee or any other statutory committee or estate representative appointed in the Chapter 11 Case or any successor case, or any other person, party, or entity (including any of the Debtor's professionals, Creditors' Committee professionals or Creditors' Committee members) (or by any such party to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) to pay any amount on account of any claims arising prior to the Commencement Date unless such payments are (A) approved by an order of this Court (including hereunder) and (B) in accordance with the DIP Agreement, DIP Documents, and Budget; (ii) to request authorization to obtain postpetition loans

or other financial accommodations pursuant to section 364(d) of the Bankruptcy Code or

otherwise other than from Lender unless all DIP Obligations (as defined in Paragraph 7 below)

will be paid in full upon the consummation of such postpetition loans or other financial

accommodations, or seek any modifications to this Interim Order not approved by Lender; or

(iii) for any purpose adverse to or otherwise against the rights, remedies, or interests of Lender or

any of its current or former Affiliates (as defined in the DIP Agreement) (including, without

limitation, to prepare, investigate, assert, join, commence, support, or prosecute any claim,

counter-claim, action, proceeding, application, motion, objection, defense or other contested

matter or cause of action of any nature whatsoever against Lender or any of its current or former

Affiliates, assigns, or successors and the respective current or former officers, directors,

employees, agents, attorneys, representatives and other advisors of each of the foregoing, each in

their capacities as such (collectively, "**Lender's Related Parties**"), with respect to any

transaction, occurrence, omission, action or other matter (including formal or informal discovery

proceedings in anticipation thereof), including (A) any avoidance actions or other actions under

chapter 5 of the Bankruptcy Code, (B) any action with respect to the validity, enforceability,

priority, or amount of the DIP Obligations, or the validity, enforceability, extent or priority of the

DIP Liens (as defined in Paragraph 9 below), (C) any action seeking to invalidate, set aside,

avoid or subordinate, in whole or in part, the DIP Liens or any other protections afforded to

Lender under the DIP Agreement, the DIP Documents, or this Interim Order, (D) except to

contest in good faith the occurrence or continuance of any Event of Default (as defined in

Paragraph 20 below), any action seeking, or having the effect of, preventing, hindering, or

otherwise delaying Lender's assertion, enforcement, or realization on the DIP Collateral in

accordance with the DIP Agreement, the DIP Documents, and this Interim Order; and/or (E) any

action seeking to modify any of the rights, remedies, priorities, privileges, protections, and

benefits granted to Lender under the DIP Agreement, the DIP Documents, or this Interim Order,

without the prior written consent of Lender; provided, however, that this Paragraph 4 shall in no

way limit the use of Advances by the special committee of the Debtor's Board of Directors or the

Creditors' Committee to investigate  any causes of action of any nature whatsoever against

Lender or Lender's Related Parties (but not to assert, join, commence, support, or prosecute any

claim, counter-claim, action, proceeding, application, motion, objection, defense or other

contested matter or cause of action against Lender or Lender's Related Parties).

     5.     Indemnification.  The Debtor is authorized and directed to indemnify

Lender against any liability arising in connection with the DIP Agreement or the DIP Documents

to the extent set forth in the DIP Agreement and the DIP Documents.  Any such unpaid

indemnities of Lender shall constitute DIP Obligations (as defined below) and shall be secured

by the DIP Collateral (as defined below) and afforded all of the priorities and protections

afforded to the DIP Obligations under this Interim Order, the DIP Agreement, and the DIP

Documents.

     6.     Validity of DIP Documents.  Upon execution and delivery of the DIP

Agreement or any DIP Document, the DIP Agreement and/or such other DIP Document shall

constitute valid and binding obligations of the Debtor, enforceable against the Debtor in

accordance with the terms thereof.  No obligation, payment, transfer, or grant of security under

the DIP Agreement, the DIP Documents, or this Interim Order shall be stayed, restrained,

voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-

bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

7.     _Advances_.  All advances made to or issued for the benefit of (or deemed issued for the benefit of) the Debtor on or after the Commencement Date under the DIP Facility (each, an "**Advance**" and, collectively, the "**Advances**"), all interest thereon, and all fees, costs, expenses, indemnification obligations, and other liabilities owing by the Debtor to Lender under the DIP Agreement, the DIP Documents, and/or this Interim Order shall hereinafter be referred to as the "**DIP Obligations**."  The Advances: (i) shall bear interest payable at the rates set forth in the DIP Agreement or other applicable DIP Document; (ii) shall be secured with the rank and priority specified in paragraph 9 below; (iii) shall be payable in accordance with the terms of the DIP Agreement or the relevant DIP Document; and (iv) shall otherwise be governed by the terms set forth herein and in the DIP Agreement and the DIP Documents.

8.     _Voluntary Prepayments_.  The Debtor may make voluntary prepayments of any Advance or other DIP Obligations as and when provided under, and for application in accordance with, the terms of the DIP Agreement, the DIP Documents, and this Interim Order.

9.     _DIP Liens and DIP Collateral_.  As security for the full and timely payment of the DIP Obligations, Lender is hereby granted, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out (as defined in Paragraph 13 below), valid, enforceable, unavoidable, and fully perfected security interests in and liens upon (collectively, the "**DIP Liens**") all pre- and postpetition property of the Debtors, whether existing on the Commencement Date or thereafter acquired, including, without limitation, all cash of the Debtor, any accounts receivable or other rights to payment whether arising before or after the Commencement Date, all of the rights of the Debtor under each Settlement Agreement (as defined in the DIP Agreement), including, without limitation, all "Reimbursement Obligations" (as defined in the applicable Settlement Agreement), together with all books and records, all

distributions, and the proceeds of all of the foregoing (collectively, the "**DIP Collateral**") prior and senior to all other security interests in and liens now existing or hereafter arising in favor of any other creditor or any other person whatsoever in the DIP Collateral and junior only to the Prior Liens; provided, however, that the DIP Collateral shall not include Excluded Property (as defined in the DIP Agreement); provided, further, however, that the DIP Collateral shall exclude Avoidance Actions (as defined in the DIP Credit Agreement), but subject only to and effective upon entry of the Final Order, the DIP Collateral shall include all proceeds of Avoidance Actions, whether by judgment, settlement or otherwise.

          10.    Automatic Effectiveness of Liens.  The DIP Liens shall not be subject to challenge, dispute, or subordination and shall immediately upon entry of this Interim Order attach and become valid, perfected, enforceable, non-avoidable, and effective by operation of law as of the Commencement Date without any further action by the Debtor or Lender, and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, or other documents or the taking of any other actions.  If Lender hereafter requests that the Debtor execute and deliver financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtor is authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and Lender is authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded on the Commencement Date.  A certified copy of this Interim Order may, in the discretion of Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

11.    <u>Lenders' Superpriority Claims</u>.  In addition to the liens and security interests granted to Lender pursuant to this Interim Order, subject to the Carve-Out and in accordance with sections 364(c)(1), 503, and 507 of the Bankruptcy Code, all of the DIP Obligations (including, without limitation, all Advances) shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") with priority over any and all administrative expenses of the Debtor, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provisions of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable from and have recourse to all DIP Collateral (including, subject only to and effective upon entry of the Final Order, any proceeds of Avoidance Actions).

12.    <u>Termination of Commitment</u>.  The commitment of Lender to provide Advances shall terminate (with no further action of the Court required) and all amounts owing under the DIP Facility shall be due and payable on the earliest to occur of the following: (i) January 23, 2020; (ii) the consummation of an Acceptable Plan (as defined in the DIP Agreement), (iii) the receipt by the Debtor, counsel to the Creditors' Committee, and the U.S. Trustee of written notice (which notice may be delivered by facsimile or other electronic transmission) of the occurrence of an Event of Default hereunder or under the DIP Agreement or the DIP Documents and a determination by Lender to terminate its commitment (such notice, a "**Carve-Out Trigger Notice**"); (iv) the date of filing of any chapter 11 plan by the Debtor in the Chapter 11 Case which is not an Acceptable Plan (as defined in the DIP Agreement); and (v) if

12

the Debtor seeks or if there is entered (a) any modification or extension of this Interim Order

without the prior written consent of Lender, and no such consent shall be implied by any other

action, inaction, or acquiescence by Lender; (b) an order converting the Chapter 11 Case to a

case under chapter 7 of the Bankruptcy Code; (c) an order dismissing the Chapter 11 Case; or

(d) an order appointing a chapter 11 trustee in the Chapter 11 Case.

