**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------------- x
In re:                                                        :    Chapter 11
                                                              :
WMC MORTGAGE, LLC,                                            :    Case No. 19–_____ (     )
                                                              :
                        Debtor.¹                              :
------------------------------------------------------------- x
```

**DECLARATION OF LAUREEN M. RYAN IN SUPPORT OF
DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 (I) AUTHORIZING THE DEBTOR
TO OBTAIN POST-PETITION SECURED SUPER-PRIORITY FINANCING,
(II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF**

I, Laureen M. Ryan, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a Managing Director with Alvarez & Marsal Disputes and Investigations, LLC, which is a wholly owned subsidiary of Alvarez & Marsal Holdings, Inc. (collectively "**A&M**"). I am authorized to submit this declaration (this "**Declaration**") on behalf of the above-captioned debtor and debtor in possession (the "**Debtor**") and in support of the *Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 363 and 364 (I) Authorizing the Debtor to Obtain Post-petition Secured Super-Priority Financing, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* (the "**DIP Motion**").²

2. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge or the knowledge of other professionals at A&M acting at my direction,

---

[1] The last four digits of the Debtor's federal tax identification number are 2008. The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion or the Asdourian Declaration (as defined in the DIP Motion), as applicable.

RLF1 21145696v.1

my review of relevant documents, my experience as a restructuring professional, or my conversations with the Debtor's management and the Special Independent Committee of the Board of Directors of the Debtor (the "**Special Committee**"). If called on to testify, I could and would testify to the facts set forth herein.

## Qualifications

3. A&M provides financial, operational, and strategic advice to a wide-range of clients, including businesses dealing with under-performance, over-leverage and cash flow issues, and other distressed situations.

4. I am a graduate of the State University of New York at Oswego, where I earned a bachelor's degree in accounting and economics. I am also a Certified Insolvency and Restructuring Advisor, a Certified Public Accountant, an Accredited Business Valuer, and a Certified Distressed Business Valuer. I have more than twenty-five years of experience providing finance, accounting, investigation, restructuring and other consulting services to companies across a broad range of industries, including ten years while being employed by A&M.

5. On or around September 20, 2018, the Debtor retained A&M to provide financial advisory and consulting services to the Debtor, including, among other things, any such services requested by the Special Committee on behalf of the Debtor. As a result of this engagement, I, along with my colleagues at A&M, have worked closely with the Debtor's management, the Special Committee and other professionals retained by the Debtor, and have become well-acquainted with the Debtor's business and affairs, financial condition and liquidity needs.

## The Debtor's Need for Post-petition Financing

6. Prior to the Commencement Date, given the state of the Debtor's operations and the limited amount of cash on hand, the Debtor and its advisors determined that the Debtor

2

would require post-petition financing to support its chapter 11 activities to pay (a) salaries and benefits of its employees; (b) other ordinary course post-petition obligations; and (c) professionals' fees to, among other things, conduct negotiations with key constituents, consummate the GE Settlement and confirm a chapter 11 plan. During the Debtor's discussions with GE Capital US Holdings, Inc., the sole member of the Debtor ("**GECUSH**" or the "**DIP Lender**"), GECUSH made an offer to provide post-petition financing to the Debtor.

## The DIP Facility Is the Product of an Arm's-Length Negotiation with the DIP Lender

7.  As is set forth in greater detail in the Asdourian Declaration, pursuant to the Amended and Restated Limited Liability Company Agreement of the Debtor, dated July 13, 2018 (the "**LLC Agreement**"), the Debtor formed the Special Committee, which consists of two Independent Directors. Neither Independent Director had previously served as a director of, nor has been engaged by, the Debtor or its predecessor entities or GE. The LLC Agreement provides that the Special Committee has the power and authority to, among other things, exercise sole oversight, negotiation, and decision-making authority with respect to any Conflict Issue (as defined therein). Pursuant to the LLC Agreement, any lending arrangement between the Debtor, as borrower, and GECUSH, as lender, constitutes a Conflict Issue. As such, the DIP Facility constitutes a Conflict Issue and, pursuant to the LLC Agreement, the Special Committee was charged with negotiating the terms thereof. The Special Committee (a) directed A&M to assist it in evaluating GECUSH's proposed financing and look at alternative financings; and (b) utilized A&M and RLF to assist in negotiating and documenting the terms of the DIP Facility.

8.  As such, at my direction, A&M evaluated the Debtor's options for obtaining financing. As is set forth in greater detail below, A&M ultimately concluded that the proposed DIP facility, which consists of a senior secured post-petition financing facility in an aggregate

principal amount not to exceed $25,000,000 (the "**DIP Facility**"), was in the best interests of the Debtor and that the only party likely willing to lend to the Debtor on such favorable terms was GECUSH.[3]

9. I, along with my colleagues at A&M, have worked with the Debtor to prepare the Budget and negotiated such Budget with the DIP Lender. I believe that the proposed DIP Facility presents the best financing option for the Debtor.