    13.   <u>Carve-Out</u>.  Upon and following the delivery of a Carve-Out Trigger

Notice, to the extent unencumbered funds are not available to pay administrative expenses in

full, the DIP Liens, and the DIP Superpriority Claims shall be subject to the payment of the

Carve-Out.  For purposes of this Interim Order, the term "**Carve-Out**" shall mean, collectively:

(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under

section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United

States Code; (ii) in the event any Chapter 11 Case is converted to a case under chapter 7 of the

Bankruptcy Code, reasonable fees and expenses incurred by a trustee under section 726(b) of the

Bankruptcy Code not to exceed $25,000; and (iii) following the delivery of a Carve-Out Trigger

Notice, (x) all accrued and unpaid fees and expenses incurred by the persons or firms retained by

the Debtor or any Creditors' Committee pursuant to an order of the Bankruptcy Court (or whose

application for retention is then pending, provided such application is ultimately approved)

(collectively, the "**Estate Professionals**") incurred in accordance with the Budget prior to the

Business Day following delivery of the Carve-Out Trigger Notice, plus (y) up to $500,000 in

aggregate unpaid fees and expenses of Estate Professionals incurred on or after the date of

delivery of the Carve-Out Notice, in each case with respect to clauses (x) and (y) to the extent

such fees and expenses are allowed at any time by order of the Bankruptcy Court and regardless

of whether allowed by interim order, procedural order, or otherwise; <u>provided</u> that the Carve-Out

shall not be available to pay fees and expenses incurred for any purpose specified in Paragraph 4 of this Interim Order.

14.    Releases.  Subject only to and effective upon entry of the Final Order, the Debtor, on behalf of itself and its successors and assigns, including a chapter 7 or chapter 11 trustee, has stipulated and is hereby deemed to: (i) release and discharge Lender (solely in its capacity as a post-petition lender pursuant to this Interim Order, the Final Order and the DIP Documents), together with its current and former agents, attorneys, employees, advisors, heirs, executors, administrators, officers, directors, affiliates, successors, and assigns (in each case, solely in their capacities as such), from any and all claims, causes of action, and remedies (whether under the Bankruptcy Code or other applicable law) arising out of, based upon or related to the DIP Agreement, the DIP Documents, the DIP Obligations, the DIP Collateral, and the DIP Liens; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, amount, and nonavoidability (under the Bankruptcy Code or otherwise) of the DIP Agreement, the DIP Documents, DIP Obligations, the DIP Liens, or the DIP Collateral.

15.    Proofs of Claim.  Lender will not be required to file proofs of claim or requests for administrative expenses in the Chapter 11 Case and, notwithstanding anything contained in this Interim Order, the provisions of this Interim Order related to the claims granted herein shall be deemed to constitute a timely filed proof of claim or request for administrative expense, as applicable.

16.    Restrictions on Granting Postpetition Liens.  Except for the Carve-Out, and as otherwise permitted by Lender in writing, no claim or lien having a priority superior to or *pari passu* with those granted to Lender pursuant to this Interim Order shall be granted or

14

allowed while any portion of the DIP Obligations remain outstanding.  The Debtor shall not grant mortgages, security interests, or liens in the DIP Collateral to any parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

17.    Beneficiaries of Order.  The provisions of this Interim Order shall be binding upon and inure to the benefit of Lender and the Debtor, and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed for or on behalf of any Debtor's estate or with respect to such Debtor's property).

18.    Survival of Order.  The provisions of this Interim Order and any actions taken pursuant thereto (i) shall survive the entry of any order: (a) confirming any chapter 11 plan in the Chapter 11 Case; (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; or (c) dismissing or transferring the Chapter 11 Case; and (ii) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order, the DIP Agreement, and the DIP Documents until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the terms of the DIP Agreement and the DIP Documents. Unless agreed to by Lender, the DIP Obligations shall not be discharged by the entry of any order confirming any chapter 11 plan in this Chapter 11 Case, and the Debtor shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    Protection under Section 364(e).  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity of any DIP Obligations, or (ii) the validity or enforceability of any claim, lien, security interest, or priority authorized or created hereby or

15

pursuant to the DIP Agreement or the DIP Documents with respect to any DIP Obligations. Notwithstanding any such reversal, modification, vacatur, or stay, any incurrence of DIP Obligations prior to the actual receipt by Lender of written notice of the effective date of such reversal, modification, vacatur, or stay, shall be governed in all respects by the provisions of this Interim Order, and Lender shall be entitled to all of the rights, remedies, protections, and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, the DIP Agreement, and the DIP Documents with respect to the incurrence of DIP Obligations.

20.     <u>Events of Default</u>.  Except as otherwise provided in this Interim Order or to the extent Lender may otherwise agree in writing, (i) any violation of any of the terms of this Interim Order, or (ii) any occurrence of an "Event of Default" under the DIP Agreement or the DIP Documents, as applicable, shall be deemed to be an "**Event of Default**" under this Interim Order.

21.     <u>Dismissal</u>.  In the event that this Chapter 11 Case is dismissed pursuant to section 1112 of the Bankruptcy Code or otherwise, the DIP Liens and the DIP Obligations shall remain in full force and effect, with all rights and remedies attendant thereto.  If an order dismissing this Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the superpriority claims, liens, and security interests granted to Lender pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been paid and satisfied in full (and that such superpriority claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, and security interests.

16

22.    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Agreement and the DIP Documents and to take any or all of the following actions without further order of or application to this Court: (i) immediately cease making any Advances to the Debtor; (ii) immediately declare all DIP Obligations to be immediately due and payable; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Agreement, the DIP Documents or applicable law to effect the repayment of the DIP Obligations, in each case, in accordance with the and subject to the rights, limitations, and priorities set forth in this Interim Order, the DIP Agreement, and the DIP Documents; <u>provided</u>, <u>however</u>, that other than with respect to Section 7.1(o) of the DIP Agreement, Lender shall provide seven (7) calendar days written notice (by facsimile, electronic mail, or overnight mail) to counsel to the Debtor, counsel to any Creditors' Committee, and the U.S. Trustee prior to exercising any lien enforcement rights or remedies with respect to the DIP Collateral (the "**Remedies Notice Period**").  During the Remedies Notice Period, the Debtor and any other party in interest may seek an emergency hearing before this Court to prevent Lender from exercising such rights and remedies; <u>provided</u>, <u>however</u>, that subject to entry of the Final Order, the Debtor may only contest at such hearing whether an Event of Default has occurred and/or is continuing.  The rights and remedies of Lender specified herein are cumulative and not exclusive of any rights or remedies that Lender may have under the DIP Agreement, the DIP Documents, or otherwise.  The Debtor shall cooperate fully with Lender in its exercise of rights and remedies in accordance with this Interim

17

Order, the DIP Agreement, or the DIP Documents, whether against the DIP Collateral or otherwise.

23. <u>Limitations on Borrowings</u>.  In further consideration for Lender's agreement to provide the DIP Facility, the Debtor, on behalf of itself and its estate, agrees that neither the Debtor nor any party acting on its behalf (including any Creditors' Committee) may seek authorization for the Debtor to borrow money from any person other than Lender to the extent that the repayment of such borrowings is to be (i) entitled to priority superior to, or *pari passu* with, the Superpriority DIP Claims; or (ii) secured pursuant to section 364(d)(1) of the Bankruptcy Code by a lien or security interest that is senior or equal to the liens and security interests held by Lender, unless the Debtor provides for the immediate indefeasible payment in full in cash of the DIP Obligations at closing in connection with such borrowings in accordance with and subject to the rights, limitations, and priorities set forth in this Interim Order, the DIP Agreement, and the DIP Documents.

24. <u>Modifications of DIP Agreement and Budget</u>.  The Debtor is authorized, without further order of this Court, to enter into agreements with Lender providing for any non-material modifications to the DIP Agreement, the DIP Documents, and the Budget, or of any other modifications to the DIP Agreement and the DIP Documents necessary to conform such documents to this Interim Order; <u>provided</u>, <u>however</u>, that notice of any material modification or amendment to the DIP Agreement, the DIP Documents, or the Budget, shall be provided to counsel to any  Creditors' Committee and the U.S. Trustee, each of whom shall have three (3) business days from the date of such notice within which to object in writing to such modification or amendment.  If the Creditors' Committee or the U.S. Trustee timely objects to any material

modification or amendment to the DIP Agreement, the DIP Documents or the Budget, such modification or amendment shall only be permitted pursuant to an order of this Court.

25.    <u>Effectiveness of Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Commencement Date immediately upon entry of this Interim Order. Notwithstanding any Local Rule or Bankruptcy Rule, including, but not limited to Bankruptcy Rules 4001(a)(3), 6004(h), and 7062, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

26.    <u>Control Person Liability</u>.  Lender (solely in its capacity as a post-petition lender pursuant to this Interim Order, the Final Order and the DIP Documents) shall not, by reason of having made loans under the DIP Facility, be deemed in control of the operations or business of the Debtor.

27.    <u>Lender's Prepetition Claims</u>.  Lender asserts various secured and unsecured pre-petition claims against the Debtor.  Nothing in this Order prejudices Lender's rights to assert any prepetition claims against the Debtor or the Debtor's right to object to such claims.

28.    <u>Section 552</u>.  Subject to entry of the Final Order, Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  The "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Lender with respect to proceeds, products, offspring, or profits of any of its prepetition collateral or the DIP Collateral.

29.    <u>Limitation on Charging Expenses against Collateral</u>.  Subject only to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction, or acquiescence of Lender.