**The Debtor is Unable to Obtain Necessary Post-petition Financing
On an Unsecured Basis or on a Secured Basis on Superior Terms**

10. Based on my familiarity and the familiarity of others at A&M with the credit markets and the Debtor's financial situation leading up to the filing of this chapter 11 case, including the state of the Debtor's operations and its limited assets to serve as collateral for a loan, I, along with my colleagues at A&M, determined that a third party lender would not provide the Debtor with financing on superior terms on a secured, administrative, or unsecured basis. The Debtor has limited assets to be pledged as collateral and has historically relied on its sole member, GECUSH, to fund its operations. Indeed, the only material assets that could potentially serve as collateral for a loan are highly contingent in nature and include (i) the Potential Claims and certain other causes of action; and (ii) certain contingent reimbursement obligations under certain settlement agreements (the "**Reimbursement Obligations**") that will only be payable if the proposed settlement of the TMI Litigation is consummated, which will not occur outside of the context of this chapter 11 case. As such, I believe that, except for the DIP

---

[3] A&M performed a preliminary, selective market survey to gauge the level of interest potential lenders would have in extending financing to the Debtor. On a "no-name" basis, A&M provided several potential lenders with basic information regarding the Debtor's financial condition and financing requirements. A&M also disclosed limited information to the potential lenders regarding the nature of the Debtor's assets that could serve as collateral. Certain potential lenders expressed preliminary interest but, in each case, at an interest rate higher than the rate proposed by the DIP Lender and would require fees that were not included in the DIP Facility. Based on the facts of this case, including the Debtor's limited assets and the contingent nature of same, I believe that it is unlikely that another lender on a fully-informed basis would provide financing to the Debtor on terms superior to those provided by the DIP Lender, if at all.

4

Facility from the DIP Lender, no other party would be willing to provide the Debtor with any post-petition financing on superior terms. Accordingly, in light of the Debtor's imminent liquidity needs, I believe that the DIP Facility is the only viable financing option available at this time.

### The Terms of the DIP Facility Are Fair, Reasonable and Appropriate Under the Circumstances

11. Based on my experience and review of the Debtor's current financial situation and my knowledge of the credit markets, I believe that the terms of the DIP Facility represent the best possible financing under the circumstances for at least four separate reasons. First, the DIP Facility does not include any commitment or exit fees and does not require the Debtor to pay the fees and expenses incurred by the DIP Lender's professionals. In my experience, any third-party lender would require the Debtor to pay some or all the foregoing fees in connection with providing a post-petition loan, which could be substantial. Second, the interest rate under the DIP Facility is reasonable and at the low end of the market for a loan of this type and size.[4] Third, under the agreement in principle between GE and WMC, in the event that a chapter 11 plan incorporating the GE Settlement is consummated, the Debtor is not required to repay the DIP Facility upon the effective date of such plan. Rather, pursuant to the terms of the DIP Facility, such facility may be rolled into an exit loan that will be secured by the Reimbursement Obligations. Fourth, it is my belief that the deadlines and the maturity date set forth in the DIP Facility provide a sufficient timeframe during which the Debtor may achieve its chapter 11 objectives, including consummating a chapter 11 plan that incorporates the GE Settlement.

---

[4] As previously noted, A&M performed a preliminary, selective market survey to gauge the level of interest potential lenders would have in extending financing to the Debtor. In addition, A&M performed an analysis of the interest rates for DIP facilities that were comparable in size to the DIP Facility. This analysis showed that the effective interest rate for these facilities were all higher than that provided under the DIP Facility.

12. I believe that the DIP Facility was the result of arm's-length and good faith negotiations between the Special Committee and the DIP Lender related to, among other things, the Debtor's financing needs, including the Budget, the scope of the collateral securing such facility and the goals of this chapter 11 case. Both the Debtor and the DIP Lender were advised by separate counsel and other professionals in connection with negotiating the terms of the DIP Facility. Importantly, these arm's-length negotiations resulted in concessions made by the DIP Lender.

13. Therefore, it is my belief that the terms and conditions of the DIP Facility are entirely fair under the circumstances and could not be replicated in the marketplace. In the absence of immediate access to the DIP Facility from the DIP Lender, the Debtor will be unable to bear the costs of operating and the chapter 11 case. Accordingly, based on the foregoing and those additional reasons set forth in the DIP Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.

Dated: April 23, 2019  
       New York, New York

*/s/ Laureen M. Ryan*  
Laureen M. Ryan  
Managing Director  
Alvarez & Marsal Disputes and Investigations, LLC