30.    <u>Final Hearing</u>.  The Final Hearing to consider the relief requested in the Motion shall be held on _____, 2019 at _____ **(prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon: (i) the proposed attorneys for the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn:  Russell C. Silberglied, Esq. and Paul N. Heath, Esq.); (ii) the U.S. Trustee (Attn: Linda Richenderfer, Esq.); (iii) counsel for any statutory committee(s) appointed in the Chapter 11 Case; and (iv) attorneys for Lender, Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq. and Jacqueline Marcus, Esq.); in each case, so as to be actually received **prior to 4:00 p.m. (prevailing Eastern Time) on _____, 2019.**  Any objections to any provisions of this Interim Order or the relief sought at the Final Hearing by the Motion may be deemed waived unless timely filed and served in accordance with this Paragraph 30.

31.    <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2019
      Wilmington, Delaware

                               _____
                               UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**(Budget)**

**WMC OPEX Budget - Cash Flow Model**

| | | April 23-30 Est 2019 | May Est 2019 | Jun Est 2019 | July Est 2019 |
|---|---|---|---|---|---|
| | **Petition Date 4/23/2019** | | | | |
| **Cash Flows** | | | | | |
| Direct Fixed Costs | | | | | |
| Employee Wages | | $ | 131,250 $ | 105,000 $ | 105,000 |
| Employee Health and other benefits | | | 37,500 | 30,000 | 30,000 |
| Rent/CAM/Parking | | | 10,000 | 10,000 | 10,000 |
| Storage Fees | | | 6,000 | 6,000 | 6,000 |
| Office Equipment Lease | | | 1,200 | 1,200 | 1,200 |
| Independent Director | | | 100,000 | 100,000 | 100,000 |
| Independent Director | | | 70,000 | 70,000 | 70,000 |
| Service fees | | | 15,000 | 15,000 | 15000 |
| | Direct Fixed Costs Sub-total | | 370,950 | 337,200 | 337,200 |
| Direct Variable Costs | | | | | |
| Office Supplies/Postage/Other | | | 5,000 | 5,000 | 5,000 |
| Ordinary Course General Legal | | | | 112,500 | 50,000 |
| UnitedLex | | | 50,000 | 200,000 | 200,000 |
| Epiq (Ordinary Course) | | | 37,500 | 20,000 | 20,000 |
| BOD Insurance coverage | | | - | - | 4,000 |
| BOD Expenses | | | 5,000 | 5,000 | 5,000 |
| Professional Fees | | | - | 447,000 | 1,822,666 |
| **Total Cash Outflows** | | **$    -   $** | **468,450 $** | **1,126,700 $** | **2,443,866** |
| | | | | | |
| **Total Cash Inflows - GEMH service charges** | | **$    15,626 $** | **48,678 $** | **48,678 $** | **48,678** |

| | April 23-30 Est 2019 | May Est 2019 | Jun Est 2019 | July Est 2019 |
|---|---|---|---|---|
| **Beginning Cash Balance** | $    204,178 $ | 719,804 $ | 1,300,032 $ | 1,722,010 |
| Less: Checks outstanding prior month to be paid current month | - | - | - | - |
| Less: Monthly Cash Outflows | - | (468,450) | (1,126,700) | (2,443,866) |
| Less: DIP interest (paid quarterly) | | | | (31,166) |
| Less: Quarterly US Trustee Payment | | | | (15,952) |
| Plus: Monthly Cash Inflows (GEMH Service Fees) | 15,626 | 48,678 | 48,678 | 48,678 |
| Plus: Application of Retainers | | | | |
| Plus: Checks outstanding current month | | | | |
| Subtotal cash balance before DIP draw | 219,804 | 300,032 | 222,010 | (720,296) |
| **Plus: DIP Draw Amount** | 500,000 | 1,000,000 | 1,500,000 | 2,000,000 |
| **Ending Cash Balance After DIP Draw** | $    719,804 $ | 1,300,032 $ | 1,722,010 $ | 1,279,704 |
| | | | | |
| Memo: DIP Loan | $    500,000 $ | 1,500,000 $ | 3,000,000 $ | 5,000,000 |
| DIP monthly interest accrual (Libor + 5%) | $    (3,117) $ | (9,350) $ | (18,699) $ | (31,166) |

# **EXHIBIT B**

**DIP Agreement**

# DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

## DATED AS OF APRIL [●], 2019

### BY AND BETWEEN

### WMC MORTGAGE, LLC,

**as Borrower, Debtor and Debtor-in-Possession**

### -AND-

### GE CAPITAL US HOLDINGS, INC.,

**as the Lender**

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This Debtor-in-Possession Credit and Security Agreement is dated as of April [●], 2019 and is by and between WMC MORTGAGE, LLC, a Delaware limited liability company ("Borrower") and GE CAPITAL US HOLDINGS, INC., a Delaware corporation (together with its permitted successors and assigns, the "Lender").

## RECITALS

WHEREAS, the Borrower is a debtor and debtor-in-possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"); and the Borrower filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 23, 2019 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), where the Borrower's bankruptcy case is administered under Case No. [●] (the "Bankruptcy Case");

WHEREAS, the Borrower has requested that the Lender make post-petition loans and advances to the Borrower pursuant to a debtor-in-possession credit facility in an aggregate principal amount not to exceed $25,000,000 at any time outstanding, and the Lender has agreed to provide the Advances, subject in all respects to (i) entry of the Financing Orders and (ii) the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.    For all purposes of this Agreement, except as otherwise expressly provided, the following terms shall have the meanings assigned to them in this Section or in the Section referenced after such term:

"Acceptable Plan" shall mean a Chapter 11 Plan which provides for an effective date no later than thirty (30) days after the date of entry of the Confirmation Order with respect to such Chapter 11 Plan, and which plan provides for the indefeasible payment in full of the Obligations on such effective date.

"Advance" has the meaning set forth in Section 2.1 hereof.

"Affiliate" or "Affiliates" means any Person controlled by, controlling or under direct or indirect common control with such specified Person. For purposes of this definition, (i) "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing and (ii) each of the Borrower and the Lender shall not be treated as an "Affiliate" of such other party.

"Agreement" means this Debtor-in-Possession Credit and Security Agreement, as may be supplemented, amended, or modified from time to time in accordance with its terms.

"Assignment Agreement" means the Assignment Agreement attached hereto as Exhibit A.

"Assignment Trigger" has the meaning set forth in Section 6.13.

"Avoidance Action" means any claim and cause of action that constitutes an avoidance action under Sections 544, 545, 547 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or other insolvency laws, whether by judgment, settlement or otherwise, other than claims and causes of action against the Lender and its Affiliates.

"Bankruptcy Case" has the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Code" has the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Court" has the meaning set forth in the Recitals of this Agreement.

"Budget" means projections approved by the Lender showing (i) all projected Advances required hereunder and (ii) all monthly projected cash disbursements, including for operating expenses, of the Borrower (with detail as to identification of cash disbursements), in each case for the applicable Budget Period; *provided* that the first Budget shall cover the Petition Date through July 31, 2019.

"Budget Period" means, for any date of determination, a period of three calendar months.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Carve-Out" has the meaning set forth in the Financing Order.

"Chapter 11 Plan" means a plan of reorganization proposed by the Borrower or any other Person (including the Lender) in the Bankruptcy Case.

"Clawback Rights" has the meaning set forth in Section 6.13.

"Commitment" means the Lender's commitment to make Advances to the Borrower.

"Confirmation Order" shall mean an order entered by the Bankruptcy Court confirming a Chapter 11 Plan.

"Controlled Account" means any Deposit Account of the Borrower that is subject to a Deposit Account Control Agreement.

"Cut-Off Time" means 12:00 p.m. (Eastern Time).

2

"Default" means an event that, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Period" means any period of time beginning on the day a Default or Event of Default occurs and ending on the date identified by the Lender in writing as the date that such Default or Event of Default has been cured or waived (if at all) in accordance with the applicable provisions hereof.

"Default Rate" means an annual interest rate, in effect during any Default Period or following the DIP Termination Date, of two percent (2%) per annum in excess of the Interest Rate.

"Deposit Account" means any "deposit account" as defined in Article 9 of the UCC.

"Deposit Account Control Agreement" means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to Lender and Borrower that (a) is entered into among Lender, the financial institution or other Person at which such Deposit Account is maintained and the Borrower, and (b) is effective for Lender to obtain "control" (within the meaning of Article 9 of the UCC) of such Deposit Account.

"DIP Closing Date" means the date upon which the conditions precedent set forth in Section 4.1 hereof shall have been satisfied.

"DIP Cash Collateral Account" has the meaning set forth in Section 2.2(b).

"DIP Collateral" means, collectively, all of Borrower's right, title and interest, whether now owned or existing or hereafter acquired or arising, in and to any and all items of its personal property described on Exhibit B hereto, together with all substitutions and replacements thereof and any products and Proceeds (as defined in the UCC) thereof; provided, that the DIP Collateral shall not include any Excluded Property and, further provided that the DIP Collateral shall exclude Avoidance Actions, but subject only to and effective upon entry of the Final Order, the DIP Collateral shall include all proceeds of Avoidance Actions, whether by judgment, settlement or otherwise.

"DIP Liens" has the meaning set forth in Section 3.1(a).

"DIP Superpriority Claim" has the meaning set forth in Section 2.9.

"DIP Termination Date" means the earliest of (a) January 23, 2020; (b) the consummation of a Chapter 11 Plan approved by the Bankruptcy Court, which provides for the indefeasible payment in full of the Obligations; (c) the date the Lender accelerates the Obligations following the occurrence of an Event of Default subject to compliance with the Interim Order and the Final Order, as then applicable; and (d) the date of filing of any Chapter 11 Plan by the Borrower which is not an Acceptable Plan.

"Dollars" and the sign "$" mean the lawful money of the U.S.

3

"Estate" means the estate created in the Bankruptcy Case pursuant to Section 541 (a) of the Bankruptcy Code.

"Event of Default" has the meaning set forth in Section 7.1.

"Excluded Property" means (a) any assets where a pledge and security interest thereon is prohibited by applicable law, rule or regulation, any lease, license or other agreement or any property subject to a purchase money security interest, a capital lease or similar arrangements, in each case, to the extent permitted under this Agreement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement, permit, purchase money, capital lease or similar arrangement or create a right of termination in favor or any other party thereto (other than the Borrower) after giving effect to the applicable provisions of the UCC or other applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under applicable law notwithstanding such prohibition; *provided* that any such asset or capital lease shall cease to be Excluded Property when the applicable restriction(s) described in this clause (a) no longer apply to such asset or capital lease, (b) any United States intent to use trademark application to the extent and for so long as creation by the Borrower or an Affiliate thereof of security interest therein would impair the validity or enforceability of such intent to use trademark application and (c) any claims or causes of action (including Commercial Tort Claims) that the Borrower may have against the Lender or any of its current or former Affiliates and any of its or their successor or assigns, or any of its or their current or former officers, directors, employees, agents, advisors, controlling persons, managers or members.

"Final Order" means a final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents, confirming the Interim Order and authorizing the incurrence by the Borrower of the Indebtedness which is the subject hereof in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in form and substance satisfactory to the Lender in its sole discretion and substantially similar to the Interim Order.

"Financing Order" means the Interim Order or the Final Order, as the context requires, and "Financing Orders" means the Interim Order and the Final Order.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Indebtedness" of any Person means, without duplication, any of the following, whether or not matured: (a) all indebtedness for borrowed money, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all reimbursement obligations with respect to amounts funded under (i) letters of credit, bank guarantees or bankers' acceptances or (ii) surety, customs, reclamation or performance bonds (in each case not related to judgments or litigation), (d) all obligations to pay the deferred purchase price of property or services, other than trade

4

payables and accrued liabilities incurred in the ordinary course of business which are not past due, (e) all obligations created or arising under any conditional sale or other title retention agreement, regardless of whether the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property, (f) all obligations under capital leases and in respect of purchase money Indebtedness and (g) all guaranties for obligations of any other Person constituting Indebtedness of such other Person of the type referred to in clauses (a) through (f) above (the amount of which shall be equal to the stated or determinable amount of the related primary obligation, or, if less, the portion thereof, in respect of which such guarantee obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith).

"Interest Rate" means with respect to any Advances, (i) LIBOR plus (ii) five percent (5.00%) per annum.

"Interim Order" means that certain order to be entered on or before three (3) Business Days after the Petition Date by the Bankruptcy Court approving this Agreement and all transactions contemplated hereunder, substantially in the form of Exhibit A attached hereto.

"Lender Clawback Receipts" means any amounts paid to the Lender in connection with the Clawback Rights following the effectiveness of the Assignment Agreement.

"Liability" means obligations, liabilities and commitments of any kind, whether known or unknown, express or implied, primary or secondary, direct or indirect, absolute, accrued, contingent, un-asserted, determined, determinable or otherwise and whether due or to become due, and including all costs and expenses relating thereto.

"LIBOR" means the rate per annum equal to the London Interbank Offered Rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars) as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Lender from time to time) at approximately 11:00 a.m., London time on the applicable date of determination, for Dollar deposits with a term of one (1) month; *provided*, that in the event that LIBOR as otherwise defined herein is unavailable for any reason, then the Lender and Borrower shall agree on an alternate benchmark rate. If LIBOR shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. Each determination by the Lender of LIBOR shall be conclusive and binding for all purposes, absent manifest error.

"Lien" means (a) any lien, mortgage, pledge, assignment, security interest, charge, license, sublicense or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof), and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Security Documents, the Budget and the Financing Orders, together with every other agreement, note, document, contract or instrument executed and delivered by the Borrower for the benefit of the Lender in connection herewith.

5

"Maximum Rate" has the meaning set forth in Section 2.4(e).

"Maximum Line Amount" means (i) following entry of the Interim Order and prior to the entry of the Final Order, an aggregate amount equal to $5,000,000, and (ii) following entry of the Final Order, an aggregate amount equal to $25,000,000 (which, for the avoidance of doubt, shall include the $5,000,000 described in clause (i)), in each case unless such amount is reduced for any reason hereunder, in which event it means such lower amount.

"Obligations" means the Advances and each and every other Indebtedness, Liability or obligation of every type and description which the Borrower may now or at any time hereafter owe to the Lender arising under any Loan Document between the Borrower and the Lender, whether now in effect or hereafter entered into.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date" has the meaning set forth in the Recitals of this Agreement.

"Prior Liens" means (i) all Liens against the DIP Collateral that were valid, perfected and non-avoidable as of the Petition Date and (ii) Liens against the DIP Collateral imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers', construction or other like Liens securing obligations incurred in the ordinary course of business and existing as of the Petition Date.

"Permitted Variance" means one hundred fifteen percent (115%) of the cumulative disbursements permitted pursuant to the Budget from the Petition Date through and including the last day of the most recent Test Period.

"Security Documents" means this Agreement and any other document delivered to the Lender by or on behalf of the Borrower from time to time pursuant to this Agreement to perfect the security interests in the DIP Collateral.

"Settlement Agreement" means each of the Settlement Agreements set forth on Exhibit A to the Assignment Agreement.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (together with interest, penalties and other additions thereto) in the nature of a tax imposed, levied, collected, withheld or assessed by any Governmental Body.

"Test Period" means a calendar month; *provided*, that the first Test Period shall include the Petition Date through May 31, 2019.

"UCC" means the Uniform Commercial Code as in effect in the State of New York, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

Section 1.2    Other Definitional Terms; Rules of Interpretation. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to

6

this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC. References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or". Defined terms include in the singular number the plural and in the plural number the singular. Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder. Any reference herein or in any other Loan Document to the "Budget," unless otherwise stated, shall be deemed to be a reference to the Budget, as of the date of determination, most recently submitted by the Borrower to the Lender and accepted in writing by the Lender (it being understood that the Lender shall have no obligation to accept any Budget which is not reasonably satisfactory to the Lender).

## ARTICLE II

## AMOUNT AND TERMS OF THE CREDIT FACILITY

Section 2.1    Advances.  The Lender agrees, subject to the terms and conditions of this Agreement and the Financing Orders, to make one or more advances (each an "Advance" and collectively, the "Advances"), to the Borrower from time to time from the date that all of the conditions set forth in Article IV are satisfied or waived, but in no event more frequently than once every two (2) weeks, through and until (but not including) the DIP Termination Date in an aggregate amount not in excess of the lesser of (i) $2,000,000 or (ii) the Advance line item amount set forth in the Budget for the calendar month during which the applicable Advance is requested to be made, *provided*, however, that at no time shall the aggregate amount of Advances made hereunder exceed the Maximum Line Amount on the applicable date of determination. The Borrower's obligation to pay the Advances shall be secured by the DIP Liens granted in the DIP Collateral pursuant to the Security Documents.

Section 2.2    Procedures for Requesting Advances.  The Borrower shall comply with the following procedures in requesting Advances:

(a)    Time for Requests.  The Borrower shall request each Advance no more than once every two weeks and not later than the Cut-Off Time three (3) Business Days prior to the date the Advance is to be made, or such shorter time period to which the Lender may agree in writing. Each such request shall set forth the aggregate amount of the requested Advance and

7

the date of borrowing of such Advance, and shall be delivered to the Lender (but only if and when actually received by the Lender) in writing by electronic mail or telecopy transmission, and certified as conforming to the terms of this Agreement and to the parameters of the Budget, by an authorized representative of the Borrower.  Any request for an Advance shall be deemed to be a representation by the Borrower that the conditions set forth in Sections 4.1 and 4.2 hereof have been satisfied as of the time of the request.

(b)  Disbursement.  Upon fulfillment of the applicable conditions set forth in Article IV, the Lender shall disburse the proceeds of the requested Advance to Borrower's bank account maintained at Deutsche Bank Trust Company or at such other banking institution reasonably satisfactory to the Lender (as approved by the Lender in writing), provided that any such account shall be a Controlled Account (the "DIP Cash Collateral Account"). If any such Advance is to be made on a day which is not a Business Day, such Advance shall instead be made on the next succeeding Business Day. Amounts maintained in any such disbursement account shall only be withdrawn to fund amounts in accordance with the Budget and in accordance with the provisions of Section 2.5 hereof.

Section 2.3     Payment of the Advances, etc. On the DIP Termination Date, the entire unpaid principal balance of the Advances, all unpaid interest accrued thereon and any other Obligations owed hereunder shall be fully due and payable. The payment of any and all Obligations hereunder shall be made in Dollars.  The Borrower may, from time to time, prepay the Obligations, in whole or in part, without premium or penalty.

Section 2.4     Application of Payments.

(a)  Interest on Advances.  The outstanding principal amount of each Advance shall bear interest at the Interest Rate. Interest shall accrue daily and shall be payable quarterly in arrears on the first calendar day of each calendar quarter commencing with June 1, 2019 and terminating on the DIP Termination Date.  Interest shall be paid in kind by adding the amount of each such payment to the then outstanding principal amount of the Advances.

(b)  Default Interest Rate.  At any time during any Default Period or following the DIP Termination Date, in the Lender's sole discretion and without waiving any of its other rights and remedies, the outstanding principal amount of each Advance shall bear interest at the Default Rate (or such lesser rate as the Lender may in writing determine), effective as of the day such Default Period begins through the last day of such Default Period (or any shorter time period that the Lender may in writing determine).  The decision of the Lender to impose a rate that is less than the Default Rate or to not impose the Default Rate for the entire duration of the Default Period shall be made by the Lender in its sole discretion and shall not be a waiver of any of its other rights and remedies, including its right to retroactively impose the full Default Rate for the entirety of any such Default Period or following the DIP Termination Date.

(c)  Application of Payments.  Payments shall be applied to the Obligations on the Business Day of receipt by the Lender. All payments shall be applied first to any accrued interest and fees and then to any outstanding principal amount of the Advances.

(d)  Computation of Interest and Fees.  Interest accruing on the outstanding principal balance of the Advances shall be computed on the basis of actual number of days elapsed in a year of 360 days.

(e)  Usury.  Notwithstanding any other provision herein, the aggregate interest paid or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the outstanding principal of the Advances or, at the Lender's option, be refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

(f)  Payment on Non-Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances or the fees hereunder, as the case may be.

Section 2.5    Use of Proceeds; Limitations on Advances.  The Borrower shall (a) use the proceeds of Advances for working capital and general corporate purposes only, including the funding of Borrower's post-petition operations, professional fees and expenses, and other items all strictly in accordance with the allowed disbursement line item(s) set forth in the Budget but subject to the Permitted Variance and (b) not use any proceeds of Advances for any purpose adverse to or otherwise against the rights, remedies or interests of the Lender or any of its Affiliates (including, without limitation, any preparation, initiation or prosecution of any causes of action of any nature whatsoever against Lender or any of its Affiliates); provided, however, that if the Borrower initiates or prosecutes causes of action against the Lender or any of its Affiliates in the Bankruptcy Court, the Lender shall continue to make Advances as provided herein but only in such amount as necessary to pay the Borrower's operating expenses and the administrative expenses of the Chapter 11 Case, but not, for the avoidance of doubt, any amounts related to the initiation, or prosecution of any such causes of action against the Lender and any of its Affiliates.  Notwithstanding the foregoing, this Section 2.5 shall in no way limit the Borrower's use of proceeds of Advances by the special committee of the Borrower's board of directors or any official committee of unsecured creditors appointed in the Bankruptcy Case, to investigate (but not to initiate or prosecute) any causes of action of any nature whatsoever against the Lender or any of its Affiliates, subject to the Budget.

Section 2.6    Single Loan.  All Advances to Borrower and all of the other Obligations of the Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of the Borrower secured by the DIP Liens in the DIP Collateral.

Section 2.7    [Reserved]

9

Section 2.8    <u>Grants, Rights and Remedies</u>.    The DIP Liens and the administrative priority granted to the Lender under or pursuant to the Financing Orders, this Agreement and/or any Loan Documents from time to time have been or may be independently granted by any of such orders and/or agreements.    Such orders and agreements supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

Section 2.9    <u>DIP Superpriority Claim</u>.    The Lender shall have a super-priority administrative expense claim (the "<u>DIP Superpriority Claim</u>") pursuant to Bankruptcy Court approval in the Interim Order and the Final Order with respect to the Obligations that will, in accordance with Section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, but shall be subject to the Carve-Out.

Section 2.10    <u>Payments Free of Taxes; Tax Forms</u>.

(a)    Any and all payments by or on account of any obligation of the Borrower hereunder and under the other Loan Documents shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of the Lender) requires the deduction or withholding of any Tax from any such payment by the Lender, then the Lender shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law.

(b)    Upon reasonable request of the Borrower after funding, the Lender shall deliver to the Borrower any other customary tax-related certificates or documentation, including to establish an exemption under the "portfolio interest exemption."  In the event that any form or certification previously delivered by the Lender expires or becomes obsolete or inaccurate in any respect, the Lender shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

Section 2.11    <u>Evidence of Debt</u>. The Lender shall maintain on its internal records an account or accounts evidencing the Obligations of the Borrower to the Lender, including the amounts of the Advances made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; <u>provided,</u> that, the failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of any applicable Advances.

**ARTICLE III**

**<u>SECURITY INTEREST</u>**

Section 3.1    <u>Grant of Security Interest</u>.    The Borrower hereby pledges, assigns and grants to the Lender new Liens (the "<u>DIP Liens</u>") on and security interests in all of the Borrower's right, title and interest in and to and under, the DIP Collateral, pursuant to Sections

10

364(c)(2), 364(c)(3) of the Bankruptcy Code, which shall at all times rank senior in priority to all Liens (other than the Prior Liens) as security for the payment and performance of the Obligations and as an element of the consideration for the Advances.

Section 3.2    <u>Lien Perfection; Further Assurances</u>.    The DIP Liens securing the Obligations granted herein, shall be deemed valid and perfected by entry of the Interim Order (subject to any limitations set forth therein) and entry of the Interim Order shall have occurred on or before the date of any Advances.  The Interim Order, and, if and when it becomes effective, the Final Order, shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Lender's DIP Liens upon the DIP Collateral, without the necessity of filing or recording any financing statement, assignment or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens of the Lender in and to the DIP Collateral or to entitle the Lender to the priorities granted herein; provided, however, that Borrower shall, upon the request of the Lender, execute such instruments, assignments or other documents as Lender reasonably requests. Borrower agrees to furnish any information requested by Lender to perfect or maintain the perfection of Lender's DIP Liens to Lender promptly upon request.  No filings or recordations shall be necessary or required in order to create or perfect any such DIP Liens. At the Lender's request, Borrower shall also promptly execute or cause to be executed and shall deliver to Lender any and all documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of the Loan Documents.  The Borrower agrees to notify the Lender no less than thirty (30) days prior to making any change of its name, corporate form or jurisdiction of formation.

Section 3.3    <u>Financing Statement</u>.  Borrower authorizes the Lender to file from time to time, at its sole discretion, such financing statements against DIP Collateral describing specific items of collateral as the Lender deems appropriate.

Section 3.4    <u>DIP Collateral</u>.  The Lender's duty of care with respect to DIP Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such DIP Collateral, or in the case of DIP Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Lender need not otherwise preserve, protect, insure or care for any DIP Collateral. The Lender shall not be obligated to preserve any rights Borrower may have against prior parties, to realize on the DIP Collateral at all or in any particular manner or order or to apply any cash proceeds of the DIP Collateral in any particular order of application. Borrower waives any right it may have to require the Lender to pursue any third Person for any of the Obligations.

Section 3.5    <u>Survival</u>.    The DIP Liens, Lien priority, administrative priorities (including the DIP Superiority Claim) and other rights and remedies granted to the Lender pursuant to this Agreement, any of the other Loan Documents or the Financing Orders (specifically including, but not limited to, the existence, perfection and priority of the DIP Liens provided herein and therein, and the administrative priority and priming liens provided for herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Bankruptcy Case (or

11

any related case, or by any other act or omission whatsoever). Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

       (a)     no costs or expenses of administration which have been or may be incurred in the Bankruptcy Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against Borrower in respect of any Obligation, except as expressly set forth in this Agreement and/or in the Financing Orders;

       (b)     the DIP Liens in favor of the Lender set forth in <u>Section 3.1</u> and <u>Section 3.2</u> hereof shall at all times constitute valid and perfected Liens on and security interests in the DIP Collateral, subject and junior only to the Prior Liens, and shall be prior and senior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (other than the Prior Liens); and

       (c)     the Assignment Agreement and <u>Section 6.13</u> of this Agreement shall survive the termination of this Agreement.

## ARTICLE IV

## CONDITIONS OF LENDING

     Section 4.1   <u>Conditions Precedent</u> .  The Lender's obligation to make any Advance on the date hereof shall be subject to the condition precedent that the Lender shall have received all of the following, each properly executed by the parties thereto and in form and substance reasonably satisfactory to the Lender in its sole discretion, unless otherwise waived in writing by the Lender:

     (a)  this Agreement;

     (b)  any other Loan Documents requested by the Lender on or prior to the date hereof (including, without limitation, (i) the Assignment Agreement and (ii) a Deposit Account Control Agreement relating to the bank account which is the subject of Section 2.2(b) hereof, in form and substance satisfactory to the Lender);

     (c)  required governmental and third-party consents (if any);

     (d)  the Interim Order shall have been entered by the Bankruptcy Court, in form and substance satisfactory to the Borrower and the Lender and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender;

     (e)  an officer's certificate of the Borrower confirming as of the date of such Advance (i) the representations and warranties set forth in <u>Article V</u> are true and correct, (ii) no Default or Event of Default has occurred and is continuing, and no order has been entered by the Bankruptcy Court that has resulted in the occurrence of an Event of Default and (iii) the

aggregate amount of all Advances (including the applicable requested Advance) do not exceed the Permitted Variance; and

(f)    such other documents as the Lender may require in its reasonable discretion.

Section 4.2    <u>Additional Conditions Precedent to the Advances</u>.  In addition to the items described in <u>Section 4.1</u>, the Lender's obligation to make the Advances to the Borrower shall be subject to the satisfaction of the following conditions precedent in a manner and pursuant to documentation reasonably acceptable to the Lender in its sole discretion:

(a)    the representations and warranties set forth in <u>Article V</u> are true and correct in all material respects on the date of such Advance as if such representations and warranties were made on and as of such date;

(b)    no Event of Default shall have occurred; and

(c)    there shall not be pending any motion, application or other filing in the Bankruptcy Case or other court of competent jurisdiction which, if granted by the Bankruptcy Court or other court of competent jurisdiction, could reasonably be expected to result in an Event of Default.

Each request for an Advance hereunder shall constitute a representation and warranty by the Borrower as of the date of the resulting Advance that the conditions contained in <u>Section 4.2</u> in respect of such Advance have been satisfied.

## ARTICLE V

## <u>REPRESENTATIONS AND WARRANTIES</u>

The Borrower represents and warrants to the Lender on the date of this Agreement and on date of each Advance as follows:

Section 5.1    <u>Existence and Power; Enforcement</u>.  Upon entry of the Interim Order, Borrower shall be deemed to have all requisite limited liability company power and authority to conduct its business, to own its properties and to execute and deliver the Loan Documents to which it is a party and to perform all of the obligations herein and in the other Loan Documents and the transactions contemplated herein. Each of the Loan Documents has been duly executed and delivered by the Borrower and constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

Section 5.2    <u>Title</u>.  The Borrower owns its assets free and clear of all Liens other than the Prior Liens.

Section 5.3    <u>Liens</u>.  Pursuant to Section 364(c)(2) of the Bankruptcy Code and as set forth in the Financing Orders, all Obligations are secured by the perfected DIP Liens on the DIP

13

Collateral, subject only and (i) junior to the Prior Liens and (ii) senior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (other than the Prior Liens).

Section 5.4    Orders.    The applicable Financing Orders are in full force and effect and have not been reversed, modified, amended, subject to a pending appeal, stayed or vacated; and the Borrower is not in breach or violation of any of its obligations thereunder.

Section 5.5    Certain Priorities.    The Borrower is in compliance with the provisions of Section 3.1 hereof; the Lender has the Lien priorities and administrative priorities which are the subject of such section; and the Borrower is not in breach or violation of any of its obligations thereunder.

Section 5.6    No Conflict; No Consents.    Subject to the entry of the applicable Financing Orders, the execution of the Loan Documents and the performance by the Borrower of its obligations thereunder will not violate or conflict with its constituent documents or any provision of law applicable to it or any material agreement, indenture, note or other instrument binding upon the Borrower or its property.    Subject to the entry of the applicable Financing Orders, no authorization from or consent by any Governmental Body is required in connection with the making or validity of and the execution, delivery and performance of any of the Loan Documents.

## ARTICLE VI

## COVENANTS

Borrower will comply with the following requirements, unless the Lender shall otherwise consent in writing:

Section 6.1    Compliance with Budget; Variance Reports.

(a)    At all times the Borrower shall perform in accordance with the Budget such that the Borrower's cumulative disbursements from the Petition Date through and including the last day of the most recently ended Test Period shall not be more than the Permitted Variance unless the Borrower requests and the Lender approves in writing.

(b)    No later than three Business Days prior to the last day of a Budget Period, an authorized representative of the Borrower shall deliver to the Lender the Budget covering the immediately succeeding Budget Period.    An authorized representative of the Borrower will also deliver a copy of such Budget to (i) the Office of the United States Trustees for Region 3 and (ii) any statutory committee in the Bankruptcy Case, in each case on the date and at the time set forth in the first sentence of this Section 6.1(b).

(c)    By no later than 5:00 p.m. (prevailing Eastern Time) on the seventh Business Day after the last day of the calendar month after each Test Period, an authorized representative of the Borrower shall deliver to the Lender a certificate, together with a variance report certified as true and correct by an authorized representative of the Borrower and in form and detail satisfactory to the Lender in its reasonable discretion, showing (i) on a line-item basis, actual

14

disbursements, in each case on a monthly and cumulative basis through such Test Period, (ii) any variances against the Budget for the periods described in <u>Section 6.1(a)</u>, in form and detail satisfactory to the Lender in its reasonable discretion, which fully and accurately describes the extent to which the Borrower complied (or failed to comply) with the Budget for the applicable Test Period, and (iii) an aged report listing post-petition accounts payable. In addition to, and notwithstanding the foregoing, Borrower shall provide to the Lender such other information and data relating to the Budget and disbursements as the Lender may reasonably request from time to time.

Section 6.2    <u>Liens; Financing Statements</u>.

(a)    Borrower will not create, incur or suffer to exist any Lien upon or of any of the DIP Collateral to secure any indebtedness; excluding, however, from the operation of the foregoing, the following:

(i)    the Prior Liens;

(ii)    the DIP Liens created herein; and

(iii)    such other Liens as Lender may hereafter approve in writing.

(b)    Borrower will not amend any financing statements in favor of the Lender except as permitted by law.  Any authorization by the Lender to any Person to amend financing statements in favor of the Lender shall be in writing.

Section 6.3    <u>Indebtedness</u>.  Borrower shall not incur any Indebtedness, except (a) the Obligations and (b) to the extent approved in writing by the Lender.

Section 6.4    <u>Existence; Business and Properties</u>.  Borrower will (a) preserve and maintain in full force and effect its limited liability company existence and (b) take all reasonable action to maintain all material rights, privileges and franchises necessary in the normal conduct of its business as currently conducted.

Section 6.5    <u>Investments and Subsidiaries</u>.  Borrower will not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person or Affiliate, including any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of Indebtedness of any other Person or Affiliate.

Section 6.6    <u>DIP Collateral Examination and Inspection; Reporting</u>.

(a)    Borrower will permit the Lender or its employees, accountants, attorneys or agents, to examine and inspect any books and records or any other property of Borrower at any reasonable time during ordinary business hours and upon two (2) Business Days' written notice if such inspection requires a visit to Borrower's offices; *provided* that such two (2) Business Days' written notice shall not be required upon the occurrence and during the continuance of an Event of Default.

15

(b)   Borrower shall furnish to Lender such financial and other information as to its business or property as Lender shall from time to time reasonably request.

Section 6.7    <u>Financing Orders Administrative Priority; Lien Priority; Payment of Claims</u>.

(a)   Borrower will not at any time seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to in writing by the Lender or otherwise in connection with the payment in full of the Obligations.

(b)   Borrower will not at any time seek, consent to or suffer to exist a priority for any administrative expense or unsecured claim against Borrower or the Estate (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations.

(c)   Other than the Prior Liens, Borrower will not, at any time, suffer to exist any Lien on the DIP Collateral having a priority equal or superior to the DIP Liens in favor of the Lender in respect of the DIP Collateral.

(d)   The Borrower shall at all times comply with the Financing Orders and all other orders entered by the Bankruptcy Court in the Bankruptcy Case.

Section 6.8    <u>Certain Notices</u>.   Promptly and in any event within three Business Days after any officer of Borrower obtaining knowledge of the occurrence of any Default or Event of Default, a notice specifying the nature and period of existence of such condition, event or change and the action taken or proposed to be taken with respect thereto shall be deliverable to Lender.

Section 6.9    <u>Compliance with Laws; Taxes</u>.   The Borrower will comply in all material respects with all laws, rules, regulations and orders of any Governmental Body applicable to its or its property.   The Borrower shall (a) timely file all federal income and material state and local tax returns that are required to be filed by it under applicable law and (b) timely pay and discharge all material Taxes imposed upon it or upon any of its properties.

Section 6.10    <u>Sale of Assets</u>.   The Borrower will not dispose of or transfer all or any portion of the DIP Collateral in one or more transaction or series of transactions, other than with the express written consent of the Lender.

Section 6.11    <u>Use of Proceeds</u>.   The Borrower will use the proceeds of the Advances as set forth in Section 2.5 hereof.

Section 6.12    <u>Budget</u>.   The Borrower will not amend or modify the Budget without the prior written consent of the Lender.

Section 6.13    <u>Settlement Agreements</u>.   The Borrower shall use its reasonable best efforts to enforce its rights to payment under each of the Settlement Agreements (such rights,

collectively, the "Clawback Rights").  If an Event of Default under Section 7.1 occurs, then, subject to paragraph 22 of the Interim Order (except with respect to an Event of Default under Section 7.1(o)), the Assignment Agreement shall become immediately and automatically effective without any further action required by either the Borrower or the Lender (the conditions described in this sentence, the "Assignment Trigger"); *provided*, *however*, that an amount, if any, equal to the excess of (x) any Lender Clawback Receipts over (y) proceeds of any Lender Clawback Receipts used to repay any Advances made hereunder or other loans made by the Lender to the Borrower during the pendency of the Bankruptcy Case shall be returned within three (3) Business Days to the Borrower or any trust established in the Bankruptcy Case, as applicable, upon the culmination of the Bankruptcy Case.

## ARTICLE VII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

Section 7.1    Events of Default.  "Event of Default," wherever used herein, means any one or more of the following events:

(a)    Failure by the Borrower to pay (i) the principal of, or interest on, any Advances due hereunder when due or (ii) any other amounts owing hereunder within five (5) Business Days after such amounts become due.

(b)    the Final Order shall not have been entered into no later than the date that is thirty-five (35) days from the date of the Interim Order or such later date as agreed to by the Lender (or such order shall fail to be in full force and effect at all times from and after the date entered or shall have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender) or shall have been entered in a form not acceptable to the Lender;

(c)    the Borrower shall fail to comply or shall default in the performance of any term of any of the Financing Orders or fail to meet any deadlines in the Financing Orders or any other default or "Event of Default" under and as defined in either of the Financing Orders shall occur, unless the Lender consents in writing or as otherwise ordered by the Bankruptcy Court;

(d)    any representation or warranty made by the Borrower in this Agreement, or by the Borrower (or any of its officers) in the Budget or in any other agreement or certificate delivered in writing pursuant to or in connection with this Agreement, or any certification provided by the Borrower, shall prove to have been untrue or incorrect in any material respect as of the date made or certified or deemed made or certified;

(e)    any breach of any of the covenants or agreements of the Borrower under this Agreement or any of the other Loan Documents;

(f)    failure at any time to comply with the Budget in accordance with Section 6.1(a) hereof, unless the Lender consents in writing or as otherwise ordered by the Bankruptcy Court;

17

(g)   the Bankruptcy Court enters an order modifying, reversing, revoking, staying, rescinding, vacating, or amending any of the Financing Orders or any of the Loan Documents;

(h)   the Borrower shall file or any other Person shall obtain an order granting any motion or application which seeks approval for or allowance of (i) the authority to use any DIP Collateral, or (ii) any claim, Lien, or security interest ranking equal or senior in priority to the DIP Liens granted to the Lender herein and under the Financing Orders or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted herein and under the Financing Orders;

(i)   the priority of the DIP Liens or DIP Superpriority Claim, as described, pledged, assigned and granted in or pursuant to Section 3.1 hereof shall have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender;

(j)   the entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(k)   the entry of an order appointing a trustee in the Bankruptcy Case or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) under section 1106(b of the Bankruptcy Code);

(l)   the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender, to realize upon, or to exercise any right or remedy with respect to, any DIP Collateral;

(m)   any litigation is commenced, and is not dismissed, stayed or withdrawn within seventy five (75) days of commencement, against Lender or any of its Affiliates by any person or entity in any court other than the Bankruptcy Court seeking to hold Lender or any of its Affiliates liable for any claims or obligations relating to Borrower on any legal grounds;

(n)   the Borrower or any committee appointed in the Bankruptcy Case shall file a pleading in the Bankruptcy Court or any court of competent jurisdiction (i) challenging the validity, perfection or priority of any DIP Liens of the Lender or (ii) challenging the validity or enforceability of the Lender's Loan Documents and, in each case, such pleading is not dismissed, stayed or withdrawn within seventy five (75) days of commencement; or

(o)   the Borrower fails to utilize best efforts in accordance with Section 6.13 hereof or does not receive payment pursuant to the Clawback Rights under any Settlement Agreement within sixty five (65) days of the date of a WMC Trust Payment (as defined in the applicable Settlement Agreement).

Section 7.2    Rights and Remedies.  During any Default Period, after giving any notice required by the Financing Orders and otherwise subject to the terms of the Financing Orders, notwithstanding the automatic stay under Section 362 of the Bankruptcy Code (which automatic stay shall be automatically terminated on the DIP Termination Date, without further notice or

18

order of the Bankruptcy Court), the Lender may exercise any or all of the following rights and remedies:

(a)    the Lender may, by notice to the Borrower, declare the Commitment to be terminated, whereupon the same shall forthwith terminate;

(b)    the Lender may, by notice to the Borrower, declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrower hereby expressly waives;

(c)    the Lender may, without notice to the Borrower and without further action, apply any and all money owing by the Lender to the Borrower to the payment of the Obligations;

(d)    the Lender may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC or otherwise, including the right to take possession of DIP Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, except as set forth in Financing Orders) and the right to transfer or assign any or all of the DIP Collateral (with or without giving any warranties as to the DIP Collateral, title to the DIP Collateral or similar warranties), and, in connection therewith, the Borrower will, on demand, make the DIP Collateral available to the Lender in a form to be designated by the Lender which is reasonably convenient to both parties;

(e)    the Lender may exercise and enforce its rights and remedies under this Agreement, any of the other the Security Documents, and any of the other Loan Documents;

(f)    the Lender may apply any DIP Collateral to the Obligations; and

(g)    subject to the limitations set forth in Section 7.2(d), the Lender may exercise any other rights and remedies available to it by law or agreement.

If the Borrower at any time fails to perform or observe any of the covenants contained herein, and if such failure shall constitute a Default or Event of Default, the Lender may, but need not, perform or observe such covenant on behalf and in the name, place and stead of the Borrower (or, at the Lender's option, in the Lender's name) and may, but need not, take any and all other actions which the Lender may reasonably deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account debtors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrower shall thereupon pay to the Lender on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Lender. To facilitate the Lender's performance or observance of such covenants of the Borrower, the Borrower hereby irrevocably appoints the Lender, or the Lender's delegate, acting alone, as the Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and

19

on behalf of the Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements and writings required to be obtained, executed, delivered or endorsed by the Borrower hereunder.

Section 7.3    Certain Notices.  If notice to the Borrower of any intended disposition of the DIP Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given (in the manner specified in Section 8.3) at least ten calendar days before the date of intended disposition or other action.

Section 7.4    Waiver of Marshaling.  The Debtor agrees that the Lender shall not be subject to the equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the DIP Collateral.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1    No Waiver; Cumulative Remedies; Compliance with Laws.  No failure or delay by the Lender in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law. The Lender may comply with any applicable state or federal law requirements in connection with a disposition of the DIP Collateral and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the DIP Collateral.

Section 8.2    Amendments, Etc.  No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of the Lender's DIP Liens shall be effective unless the same shall be in writing and signed by the parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 8.3    Notices; Communication of Confidential Information; Requests for Accounting.  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be sent by (a) hand delivery or overnight mail or (b) electronic mail, in each case delivered or sent to the party to whom notice is being given to the business address and e-mail address set forth below (or as may be hereafter designated in writing to the other party). All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (w) the date received if personally delivered, (x) the date delivered by the courier or messenger if delivered by overnight courier or messenger, or (z) the date of transmission if sent by email, except that notices or requests delivered to the Lender pursuant to any of the provisions of Article II shall not be effective until received by the Lender. All notices, financial information, or other business records sent by either party to this Agreement may be transmitted, sent, or otherwise communicated via such medium as the sending party may deem

appropriate and commercially reasonable.  The Borrower hereby requests that the Lender respond to all such requests which on their face appear to come from an authorized individual and releases the Lender from any liability for so responding. Unless and until any party hereto notifies the other party as provided above, notices shall be sent in accordance with the following information:

| If to the Borrower: | WMC Mortgage, LLC |
| | 6320 Canoga Ave., Suite 1420 |
| | Woodland Hills, CA 91367 |
| | Attention: Mark V. Asdourian |
| | Mark.asdourian@wmcmortgagellc.com |

With a copy to:     Richards, Layton & Finger
                    One Rodney Square
                    920 North King Street
                    Wilmington, DE 19801
                    Attention: Russell C. Silberglied
                    silberglied@rlf.com

If to the Lender:   GE Capital US Holdings, Inc.
                    901 Main Avenue
                    Norwalk, CT 06851
                    Attention: Christopher D. Moore
                    Christopher.d.moore@ge.com

With a copy to:     Weil, Gotshal & Manges LLP
                    767 Fifth Avenue
                    New York, NY 10153
                    Facsimile: 212-310-8007
                    Attention:  Jacqueline Marcus
                    E-mail: Jacqueline.marcus@weil.com

Section 8.4    <u>Further Assurances, etc</u>.  The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request from time to time in connection with this Agreement or any of the other Loan Documents or the transactions contemplated hereby or thereby (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the DIP Liens granted hereunder, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

21

Section 8.5    <u>Indemnification and Expenses</u>.

(a)  The Borrower will indemnify and hold harmless the Lender, its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") from and against all reasonable and documented costs, expenses (including reasonable and documented out-of-pocket fees, disbursements and other charges of outside counsel but subject to the limitations set forth two paragraphs below) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the DIP Facility, any of the orders referenced herein, or the transactions contemplated hereby/thereby; *provided that*, no Indemnified Person will be indemnified for any cost, expense  or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted (i) from such Indemnified Person's gross negligence or willful misconduct, (ii) from a claim brought by the Borrower against an Indemnified Person for material breach of such Indemnified Person's obligations under the DIP Facility or under any documents or agreements executed in connection therewith, or (iii) from a dispute solely among Indemnified Persons.

(b)  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's bad faith, gross negligence, willful misconduct or material breach of its obligations hereunder. In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.

(c)  Any amounts which are due pursuant to this section shall be payable on the DIP Termination Date.

Section 8.6    <u>Execution in Counterparts; Electronic Execution</u>.  This Agreement and other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by electronic means also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 8.7    <u>Binding Effect; Assignment; Complete Agreement; Sharing Information</u>. The Loan Documents shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns (<u>provided</u> that (i) the obligations of the Borrower hereunder cannot be transferred or assigned other than to any trustee or examiner of the Borrower or the Estate and (ii) the Lender may assign to an Affiliate thereof all or a portion

22

of the Lender's rights and obligations hereunder upon (x) the consent of the Borrower or (y) an order of the Bankruptcy Court). This Agreement, together with the Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, this Agreement shall control.

Section 8.8    Severability of Provisions.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

Section 8.9    Headings.  Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 8.10    Governing Law: Jurisdiction, Venue; Waiver of Jury Trial.  The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of New York. The parties hereto hereby (i) consent to the personal jurisdiction of the Bankruptcy Court in connection with any controversy related to this Agreement; (ii) waive any argument that venue in any such forum is not convenient; (iii) agree that any litigation initiated by the Lender or the Borrower in connection with this Agreement or the other Loan Documents shall be venued exclusively in the Bankruptcy Court; and (iv) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. **THE BORROWER AND THE LENDER WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.**

Section 8.11    Lender as Party-in-Interest.  The Borrower hereby stipulates and agrees that the Lender is and shall remain a party in interest in the Bankruptcy Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, the Lender shall have the right to make any motion or raise any objection it deems to be in its interest, provided that the Lender will not exercise such right if the action or inaction by the Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 8.12    Waiver of Right to Obtain Alternative Financing.  In consideration of the Advances made or to be made to the Borrower by the Lender, the Borrower hereby further waives any rights it may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain additional financing pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lender, unless such financing (i) would result in full payment of all of the Obligations owed to the Lender, or (ii) is consented to by the Lender.

Section 8.13    [Reserved].

Section 8.14   <u>Set-Off</u>.   In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized by the Borrower at any time or from time to time, without notice to the Borrower or to any other Person except as set forth in the Financing Orders, to set-off and to appropriate and to apply any other obligations or Indebtedness at any time held or owing by the Lender to or for the credit or the account of the Borrower against and on account of the Obligations the Borrower to the Lender hereunder, and under the other Loan Documents, including all claims of any nature or description arising out of or connected hereto or with any other Loan Document, The rights of the Lender under this <u>Section 8.14</u> are in addition to other rights and remedies (including other rights of set-off) that the Lender may otherwise have.

Section 8.15   <u>Payments Set Aside</u>.   To the extent that the Borrower makes any payment to the Lender, or the Lender exercises its right to set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party in connection with any insolvency proceeding or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred.

Section 8.16   <u>Independence of Covenants</u>.   All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not preclude the occurrence of a Default or an Event of Default if such action is taken or condition exists.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

24

IN WITNESS WHEREOF, the parties hereto have caused this Debtor-in-Possession Credit and Security Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**<u>Lender</u>**

**GE CAPITAL US HOLDINGS, INC.**


By: _____
Name:  Christopher D. Moore
Title:   Vice President and General Counsel

**<u>Borrower</u>**

**WMC MORTGAGE, LLC**


By: _____
Name:
Title:

**EXHIBIT A TO**
**DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT**

**Assignment Agreement**

[Attached.]

# ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "Agreement"), dated as of April [●], 2019, is entered into by and between WMC Mortgage, LLC, a Delaware limited liability company (the "Borrower") and GE Capital US Holdings, Inc., a Delaware corporation (the "Lender"; each of the Borrower and the Lender are referred to herein as a "Party" and together, collectively, as the "Parties").

WHEREAS, the Lender and the Borrower have entered into that certain Debtor-in-Possession Credit and Security Agreement, dated as of April [●], 2019 (the "DIP Agreement"), providing for, among other things, the provision by the Lender to the Borrower of a debtor-in-possession credit facility in an aggregate principal amount not to exceed $25,000,000; and

WHEREAS, in accordance with and subject to the terms of the DIP Agreement, the Lender and the Borrower have agreed to enter into this Agreement, providing for the assignment from Borrower to the Lender of all of the Borrower's right, title and interest in, under and to the Clawback Rights in each of the Settlement Agreements from and after this Agreement becomes effective in accordance with its terms.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

1. **Definitions**.

(a) Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the DIP Agreement.

(b) In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings:

"Clawback Rights" means the payment rights under each of the Settlement Agreements.

"Settlement Agreement" means each of the Settlement Agreements set forth on Exhibit A hereto.

2. **Assignment**.  The Borrower hereby conveys, assigns, transfers and delivers to the Lender all of the Borrower's worldwide right, title and interest in, under and to the Clawback Rights in each of the Settlement Agreements from and after the date that this Agreement becomes effective in accordance with its terms.

3. **Acceptance**.    The Lender hereby accepts the assignment, transfer and conveyance of all of the Borrower's worldwide right, title and interest in, under and to the Clawback Rights in each of the Settlement Agreements from and after the date that this Agreement becomes effective in accordance with its terms.

4. **Effectiveness**.   This Agreement shall be effective immediately upon the occurrence of the Assignment Trigger.

5. **Further Assurances**.   Following the date first written above, as and when reasonably requested by either Party, the other Party shall promptly execute and deliver, or cause to be executed and delivered, all such documents, instruments and certificates and shall take, or cause to be taken, all such further or other actions as are necessary to evidence and effectuate the assignment and transfer to the Lender of all of the Borrower's worldwide right, title and interest in, under and to the Clawback Rights in each of the Settlement Agreements in accordance with the terms of this Agreement and the DIP Agreement.

6. **Parties in Interest**.   This Agreement shall inure to the benefit of, and be binding upon, the Parties and the successors by operation of law and permitted assigns of the Parties.

7. **Conflicts**.   This Agreement is executed and delivered pursuant to the DIP Agreement. This Agreement may not be deemed to defeat, limit, alter, impair, enhance or enlarge any right, obligation, claim or remedy created by the DIP Agreement, and in the event of any conflict between this Agreement and the DIP Agreement, the DIP Agreement shall control.

8. **Counterparts**.   This Agreement may be executed in two (2) or more counterparts (including by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

9. **Loan Documents**.   This Agreement shall be deemed to be a Loan Document.

10. **Survival**.   Pursuant to Section 3.5(c) of the DIP Agreement, this Agreement shall survive termination of the DIP Agreement.

11. **Governing Law**.   This Agreement shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of New York. The parties hereto hereby (i) consent to the personal jurisdiction of the Bankruptcy Court in connection with any controversy related to this Agreement; (ii) waive any argument that venue in any such forum is not convenient; (iii) agree that any litigation initiated by the Lender or the Borrower in connection with this Agreement shall be venued exclusively in the Bankruptcy Court; and (iv) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. **THE BORROWER AND THE LENDER WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.**

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first written above.

**Lender**

**GE CAPITAL US HOLDINGS, INC.**


By: _____
Name:  Christopher D. Moore
Title:   Vice President and General Counsel

[SIGNATURE PAGE TO ASSIGNMENT AGREEMENT]

**<u>Borrower</u>**

**WMC MORTGAGE, LLC**


By: _____
Name:
Title:

**EXHIBIT A TO ASSIGNMENT AGREEMENT**
**LIST OF SETTLEMENT AGREEMENTS**

# FILED UNDER SEAL

**EXHIBIT B TO**
**DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT**

The DIP Collateral shall be all of Borrower's right, title and interest, whether now owned or existing or hereafter acquired or arising, in and to the following unless specifically designated as Excluded Property (capitalized terms used but not defined herein shall have the meanings given such terms in the Agreement or the UCC, as applicable):

(a)     all Accounts;

(b)     all cash, cash equivalents and all Deposit Accounts;

(c)     all Commercial Tort Claims;

(d)     all Chattel Paper;

(e)     all Documents;

(f)     all Equipment;

(g)     all Fixtures;

(h)     all General Intangibles;

(i)     all Goods;

(j)     all Instruments;

(k)     all Inventory;

(l)     all Investment Property;

(m)     all Letters of Credit and Letter-of-Credit Rights;

(n)     all leases of Grantor;

(o)     all Promissory Note and other debt securities;

(p)     all books and records pertaining to the Collateral;

(q)     all Supporting Obligations;

(r)     all proceeds of Avoidance Actions; and

(s)     to the extent not otherwise included, all other personal property of Grantor, whether tangible or intangible, and all Proceeds and products of any and all of the foregoing (including, for the avoidance of doubt, all amounts received pursuant to or in connection with the Settlement Agreements).