## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x
*In re:*                       :        **Chapter 11**

                               :

**WMC MORTGAGE, LLC,**      :        **Case No. 19–10879 (CSS)**

                               :

           **Debtor.**[1]        :        **Re: Docket No. 168**
-------------------------------------------------------- x

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF LIQUIDATION OF WMC MORTGAGE, LLC

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
Christopher M. De Lillo (No. 6355)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700

*Attorneys for the Debtor and Debtor in Possession*

Dated: August 2, 2019
       Wilmington, Delaware

---

[1]  The last four digits of the Debtor's federal tax identification number are 2008.  The Debtor's principal office is located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, California 91367.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. ON [●], 2019 (EASTERN TIME), UNLESS THE VOTING DEADLINE IS EXTENDED IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER.    TO BE COUNTED, THE VOTING AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

ii

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.    YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.    THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.    THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.    FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF

FACT, LIABILITY, STIPULATION, OR WAIVER.  RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE POST-EFFECTIVE DATE DEBTOR OR LIQUIDATING TRUSTEE, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE POST-EFFECTIVE DATE DEBTOR AND LIQUIDATING TRUSTEE, AS APPLICABLE, THE RIGHT TO OBJECT TO PROOFS OF CLAIM AND BRING CAUSES OF ACTION AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.    FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE

DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND EQUITY INTERESTS OR OTHER PARTIES IN INTEREST REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTOR FILED THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

RLF1 21809021v.1

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

    A.    Definitions and Exhibits ......................................................................... 1

    B.    Notice to Creditors and Purpose of Disclosure Statement...................... 1

    C.    Background and Overview of the Plan .................................................... 2

II.    OVERVIEW OF DEBTOR'S OPERATIONS AND CHAPTER 11 CASE ................. 5

    A.    Debtor's Prepetition Business Operations ............................................... 5

    B.    Debtor's Organizational Structure .......................................................... 6

    C.    Prepetition Capital Structure.................................................................. 6

    D.    Events Leading to the Debtor's Chapter 11 Filings................................. 7

    E.    The Chapter 11 Case ............................................................................ 12

III.   OVERVIEW OF THE PLAN.............................................................................. 13

    A.    General ................................................................................................ 13

    B.    Administrative Expense Claims, Professional Fee Claims, Priority Tax
        Claims, and DIP Loan Claim ............................................................... 14

    C.    Classification of Claims and Equity Interests........................................ 16

    D.    Treatment of Claims and Equity Interests ............................................ 17

    E.    Elimination of Vacant Classes ............................................................. 19

    F.    Voting Classes; Presumed Acceptance by Non-Voting Classes.......... 19

    G.    Confirmation under Section 1129(b); Cramdown .................................. 19

    H.    Special Provision Governing Unimpaired Claims.................................. 19

    I.    Means for Implementation and Execution of the Plan........................... 19

    J.    Provisions Governing Distributions Under the Plan.............................. 32

    K.    Procedures for Resolving and Treating Disputed Claims...................... 36

    L.    Treatment of Executory Contracts ....................................................... 38

    M.    Conditions Precedent to Effective Date of the Plan.............................. 39

    N.    Establishing the Effective Date............................................................ 39

    O.    Release, Injunction, and Related Provisions......................................... 40

    P.    Retention of Jurisdiction ..................................................................... 47

    Q.    Miscellaneous Provisions..................................................................... 49

IV.    ALTERNATIVES TO THE PLAN ...................................................................... 52

    A.    Liquidation Under Chapter 7 of the Bankruptcy Code ......................... 52

B.  Alternative Chapter 11 Plan ................................................................ 53

V.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................. 53

VI.    SOLICITATION AND VOTING PROCEDURES ......................................................... 53

A.  Distribution of the Solicitation Materials ............................................ 54

B.  Voting Instructions and General Tabulation Procedures ..................... 54

VII.    CONFIRMATION PROCEDURES .............................................................................. 55

A.  Confirmation Hearing .......................................................................... 55

B.  Statutory Requirements for Confirmation of the Plan ......................... 56

VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING .................... 59

A.  Risk Factors that Might Affect the Debtor's Ability to Consummate the
Plan ....................................................................................................... 60

B.  Risk Factors that may Affect Distributions under the Plan ................. 62

C.  Disclosure Statement Disclaimer ........................................................ 63

IX.    CONCLUSION ............................................................................................................ 65

RLF1 21809021v.1

## TABLE OF EXHIBITS

Exhibit A            Chapter 11 Plan of Liquidation of WMC Mortgage, LLC

Exhibit B            Liquidation Analysis

## I.        INTRODUCTION

This is the disclosure statement (the "**Disclosure Statement**") of WMC Mortgage, LLC ("**WMC**" or the "**Debtor**") in the above-captioned chapter 11 case, pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). This Disclosure Statement is filed in connection with the Debtor's Chapter 11 Plan of Liquidation, dated August 2, 2019 (the "**Plan**"), a copy of which is attached to this Disclosure Statement as **Exhibit A**.

### A.        Definitions and Exhibits

1.        Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

2.        Exhibits

All exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

### B.        Notice to Creditors and Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists holders of Claims entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated [●], 2019 [Docket No. [●]] (the "**Disclosure Statement Order**"), the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information" as that term is used in section 1125(a)(1) of the Bankruptcy Code. The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan. Creditors should carefully read the Disclosure Statement, in its entirety, before voting on the Plan.

**IT IS THE DEBTOR'S OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND CREDITORS.    THEREFORE, THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  A COPY OF THE PLAN IS ATTACHED AS **EXHIBIT A**.  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN FOR THE CONVENIENCE OF CREDITORS AND EQUITY INTEREST HOLDERS, BUT THE PLAN ITSELF QUALIFIES ALL OF THE SUMMARIES.    ACCORDINGLY, IF ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT EXISTS, THE TERMS OF THE PLAN WILL CONTROL.

C.       **Background and Overview of the Plan**

The Plan encompasses a comprehensive resolution of the largest outstanding Claims against the Debtor, and maximizes the value of the Debtor's remaining assets for the benefit of all creditors.   This is the product of good faith, arm's-length negotiations and an agreement between the Debtor and its corporate parent and its affiliates.  The following table provides a summary of the classification and treatment of Claims and Equity Interests under the Plan.  The table and summaries are qualified in their entirety by reference to the Plan, which is attached hereto as **<u>Exhibit A</u>**.

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Approx. Recovery (%) | Estimated Amount of Allowed Claims / Interests[2] |
|---|---|---|---|---|---|
| 1 | Secured Claims | In full and complete satisfaction of their Allowed Secured Claims, each holder of an Allowed Secured Claim will receive, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Secured Claim becomes and Allowed Claim, or as soon as practicable thereafter, either (i) such treatment as such Class 1 claimant and the Debtor or the Post-Effective Date Debtor, as applicable, agree, or (ii) at the option of the Debtor or the Post-Effective Date Debtor, as applicable:  (x) payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or order of the Bankruptcy Court), or (y) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.   For the avoidance of doubt, any Intercompany Claim that would constitute a Secured Claim will be treated solely as a Class 5 – Intercompany Claim. | Unimpaired<br><br>Not entitled to vote (deemed to accept) | 100% | $0 |

---

[2]  Amounts are subject to further change upon the Debtor's analysis of the filed proofs of Claim.

RLF1 21809021v.1

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Approx. Recovery (%) | Estimated Amount of Allowed Claims / Interests[2] |
|---|---|---|---|---|---|
| 2 | Other Priority Claims | In full and complete satisfaction of their Allowed Other Priority Claims, each holder of an Allowed Other Priority Claim will receive, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as practicable thereafter, either (i) such treatment as such Class 2 claimant and the Debtor or the Post-Effective Date Debtor, as applicable, agree, or (ii) at the option of the Debtor or the Post-Effective Date Debtor, as applicable: (x) payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or order of the Bankruptcy Court), or (y) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy. | Unimpaired<br><br>Not entitled to vote (deemed to accept) | 100% | $1,000 |
| 3 | TMI Claim | In full and complete satisfaction of the TMI Claim, on the TMI Effective Date, the TMI Trust shall receive payment of the TMI Settlement Amount pursuant to and in accordance with the TMI Settlement. In the event the TMI Settlement is terminated pursuant to section 2.09 thereof, in full and complete satisfaction of the TMI Claim, the Post-Effective Date Debtor shall make payment of the TMI Distribution Amount in Cash to the TMI Trust in accordance with the payment instructions provided by TMI as soon as reasonably practicable after such termination, but not prior to the Effective Date. | Impaired<br><br>Entitled to Vote | 44.4% | $446,000,000[3] |

---

[3] The Separate Trustee filed a proof of claim in the approximate amount of $980,000,000 on account of the TMI Claim. For the reasons set for herein and in the TMI Litigation, the Debtor disputes the TMI Claim in its asserted amount. Nevertheless, in order to estimate the percentage recovery that the TMI Trust is receiving under the Plan and thereby establish the Plan's compliance with section 1129(b)(1) of the Bankruptcy Code, the Debtor has estimated the Allowed amount of the TMI Claim to be $446,000,000.

3

| Class | Claim or Equity Interest | Treatment | Impairment and Entitlement to Vote | Approx. Recovery (%) | Estimated Amount of Allowed Claims / Interests[2] |
|---|---|---|---|---|---|
| 4 | General Unsecured Claims | In full and complete satisfaction of their Allowed General Unsecured Claims, on the Initial Distribution Date, each holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to such Claim's Pro Rata share of the amount of the Class 4 Distribution available for distribution, or such less favorable treatment as may be agreed upon by such Class 4 claimant and the Liquidating Trustee. From time to time thereafter, each holder of an Allowed General Unsecured Claim shall receive on any Subsequent Distribution Date, its Pro Rata share of the amount of the Class 4 Distribution available for distribution, as determined by the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement. | Impaired<br><br>Entitled to Vote | [●]%[4] | $[●] |
| 5 | Intercompany Claims | Pursuant to the terms of the Sponsor Settlement, each holder of an Intercompany Claim (except the DIP Loan Claim) has agreed to waive and release its Intercompany Claim, and will not receive a Distribution under the Plan. | Impaired<br><br>Agreed to Accept | 0% | $93,458,388.86 |
| 6 | Existing Equity Interests | Holders of existing Equity Interests in the Debtor will not receive a Distribution under the Plan and all such Equity Interests will be cancelled as of the Effective Date; *provided, however*, that, upon the Effective Date, the Post-Effective Date Officer will be deemed to hold one limited liability company interest in the Post-Effective Date Debtor for the benefit of holders of Allowed Claims (other than holders of Allowed Class 4 General Unsecured Claims); *provided, further*, that the Post-Effective Date Officer will not be entitled to receive any Distribution on account of such Equity Interest. | Impaired<br><br>Agreed to Accept | 0% | N/A |

---

[4] [The General Bar Date was June 27, 2019.  The Debtor is in the process of assessing the proofs of Claim that were timely filed and will update this chart once this review is complete.]

4

## II.    OVERVIEW OF DEBTOR'S OPERATIONS AND CHAPTER 11 CASE

### A.    Debtor's Prepetition Business Operations

#### 1.    Historical Business

The Debtor's predecessor was founded in 1955 as Pacific Western Mortgage Company, later renamed Weyerhaeuser Mortgage Company, a California corporation ("**Weyerhaeuser**").  For more than fifty years, Weyerhaeuser was in the business of residential mortgage lending.  Over time, Weyerhaeuser developed national retail and wholesale mortgage origination operations focused on originating single-family prime mortgage loans.  In May 1997, Weyerhaeuser was sold to WMC Finance Co., a Delaware corporation ("**WMC Finance**"), which was a predecessor to the Debtor.

From 2000 through the suspension of its mortgage loan origination operations in 2007, WMC did not maintain a full servicing platform for the residential loans it made.  Rather, WMC retained a third party to service the mortgage loans it originated on an interim basis until WMC sold the loans, which generally occurred within a short period of time after origination.  Often, counterparties that purchased mortgage loans from WMC would, generally through affiliates, deposit the loans into trusts that would hold the loans as collateral for the issuance of residential mortgage backed securities ("**RMBS**") sold to investors.

#### 2.    GECC Acquisition

On June 14, 2004, the consumer finance division of General Electric Capital Corporation ("**GECC**") acquired WMC Finance and its subsidiary, WMC Mortgage Corp. (f/k/a Weyerhaeuser), from affiliates of Apollo Global Management L.P. for aggregate net consideration of $645.3 million.  By the date of GECC's acquisition, WMC Mortgage Corp. had sold its "prime" mortgage lending business and was focused on originating "subprime" loans on a wholesale basis.  Following GECC's purchase, WMC Mortgage Corp. continued to sell loans shortly after origination to purchasers, including financial institutions and investment banks, pursuant to loan sale agreements.  In these agreements WMC Mortgage Corp. typically made various representations and warranties to the purchasers concerning certain attributes of the loans being sold ("**R&Ws**").  Also, in certain instances, WMC Mortgage Corp. acknowledged that its R&Ws would extend to any successor-in-interest to the purchaser of its mortgage loans.  After WMC Mortgage Corp. sold a loan, the initial loan purchasers would frequently transfer the loans to affiliated securitization entities who would then deposit the loans into RMBS trusts and transfer all rights and remedies under the sale agreements to the trustees, on behalf of the trusts.  During GECC's ownership, mortgage loans originated by WMC Mortgage Corp. were deposited into more than 130 different RMBS trusts.

#### 3.    2007 Transactions

In January 2007, WMC Mortgage Corp., GECC, GE Money Bank, FSB ("**GEMB**"), and WMC-GEMB Mortgage Corp. entered into a series of agreements that effectively transferred WMC Mortgage Corp.'s origination business to GEMB.  After the

transfer, GEMB would periodically sell the mortgages it originated to WMC Mortgage Corp., which in turn would sell them to third parties.

The collapse of the housing and financial markets presaging the Great Recession decimated WMC's loan origination business. By the second quarter of 2007, WMC and GEMB had essentially stopped originating new loans and focused on winding down WMC's operations and resolving the substantial liabilities associated with its former mortgage business. In November 2007, the parties rescinded the arrangement between WMC and GEMB, and the mortgage business, assets, and employees were returned to WMC Mortgage Corp.

In December 2007, WMC Mortgage Corp. sold a significant portion of its material assets, including nearly all of its remaining inventory of loans, real estate owned properties and intellectual property, to DLJ Mortgage Capital, Inc. for approximately $117 million (the "**DLJ Sale**"). WMC Mortgage Corp. retained all of the proceeds realized from the DLJ Sale. On December 28, 2007, after the DLJ Sale had closed, WMC Mortgage Corp. merged into WMC Finance. Thereafter, on December 31, 2007, WMC Finance converted into a Delaware limited liability company and was renamed WMC Mortgage, LLC, which is the Debtor in this chapter 11 case.

## B.    Debtor's Organizational Structure

### 1.    Corporate Family

The Debtor does not have any subsidiaries. The Debtor is a direct, wholly-owned subsidiary of the Sponsor. The Sponsor is a wholly-owned subsidiary of GE Capital Global Holdings, LLC. GEC in turn owns 100% of the membership interests of GE Capital Global Holdings, LLC.

### 2.    Debtor's Board

The Debtor's current board of directors (the "**Board**") is composed of Mark V. Asdourian, John S. Dubel, and Michael E. Jacoby. Mr. Asdourian is the Chairman of the Board.

## C.    Prepetition Capital Structure

Since GECC's acquisition of WMC Finance in 2004, GECC (and then from 2015 onward, the Sponsor) historically provided funding to WMC's mortgage loan origination operations through various intercompany financing agreements, including term loans, cash management agreements, and cash pooling agreements. GECC (and subsequently, the Sponsor) and WMC have duly reflected this financing and any related payments on their books and records.

On October 10, 2017, WMC entered into a Loan and Security Agreement with the Sponsor, pursuant to which the Sponsor provided WMC with a loan in a principal amount equal to $73,534,867 in exchange for a security interest in WMC's right, title, and interest in certain recovery rights incorporated in settlement agreements entered into by and between certain counterparties and WMC. The principal under the loan agreement was fully repaid on February

28, 2018, from funds that constituted the Sponsor's collateral. The Debtor's remaining obligations under the loan agreement consist of a Secured Claim for accrued interest of $435,865.21.

The Debtor's other prepetition indebtedness consists of unsecured intercompany payables of $92,616,018.94 and $406,504.71 to GE Capital Treasury Services (U.S.) LLC and the Sponsor, respectively. Nearly all of the Debtor's other prepetition liabilities are contingent, unliquidated, or disputed unsecured claims. The Debtor has *de minimis* unsecured trade debt.

### D.    Events Leading to the Debtor's Chapter 11 Filings

1.    <u>RMBS Litigation</u>

a.    *Market Collapse*

During the course of the Great Recession, many homeowners faced immediate and ongoing difficulty making their mortgage payments, refinancing their mortgages or selling their homes to avoid foreclosure. Consequently, the borrowers of many of the residential mortgage loans originated in the years prior to the Great Recession defaulted. Because of these defaults and the continuing deterioration of the entire U.S. housing market, residential mortgage loans, many of which now were owned by RMBS trusts, were substantially devalued.

The incidents of mortgage loan defaults led numerous loan purchasers and RMBS trustees to request that mortgage originators, or other responsible parties under the applicable agreements, repurchase mortgage loans that allegedly breached R&Ws, or for which the borrowers failed to make the first few payments after the originator sold the loan. Rising repurchase requests, related litigation, and a deteriorating mortgage market in 2006 and 2007 led many mortgage companies, including WMC, to cease their mortgage origination activities. When originators (or the applicable responsible party) did not grant repurchase requests, some loan purchasers and trustees filed lawsuits for breach of contract of the applicable agreements containing the R&Ws.

b.    *Litigation*

Since 2011, WMC has been named as a defendant in fourteen lawsuits filed by trustees alleging breaches of R&Ws and seeking the repurchase of the allegedly breaching mortgage loans. Thirteen of those lawsuits have been settled to date for an aggregate amount of $870,000,000, which resolved approximately $6.2 billion of asserted liabilities. There is one remaining lawsuit, which has been stayed by agreement of the parties and is discussed in detail in Section II.D.1c, *infra*.

WMC funded $870,000,000 to settle the referenced lawsuits through capital contributions from GECC and, from 2015 onward, the Sponsor. In addition, WMC made other settlement payments in the aggregate amount of more than $630,000,000 to numerous counterparties for other claims. The funding for these other settlement payments and related costs came from a combination of (i) the proceeds of the DLJ Sale, (ii) funds borrowed by WMC

7

under various intercompany financing agreements, and (iii) capital contributions made to WMC from GECC or the Sponsor.

              *c.*       *SABR 2006-WM2 Litigation*

On October 26, 2012, the separate trustee for the SABR 2006-WM2 Trust commenced an action against WMC by filing a complaint in the United States District Court for the District of Connecticut (the "**CT Court**"), which is now captioned *TMI Trust Co., solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 (SABR 2006-WM2) v. WMC Mortgage, LLC f/k/a WMC Mortgage Corp.*, No. 3:12-cv-01538-CSH (D. Conn. 2012) (the "**TMI Litigation**").

The TMI Litigation arises out of the securitization of a pool of approximately 5,000 mortgage loans deposited into the SABR 2006-WM2 Trust. TMI Trust Company, in its capacity as the separate trustee (the "**Separate Trustee**") of the SABR 2006-WM2 Trust, is prosecuting the TMI Litigation. The complaint alleged that WMC had breached numerous R&Ws, failed to provide proper notification regarding the breaches of the R&Ws, and failed to repurchase the breaching loans despite due demand. The Separate Trustee has asserted damages in excess of $983,000,000 in the TMI Litigation.

After several years of discovery and motion practice, and multiple attempts at settlement, a bench trial began in the CT Court on January 16, 2018. The parties concluded their cases in chief on February 5, 2018, and the court held closing arguments on June 12, 2018. After closing arguments, the CT Court took the matter under advisement.

In January 2019, while the matter remained under advisement, WMC reached a tentative agreement regarding a settlement supported by certificateholders owning 42% of the outstanding certificates in the SABR 2006-WM2 Trust. The proposed settlement with TMI would resolve all of the claims in the TMI Litigation in exchange for WMC's payment of $198,000,000. In February 2019, the Separate Trustee provided notice to all certificateholders of the proposed settlement and joined with WMC in requesting that the CT Court stay the proceedings to enable the parties to proceed with finalizing the TMI Settlement. The CT Court entered a stay, which it extended twice. The case now is stayed by the automatic stay under 11 U.S.C. § 362(a).

On April 4, 2019, WMC presented a proposed settlement agreement to the Separate Trustee for its review. As part of its review process, the Separate Trustee provided a copy of the proposed agreement to all certificateholders and requested that holders who wish to express their views concerning whether the Separate Trustee should accept the proposed settlement do so no later than May 15, 2019. WMC presented multiple drafts of a revised proposed settlement agreement to the Separate Trustee and the Trustee of the TMI Trust. The Separate Trustee provided a copy of a revised proposed agreement to all certificateholders, and accepted a revised proposed settlement agreement, subject to the conditions set forth therein, on July 23, 2019. The Separate Trustee has made a Minnesota TIP Election (as defined in the TMI Settlement). The TMI Settlement is attached to the Plan as **Exhibit B**. The TMI Settlement is discussed further in section III.I.3, *infra*.

2.    DOJ Investigation and Settlement

In addition to these contract actions, WMC and GECC were the subject of an investigation by the Civil Division of the United States Department of Justice ("**DOJ**") in connection with potential violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 arising out of WMC's origination, purchase, or sale of residential mortgage loans ("**FIRREA Claims**").  On April 11, 2019, WMC, the United States of America (acting through the DOJ), and GEC executed a settlement agreement, which provided for GEC's payment of $1.5 billion (the "**DOJ Payment**") in full and final satisfaction of all FIRREA Claims that might be asserted by the United States against WMC, GEC, and their affiliates. GEC made the entire DOJ Payment on April 18, 2019.

3.    Special Committee Investigation

a.    *Formation of the Special Committee*

In July 2018, two independent directors (the "**Independent Directors**") were appointed to the Board.  The Independent Directors are John S. Dubel of Dubel & Associates, LLC, and Michael E. Jacoby, of Phoenix Management Services, LLC.  Neither Independent Director previously had served as a director of WMC, nor had been engaged by WMC, its predecessor entities, or GE.

That same day, WMC formed a special independent committee of the Board consisting solely of the Independent Directors (the "**Special Committee**").  As set forth in the Amended and Restated Limited Liability Company Agreement of WMC, dated July 13, 2018, the Special Committee was empowered and authorized to, among other things, investigate WMC's potential claims and causes of action against GEC and WMC's other current or former affiliates (the "**Potential Claims**").   The Special Committee also was empowered and authorized, as it deemed appropriate, to prosecute or settle the Potential Claims on behalf of WMC.  WMC's legal counsel, Richards, Layton & Finger, P.A. ("**RLF**"), and financial advisor, Alvarez & Marsal Disputes and Investigations, LLC ("**A&M**"), assisted the Special Committee in the performance of its investigative responsibilities.

b.    *Investigation*

The Special Committee and its advisors conducted a comprehensive evaluation of the facts and law underlying the Potential Claims.  The investigation focused primarily, but not exclusively, on events that took place between 2004 and 2007, when WMC was operating its mortgage loan origination and sale businesses as a wholly-owned subsidiary of GECC.

During the course of the investigation, the Special Committee met approximately 60 times, including with its advisors, and its advisors performed more than 12,000 hours of work.  The Special Committee collected approximately 2,000,000 documents from GE and WMC.  These documents were from more than 400 document custodians and data repositories, and included, among other things, emails, contracts, corporate governance materials, and presentations.  In obtaining documents from GE, the Special Committee's advisors submitted numerous document and information requests to GE.  RLF and A&M also had access to a

9

substantial number of documents that were generated in the past decade of litigation involving WMC and its origination and sale of mortgage loans. These materials included, among other things, almost 100 deposition and trial testimony transcripts from those matters.

Utilizing the vast collection of materials available to it, the Special Committee and its advisors examined the facts and circumstances the conduct of WMC and GECC and its Affiliates during the relevant time period. This included an assessment of whether the conduct supported legal theories for liability and damages, as well as an analysis of financial issues related to WMC and the Potential Claims. This review led to the submission by the advisors to the Special Committee of a comprehensive report, a detailed timeline, and financial analyses prepared by A&M.

The Special Committee, which substantially completed its investigation in late March 2019, has now concluded its investigation.

### c.    Evaluation of the Potential Claims

Based on its comprehensive evaluation of the facts and law underlying the Potential Claims, including, but not limited to, claims of alter ego/piercing the corporate veil, breach of fiduciary duty, and fraudulent transfer, as well as likely defenses to those claims, the Special Committee, in consultation with its advisors, determined that for the Debtor to succeed on the Potential Claims, it likely would need to prevail on the issues described below.

### (i)    Alter Ego/Piercing the Corporate Veil

To successfully pierce its corporate veil, the Debtor would need to prevail on at least the following issues.

First, the Debtor would need to demonstrate that it may "self-pierce" its corporate veil. Courts differ regarding whether alter ego is a "cause of action" belonging to the company—such that it may "self-pierce" its veil to reach the assets of its parent—or whether alter ego is a remedy for other claims that typically belong to creditors.

Second, the Debtor would need to demonstrate that the statute of limitations has not expired. Because the underlying events occurred over twelve years ago, WMC likely would have to rely on a tolling doctrine.

Third, the Debtor would need to prove the elements of an alter ego claim. An alter ego plaintiff generally must prove two elements: first, that the parent and subsidiary were a "single economic entity" or had such a "unity of interest and ownership" that they were in reality one in the same; and second, that absent piercing, the result would be unjust or inequitable. To determine whether a parent and subsidiary are a "single economic entity," courts assess factors such as whether the parent so dominated and controlled the subsidiary as to control its day-to-day operations, and whether the subsidiary respected corporate formalities. To determine whether a result would be unjust in the absence of piercing, courts ask whether the parent abused the subsidiary's corporate form.

10

(ii)     Breach of Fiduciary Duty

To prove a breach of fiduciary duty by GECC or its Affiliates, the Debtor would need to prevail on at least the following issues.

First, the Debtor would need to establish that GECC or its Affiliates owed WMC a fiduciary duty, which in turn would depend on whether the Debtor was insolvent at the time of the challenged conduct in 2004–2007. Sole shareholders generally do not owe distinct fiduciary duties to their subsidiaries. However, when a wholly owned subsidiary is insolvent, its creditors become the subsidiary's residual stakeholders. As a result, the parent no longer can exercise control over the subsidiary and cause it to act in a manner that ignores the best interests of the subsidiary as a whole for the benefit of all of its stakeholders, including creditors. The Debtor would need to prove its insolvency on the relevant dates, likely through expert testimony demonstrating balance sheet or cash flow insolvency.

Second, if the Debtor could establish that it was insolvent at the time of the challenged conduct, then it would then have to demonstrate a breach of fiduciary duty. The Debtor would have to establish that GECC or its Affiliates acted with gross negligence, in bad faith, or disloyally in connection with the challenged conduct.

Finally, given the fact that most of the challenged conduct occurred more than 10 years ago, the Debtor likely would need to overcome a statute of limitations defense. The statute of limitations for a breach of fiduciary duty claim is four years in California and three years in Delaware. Thus, the Debtor likely would need to demonstrate that the statute of limitations was tolled.

(iii)     Fraudulent Transfer

To succeed on a fraudulent transfer claim, the Debtor would need to prove that it transferred property with an actual intent to hinder, delay, or defraud creditors. Alternatively, the Debtor would need to prove that it transferred property while insolvent for less than reasonably equivalent value. Once again, this likely would require expert testimony.

In addition, the Debtor would need to demonstrate that any transfer it seeks to avoid is within the "reach-back period" for avoidance. The Bankruptcy Code allows a plaintiff to reach back only two years, which cannot be extended by tolling doctrines. State fraudulent transfer law provides a longer reach-back period (typically up to four years) and does permit tolling, but only in very limited circumstances. Thus, to prevail on a fraudulent transfer claim against any transfer that the Debtor made while it was an operating company, the Debtor would need to demonstrate some legal basis allowing it to reach back 12 years.

(iv)     Causation and Damages

For some of the Potential Claims, the Debtor also would need to prove causation and damages. With respect to causation, the Debtor would need to demonstrate that the harm it suffered was caused by the actions of GECC or its Affiliates, as opposed to the Debtor's own actions or other circumstances. As for damages, the Debtor would need to demonstrate that any

11

financial harm it suffered was not negated by the subsequent conduct of GECC or its Affiliates, for example infusions of capital contributions.

Although the Debtor believes that it has credible arguments to make in support of its claims and damages, each of these issues likely would be heavily contested in any litigation. Such litigation also is likely to be expensive and protracted (thereby substantially delaying creditor recoveries, if any).

In spite of these challenges, the Special Committee has negotiated for the substantial consideration of the Sponsor Settlement, as discussed further in sections III.D.3.d and III.I.2, *infra*.

d.　　*Negotiations and Settlement with GE*

In March 2019, the Special Committee commenced negotiations with GE to determine whether the Potential Claims could be favorably settled and resolved. Following several rounds of negotiations and offers over a period of several months, the Special Committee and GE reached an agreement in principle to resolve all of the Potential Claims, subject to definitive documentation and approval by the Bankruptcy Court. Thereafter, the parties exchanged numerous drafts of the Sponsor Settlement before coming to final agreement. The Sponsor Settlement is attached to the Plan as **Exhibit A**. The Special Committee determined, in the exercise of the Independent Directors' duties, that settling the Potential Claims on the terms in the Sponsor Settlement was favorable and would avoid the substantial expense, burden, and attendant risk of protracted litigation of the Potential Claims. The Sponsor Settlement is discussed further in section III.I.2, *infra*.

**E.　　The Chapter 11 Case**

1.　　Commencement of the Chapter 11 Case

On April 23, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An official committee of unsecured creditors was not appointed in the Chapter 11 Case.

2.　　Events During the Pendency of the Chapter 11 Case

a.　　*First Day Motions*

On the Commencement Date, the Debtor filed a number of motions and other pleadings (the "**First Day Motions**") to ensure an orderly transition into chapter 11. The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtor to, among other things: (i) retain Epiq Corporate Restructuring, LLC as the Debtor's claims and noticing agent [Docket No. 25]; (ii) continue the use of the Debtor's cash management system, bank accounts, and business forms [Docket No. 26]; (iii) continue paying employee wages and benefits [Docket No. 27]; and (iv) obtain post-petition financing [Docket No. 29]. Sponsor, in its capacity as DIP Lender, provided the DIP

12

Financing, which provided the Debtor with up to $25 million of available liquidity to finance the Chapter 11 Case and pay related expenses.

### b.    Procedural Motions

The Debtor also filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity, including a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals [Docket No. 45], and a motion for entry of an order authorizing the Debtor to employ and retain certain professionals utilized in the ordinary course of the Debtor's business [Docket No. 46].  In addition, the Debtor also filed a motion for entry of an order (i) authorizing the Debtor to enter into certain agreements and instruments disclaiming any interest in certain real property and (ii) modifying, to the extent applicable, the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code in connection therewith [Docket No. 151].

### c.    Retention of the Debtor's Professionals

The Debtor retained, *nunc pro tunc* to the Commencement Date, (i) Richards, Layton & Finger, P.A. as its bankruptcy counsel [Docket No. 81], (ii) Alvarez & Marsal Disputes and Investigations, LLC as its financial advisor [Docket No. 78], (iii) Epiq Corporate Restructuring, LLC as its administrative advisor [Docket No. 65], and (iv) Jenner & Block LLP as its special counsel [Docket No. 79].

### d.    Schedules and Statements and Bar Dates

On May 1, 2019, the Debtor filed a motion [Docket No. 47] to establish certain bar dates for filing proofs of Claim against the Debtor's Estate.  On May 17, 2019, the Bankruptcy Court entered the General Bar Date Order [Docket No. 64], establishing June 27, 2019 at 5:00 p.m. (Eastern Time) as the General Bar Date and October 21, 2019 at 5:00 p.m. (Eastern Time) as the Governmental Unit Bar Date.  On May 21, 2019, the Debtor filed its Schedules [Docket Nos. 83, 84].  On May 23, 2019, the Debtor filed an amended Schedule G [Docket No. 90].  The Debtor is in the process of reviewing the proofs of claim that have been filed.

## III.    OVERVIEW OF THE PLAN

### A.    General

This section of the Disclosure Statement summarizes certain sections of the Plan, which is set forth in its entirety as **Exhibit A** hereto.  This summary is qualified in its entirety by reference to the Plan.  YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "Impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim or equity interest in that class or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims or equity interests in that class.  In addition, pursuant to section 1126 of the Bankruptcy Code, holders of Impaired claims and equity interests are only required to vote on a plan if those holders are receiving or retaining property under the plan.  Claims in Class 3 (TMI Claim), and Class 4 (General Unsecured Claims) are Impaired, and the holders of these Claims are receiving or retaining property under the Plan.  Therefore, holders of these Claims may vote on the Plan. Intercompany Claims in Class 5 and Equity Interests in Class 6 are also Impaired.  Subject to the terms of the Sponsor Settlement, each holder of an Intercompany Claim or Equity Interest has agreed to waive and release such Claim and will not receive a Distribution under the Plan, but has agreed to vote to accept the Plan.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan.  These classes are referred to as "Unimpaired," and because of the favorable treatment accorded to these classes, they are conclusively deemed to have accepted the plan and therefore need not be solicited to vote to accept or reject the plan.  The holders of Claims in Class 1 (Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired, and therefore are deemed to accept the Plan and are not being solicited in connection with the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Finally, certain classes of Claims are not classified under the Plan and thus are not entitled to vote on the Plan.  These classes include Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and the DIP Loan Claim.

Therefore, based on the foregoing, only the holders of Claims in Class 3 (TMI Claim), Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), and Class 6 (Equity Interests) are receiving a ballot to submit their votes on the Plan.

**B.**     **Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and DIP Loan Claim**

1.     Treatment of Administrative Expense Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Expense Claims.  On the Effective Date or as soon as practicable thereafter, each holder of an Allowed Administrative Expense Claim will receive, on the Effective Date or as soon as practicable thereafter, payment in full in Cash of the Allowed amount of such Claim (as determined by agreement or settlement or order of the Bankruptcy Court), or such other treatment as may be agreed upon by any such administrative expense claimant and the Debtor or the Post-Effective Date Debtor, as applicable; *provided*, *however*, that the U.S. Trustee will not be required to file a request for payment of fees and charges assessed against the Estate under 28 U.S.C. § 1930 before the Administrative Bar Date; *provided*, *further*, that requests of Governmental Units for payment of Administrative Tax Claims will not be subject to the Administrative Bar Date.

Allowed Administrative Expense Claims are projected to be approximately $[●] on the Effective Date.

2.    Treatment of Professional Fee Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Professional Fee Claims.  The Bankruptcy Court will fix in the Confirmation Order a date for filing all Professional Fee Claims, the deadline for which will be forty-five days after the Effective Date pursuant to Article II.B of the Plan unless that deadline is extended for one or more Professionals by agreement of the Post-Effective Date Debtor.  Any Professional Fee Claim not Filed by the Professional Fee Claims Bar Date (or such later date as may be agreed upon by the Post-Effective Date Debtor) in accordance with Article II.B of the Plan will be deemed disallowed under the Plan and will be forever barred against the Debtor, the Estate, the Post-Effective Date Debtor, the Liquidating Trust, or any of the Post-Effective Date Debtor Assets or the Liquidating Trust Assets, and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.  Subject to the provisions of sections 330(a) and 331 of the Bankruptcy Code, the Post-Effective Date Debtor will pay each holder of an Allowed Professional Fee Claim the full unpaid amount of such Allowed Professional Fee Claim in Cash no later than five Business Days after the date that such Claim is Allowed by order entered by the Bankruptcy Court

On the Effective Date, the Debtor will establish and fund the Professional Fee Escrow Account.  The Debtor will fund the Professional Fee Escrow Account with Cash equal to the Professionals' good faith estimates of the Professional Fee Claims.  Funds held in the Professional Fee Escrow Account will not be considered property of the Estate, the Liquidating Trust and/or the Post-Effective Date Debtor, but will, after all Allowed Professional Fee Claims have been irrevocably paid in full, be available to the Post-Effective Date Debtor to pay any other Post-Effective Date Debtor Expenses, and then be paid to the Liquidating Trust and constitute Excess Post-Effective Date Debtor Assets.  The Professional Fee Escrow Account will be held in trust for the Professionals retained by the Debtor and for no other parties until all Allowed Professional Fee Claims have been irrevocably paid in full.  Fees owing to the applicable Professionals will be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Interim Compensation Order; *provided, ho*wever, that the Post-Effective Date Debtor's obligations with respect to Professional Fee Claims will not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy any Allowed Professional Fee Claims owing to the Professionals as of the Effective Date, such Professionals will have Allowed Administrative Expense Claims for any such deficiency, which will be satisfied in accordance with the Plan.  No liens, claims, or interests will encumber the Professional Fee Escrow Account (or the funds therein) in any way.

Professional Fee Claims are projected to be approximately $[●] on the Effective Date.

3.      Treatment of Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified the Priority Tax Claims. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, on the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon as practicable thereafter, payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or order of the Bankruptcy Court), or such other treatment as may be agreed upon by any such priority tax claimant and the Debtor or the Post-Effective Date Debtor, as applicable.

Priority Tax Claims are projected to be approximately $[●] on the Effective Date.

4.      Treatment of DIP Loan Claim

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified the DIP Loan Claim. The DIP Loan Claim will be an Allowed Claim. Except to the extent that the DIP Lender agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of the Allowed DIP Loan Claim, on the Effective Date, to the extent not paid prior thereto, the DIP Loan Claim will be indefeasibly paid in full in Cash.

The DIP Loan Claim is projected to be approximately $13,000,000 on the Effective Date.

**C.      Classification of Claims and Equity Interests**

1.      Classification in General

A Claim or Equity Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only if that Claim is an Allowed Claim in that Class and that Claim has not been paid or otherwise settled prior to the Effective Date.

2.      Summary of Classification

Claims and Equity Interests, except for Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and the DIP Loan Claim, are classified in the Classes set forth in Article III of the Plan. A Claim or Equity Interest is classified in a particular class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of those other Classes.

The following table designates the Classes of Claims against and Equity Interests in the Debtor and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy

16

Code; and (iii) deemed to accept or reject the Plan.  The table is qualified in its entirety by reference to the Plan, a copy of which is annexed hereto as **Exhibit A**.

| Class | Description | Impairment | Entitled to Vote |
|:---:|---|:---:|:---:|
| 1 | Secured Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 3 | TMI Claim | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | Yes |
| 6 | Existing Equity Interests | Impaired | Yes |

### D.    Treatment of Claims and Equity Interests

1.    <u>Class 1: Secured Claims</u>

Class 1 consists of Secured Claims against the Debtor, except for the DIP Loan Claim.  On the later of the Effective Date and the date that is ten (10) Business Days after the date such Secured Claim becomes an Allowed Claim, or as soon as practicable thereafter, each holder of an Allowed Secured Claim will receive either (i) such treatment as such Class 1 claimant and the Debtor or the Post-Effective Date Debtor, as applicable, agree, or (ii) at the option of the Debtor or the Post-Effective Date Debtor, as applicable:  (x) payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or order of the Bankruptcy Court), or (y) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  For the avoidance of doubt, any Intercompany Claim that would constitute a Secured Claim will be treated solely as a Class 5 – Intercompany Claim.  Class 1 is Unimpaired and, in accordance with section 1126(f) of the Bankruptcy Code, each holder of a Secured Claim is conclusively deemed to have accepted the Plan and, therefore, is not entitled to vote on the Plan.

2.    <u>Class 2: Other Priority Claims</u>

Class 2 consists of Other Priority Claims.  On the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as practicable thereafter, each holder of an Allowed Other Priority Claim will receive either (i) such treatment as such Class 2 claimant and the Debtor or the Post-Effective Date Debtor, as applicable, agree, or (ii) at the option of the Debtor or the Post-Effective Date Debtor, as applicable:  (x) payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or order of the Bankruptcy Court), or (y) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy.  Class 2 is Unimpaired and, in accordance with section 1126(f) of the Bankruptcy Code, each holder of an Other Priority

Claim is conclusively deemed to have accepted the Plan and, therefore, is not entitled to vote on the Plan.

### 3. Class 3: TMI Claim

Class 3 consists of the TMI Claim. On the TMI Effective Date, the TMI Trust shall receive payment of the TMI Settlement Amount pursuant to and in accordance with the TMI Settlement. In the event the TMI Settlement is terminated pursuant to section 2.09 thereof, in full and complete satisfaction of the TMI Claim, the Post-Effective Date Debtor shall make payment of the TMI Distribution Amount in Cash to the TMI Trust as directed by TMI as soon as reasonably practicable after such termination, but not prior to the Effective Date. Class 3 is Impaired and the holder of the TMI Claim is entitled to vote to accept or reject the Plan.

### 4. Class 4: General Unsecured Claims

Class 4 consists of all General Unsecured Claims, which, among others, expressly exclude the TMI Claim and Intercompany Claims. On the Initial Distribution Date, each holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to such Claim's Pro Rata share of the amount of the Class 4 Distribution available for distribution, or such less favorable treatment as may be agreed upon by such Class 4 claimant and the Liquidating Trustee. From time to time thereafter, each holder of an Allowed General Unsecured Claim shall receive on any Subsequent Distribution Date, its Pro Rata share of the amount of the Class 4 Distribution available for distribution, as determined by the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement. Class 4 is Impaired and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

### 5. Class 5: Intercompany Claims

Class 5 consists of the Intercompany Claims, excluding the DIP Loan Claim. Pursuant to the terms of the Sponsor Settlement, each holder of an Intercompany Claim (except the DIP Loan Claim) has agreed to waive and release its Intercompany Claim, and will not receive a Distribution under the Plan. Class 5 is Impaired and will neither retain nor receive any property under the Plan. Notwithstanding the foregoing and section 1126(g) of the Bankruptcy Code, subject to the terms of the Sponsor Settlement, GEC (whose Affiliates are the only holders of Intercompany Claims) has agreed to cause its Affiliates to vote to accept the Plan.

### 6. Class 6: Equity Interests

Class 6 consists of the existing Equity Interests. Holders of existing Equity Interests in the Debtor will not receive a Distribution under the Plan and all such Equity Interests will be cancelled as of the Effective Date; *provided, however*, that, upon the Effective Date, the Post-Effective Date Officer will be deemed to hold one limited liability company interest in the Post-Effective Date Debtor for the benefit of holders of Allowed Claims (other than holders of Allowed Class 4 General Unsecured Claims); *provided, further*, that the Post-Effective Date Officer will not be entitled to receive any Distribution on account of such Equity Interest. Class 6 is Impaired and will neither retain nor receive any property under the Plan. Notwithstanding the foregoing and section 1126(g) of the Bankruptcy Code, subject to the terms

18

of the Sponsor Settlement, the Sponsor (as the sole holder of existing Equity Interests) has agreed to vote to accept the Plan.

### E.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, at least one holder of an Allowed Claim or Equity Interest in an amount greater than zero for voting purposes, or a holder of a Claim temporarily allowed under Bankruptcy Rule 3018, will be deemed eliminated from the Plan for all purposes, including for purposes of determining acceptance of the Plan by that Class under section 1129(a)(8) of the Bankruptcy Code.

### F.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims eligible to vote on the Plan and no holder of Claims eligible to vote in that Class votes to accept or reject the Plan, then the Plan will be presumed to be accepted by holders of the Claims of such Class.

### G.    Confirmation under Section 1129(b); Cramdown

If any Class of Claims entitled to vote on the Plan does not vote to accept the Plan, then the Debtor may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.

### H.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Post-Effective Date Debtor's right in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any Unimpaired Claim.

### I.    Means for Implementation and Execution of the Plan

1.    <u>General Settlement of Claims</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and will be deemed a good-faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies in accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that any such compromise and settlement is in the best interests of the Debtor, its Estate, and holders of Claims and Equity Interests and is fair, equitable, and reasonable.  All Distributions made to holders of Allowed Claims in any Class are intended to be and will be final with respect to such Distributions.

2.    Sponsor Settlement and Funding

The Sponsor Settlement contemplates that GEC will pay, or cause to be paid, to WMC on the Effective Date the Sponsor Settlement Amount, which is $192,600,000 in Cash plus the total outstanding amount due under the DIP Financing as of the Effective Date. In addition, on the Effective Date, GECUSH will provide the Exit Financing of $39,500,000. Further, as of the Effective Date, GEC and GECUSH will release (and cause their affiliates to release) any and all prepetition Claims against the Debtor, including approximately $93,500,000 owed to GE under various intercompany financing agreements. GE also will vote or cause to be voted its Claims and Equity Interests to accept the Plan and not object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan. This consideration will be provided in full and final satisfaction of the Potential Claims. A table summarizing the consideration provided by GE under the Sponsor Settlement is set forth below.

| Description | Amount |
|---|---|
| Cash | $192,600,000 |
| Projected DIP Financing | $13,000,000 |
| Exit Financing | $39,500,000 |
| Waiver of Intercompany Claims | $93,458,389 |
| **Total** | **$338,558,389** |

In exchange for GE's obligations under the Sponsor Settlement and the Plan, the Debtor and each holder of a Claim will be deemed to forever release, waive, and discharge GEC, GECUSH, and each of their predecessors, successors, assigns, current and former subsidiaries (other than WMC) and affiliates, and such Persons' current and former officers, directors, principals, shareholders, members, partners, employees, managers, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, of and from any and all claims, causes of action, obligations, interests, suits, demands, damages, rights, losses, remedies, or liabilities whatsoever that have been or could be asserted against, or in any way relating to, or arising out of (i) the Debtor, its business, or its property, (ii) the Potential Claims, (iii) the Chapter 11 Case, (iv) the formulation, preparation, negotiation, implementation, confirmation, or consummation of the Plan or any other document related to the Debtor, the Chapter 11 Case, or the Plan, including the Sponsor Settlement, and (v) any other act taken or omitted to be taken in connection with the Chapter 11 Case. Under the Sponsor Settlement, GE does not admit or acknowledge that GE has any liability or committed any wrongdoing, or the existence or viability of any Potential Claim.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and is expressly conditioned upon the approval and effectiveness of the

Sponsor Settlement.  As of the Effective Date, the Plan represents a full, final, integrated, complete, and good-faith compromise, settlement, release, and resolution of, among other matters, disputes and potential litigation between the Debtor and GE through the Sponsor Settlement.  The Sponsor Settlement is the fundamental foundation of the Plan.  The Plan will be deemed a motion to approve the Sponsor Settlement and the good-faith compromise and settlement of the Potential Claims pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order will constitute (i) the Bankruptcy Court's approval of the Sponsor Settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, (ii) a finding by the Bankruptcy Court that the Sponsor Settlement is fair, equitable, and reasonable and is in the best interests of the Debtor and its Estate, and (iii) a judicial determination that the Sponsor Settlement is integral to, and not severable from, the Plan; *provided, however*, that the Sponsor Settlement will not constitute an admission of the Sponsor's actual liability.

The Sponsor Settlement satisfies the requirements of Bankruptcy Rule 9019, which governs the approval of compromises and settlements, and should be approved. Bankruptcy Rule 9019 provides, "after notice and a hearing, the court may approve a compromise or settlement."  Settlements are generally favored and encouraged in bankruptcy proceedings.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The decision of whether to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).  In evaluating the settlement, the Court should consider "whether the compromise is fair, reasonable, and in the best interest of the estate."  *In re Louise's Inc.*, 211 B.R. 798, 801 (Bankr. D. Del. 1997).  The bankruptcy court's discretion should be exercised "in light of the general public policy favoring settlements."  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)).  In considering the merits of the settlement, a bankruptcy court does not need to be convinced that the settlement is the best possible outcome for the parties; rather the court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012) (citing *Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (D.N.J. 2000)); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).

In determining whether a proposed settlement is fair, reasonable, and in the best interests of the estate, courts in this circuit consider the following four factors:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *In re Martin*, 91 F.3d at 393; *see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *In re eToys, Inc.*, 331 B.R. 176, 198 (Bankr. D. Del. 2005).  "The court must also consider 'all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.'"  *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *Protective Comm. for Independent S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).  Accordingly, at its core, "the ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'"  *Id.* (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)); *see also In re Wash. Mut. Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to

approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" (citation omitted)).

Analysis of the *Martin* factors supports approval of the Sponsor Settlement:

- <u>Probability of success in the litigation</u>.  The likelihood of success in proceedings to prosecute the Potential Claims is uncertain.  The Potential Claims include, among others, claims for piercing the corporate veil, alter ego, breach of fiduciary duty, and fraudulent transfer.  Each claim involves numerous complex issues of fact and law, the underlying events of which occurred more than a decade ago.  GE disputes that it has any liability on the Potential Claims.  To succeed, the Debtor would have to overcome, among other things, defenses that (i) GE already has contributed, as capital contributions, more money than the amount of any alleged damages; (ii) WMC was solvent at the relevant times; (iii) WMC lacks standing to assert certain claims; (iv) WMC, rather than GE, directed certain key actions; and (v) the Debtor cannot establish liability or damages.  *See, e.g.*, *Stanziale v. U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings, LLC)*, 2018 WL 2102323, at \*8 (Bankr. D. Del. May 4, 2018) (noting significant challenges for the trustee to succeed on its claims favored approval of the settlement).  Following its months-long and comprehensive investigation, the Special Committee compiled facts and formulated arguments concerning these key issues.  However, there can be no assurance it would succeed on such theories.  Accordingly, the Special Committee determined that the benefits of pursuing the Potential Claims, adjusted for the inherent risk and cost associated with protracted and uncertain litigation, were outweighed by the manifest benefits that the Sponsor Settlement provides to the Debtor and its Estate.  The Sponsor Settlement provides the certainty of significant recoveries to the Debtor's creditors now, as opposed to speculative future recoveries if the Estate pursued the Potential Claims.  Accordingly, the first *Martin* factor supports approval of the Sponsor Settlement.

- <u>Difficulties associated with collection</u>.  Although the Special Committee has little concern that GE has the ability to pay any judgment, for reasons similar to those discussed in the first *Martin* factor above, the Special Committee determined that the Estate would be required to incur significant time and expense in order to eventually collect on the Potential Claims and realize any economic benefit from them.  First, the Potential Claims have not yet been filed.  Accordingly, the Potential Claims are nowhere close to the collection stage.  Second, even assuming eventual success in litigation, a judgment by any court against GE on the Potential Claims likely would be subject to multiple layers of appellate review.  Such review could, of course, delay not only the Debtor's ability to collect on a judgment, but also the Debtor's more basic need to resolve all of its creditors' claims against it and require expenditure of valuable

(and finite) estate assets.  *See, e.g.*, *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 774 (Bankr. D. Del. 2018) (finding factor favored approval of settlement because "lengthy and expensive litigation on a variety of fronts . . . would eat up the successful litigants' ability to recover on their claims").  Thus, the second *Martin* factor favors approving the Sponsor Settlement.

- Complexity of the litigation and the attendant expense, inconvenience, and delay.  The nature of the Potential Claims involves complex issues of fact and law, some of which are described above and which would present litigation challenges for the Debtor.  The Potential Claims involve facts and circumstances that run the gamut of WMC's business and its relationships with its affiliates over the course of four years and beyond.  The complexity of these facts is evidenced by the substantial volume of documents and information that the Special Committee collected and reviewed in connection with its investigation.  Indeed, the Special Committee collected almost 2,000,000 documents and nearly 100 transcripts of sworn testimony over the course of the investigation.  Notwithstanding the Special Committee's prepetition investigation, litigation on these issues would require extensive discovery and significant pretrial proceedings, and a lengthy trial.  This necessarily would require significant expense to prosecute the Potential Claims.  However, the Debtor does not have the resources to pay these significant litigation expenses.  Also, as noted above, lengthy litigation would delay any recoveries to the Debtor's creditors, without any assurance of eventual collection on the Potential Claims.  *See In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 774 (benefits of plan settlement "heavily outweighs the lengthy and costly litigation that lies in wait if the settlements are not approved").  Accordingly, the third *Martin* weighs in favor of approving the Sponsor Settlement.

- Paramount interest of creditors.  The Sponsor Settlement serves the paramount interests of creditors because, if approved, it will allow the Debtor to fund recoveries for and resolve the TMI Claim and General Unsecured Claims.  Further, the Special Committee, with the assistance of its advisors, negotiated the Sponsor Settlement at arm's length with GE, which involved numerous rounds of negotiations over the course of several months.  The Sponsor Settlement brings significant value into the Debtor's Estate without which the Debtor could not fund the Plan or Distributions to creditors.  This sum certain will come into the Estate on the Effective Date, rather than the contingent and uncertain future recovery that protracted litigation might provide.  Accordingly, the fourth *Martin* factor supports approval of the Sponsor Settlement.

The Special Committee, on behalf of the Debtor, with the assistance of its legal and financial advisors, has determined that the benefits of settling the Potential Claims outweighs

the benefits of litigating them, the outcome of which would be exceedingly uncertain, delayed, and expensive.  Absent a resolution of the Potential Claims, the Debtor would not have been able to achieve the comprehensive resolution of the Claims against the Debtor through the Plan, including the TMI Claim.  Accordingly, the Debtor believes that the Sponsor Settlement is fair, reasonable and in the best interests of the Debtor's Estate.

           3.      <u>TMI Settlement</u>

In full and final settlement and resolution of the TMI Claim, the TMI Settlement contemplates that the Debtor or Post-Effective Date Debtor, as applicable, will pay the TMI Settlement Amount to the TMI Trust in accordance with the payment instructions provided by TMI.  In the event that the TMI Effective Date occurs after the Effective Date, the Post-Effective Date Debtor will hold the TMI Settlement Amount in a segregated account for the benefit of the TMI Trust until it is paid to the TMI Trust accordance with the TMI Settlement or Article III.B.3 of the Plan.  Pursuant to section 2.09(a) of the TMI Settlement, each party may terminate the agreement if certain conditions do not occur or are not otherwise waived within the specified time periods.  In the event that the TMI Settlement is terminated pursuant to section 2.09 thereof, then the Post-Effective Date Debtor nevertheless will pay to the TMI Trust, in accordance with the payment instructions provided by TMI, the TMI Distribution Amount in Cash as soon as reasonably practicable after termination of the TMI Settlement, but not prior to the Effective Date.  In consideration of the TMI Settlement Amount, the Separate Trustee, the TMI Trust, and any persons claiming by, through, or on behalf of the trust, including, without limitation, all certificateholders, as well as any and all agents or appointees acting on behalf of the trust, grant a full, final, and complete release, waiver, and discharge of all of the Released Claims (as defined in the TMI Settlement) to (i) the Debtor, (ii) any past or present Debtor Affiliate (as defined in the TMI Settlement), and (iii) their respective past, present, or future employees, agents, officers, directors, attorneys, managers, members, advisors, representatives, accountants, and auditors. The provisions of the TMI Settlement, including the release provided therein, are binding on all Persons (as defined in the TMI Settlement) claiming a beneficial interest in the TMI Trust, including without limitation, the Trustee of the TMI Trust, all investors (as defined in the TMI Settlement), and their successors in interest, assigns, and transferees.  The TMI Settlement does not constitute an admission by the Debtor of any liability on the TMI Claim.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and seeks the approval of the TMI Settlement.  The Plan and the TMI Settlement represent a full, final, integrated, complete, and good-faith compromise, settlement, release, and resolution of, among other matters, disputes and potential litigation between the Debtor and the Separate Trustee through the TMI Settlement.  The TMI Settlement resolves litigation that has been ongoing for nearly seven years and a proof of claim in the amount of almost $1 billion.  The Confirmation Order will constitute the Bankruptcy Court's approval of the TMI Settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that the TMI Settlement is in the best interests of the Debtor and its Estate, and is fair, equitable, and reasonable.  The TMI Settlement represents a good faith compromise of the TMI Claim.

The TMI Settlement satisfies the requirements of Bankruptcy Rule 9019, which governs the approval of compromises and settlements, and should be approved.  The standards

governing approval of settlements in bankruptcy are set forth in section III.I.2, *supra*, and incorporated by reference here.   Analysis of the *Martin* factors supports approval of the TMI Settlement:

- <u>Probability of success in the litigation</u>.  The Separate Trustee's litigation position was that it established liability and damages in excess of $980,000,000, and the Separate Trustee filed a proof of claim against the Debtor in approximately that amount.  The Debtor disputes liability and damages, but after a three week bench trial, and extensive post-trial briefing and argument, there is no assurance that a court would agree with the Debtor's position.  Accordingly, the first *Martin* factor weighs in favor of approving the TMI Settlement.

- <u>Difficulties associated with collection</u>.  The difficulties associated with collection are not implicated in this situation because the Debtor was the defendant in the TMI Litigation.  Accordingly, this factor is neutral.

- <u>Complexity of the litigation and the attendant expense, inconvenience, and delay</u>.  Entry into the TMI Settlement puts an end to further protracted, complicated, and expensive litigation between TMI and the Debtor.  The TMI Litigation already has spanned nearly seven years and involved extensive discovery, culminating in a three-week trial.  Given that history, any appeal in the TMI Litigation would likely be complex, time consuming, and expensive.  This would divert the Debtor's resources from resolving all of the claims against it and maximizing value for all of its creditors.  The TMI Settlement fixes the Debtor's liability on the TMI Claim, cutting off further litigation expenses.  Therefore, the third *Martin* factor supports approving the TMI Settlement.

- <u>Paramount interest of creditors</u>.  With the payment of the TMI Settlement Amount, the TMI Settlement fully and finally resolves the TMI Claim and the TMI Litigation.  The Separate Trustee asserted damages in excess of $980,000,000 in the TMI Litigation, which the Debtor is resolving for the TMI Settlement Amount ($198,000,000).   This prevents incurring significant potential liability for the Debtor, which likely would reduce recoveries for other creditors.  Further, the TMI Settlement prevents the continued accrual of costs and fees attendant to the litigation, including the substantial costs and fees associated with an appeal of any judgment.  It also enables Distributions to be made to other creditors without the need for a sizable, and likely impractical, reserve for the TMI Claim.  Accordingly, the fourth *Martin* factor supports approval of the TMI Settlement.

The Debtor, with the assistance of its legal and financial advisors, has determined that the benefits of settling the TMI Claim outweigh the benefits of continued litigation, which would be complex, protracted, and expensive and the outcome of which would be uncertain.  Absent a resolution of the TMI Claim, the Debtor could potentially be subject to a significant

adverse judgment, and further costs to contest such judgment in post-trial and appellate proceedings. Accordingly, the Debtor believes that the settlement is fair, reasonable and in the best interests of the Debtor's estate.

4.    Sources for Distributions

Distributions under the Plan to holders of the DIP Loan Claim, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Secured Claims and the TMI Claim will be funded from the Post-Effective Date Debtor Assets (other than the proceeds of the Exit Financing Collateral unless and until all obligations arising under the Exit Financing have been indefeasibly paid in full) and distributed by the Post-Effective Date Debtor. Substantially all of the Cash available for Distributions will be funded by GE under the Sponsor Settlement. Prior to the Effective Date, the Debtor will draw down a sufficient amount of the DIP Financing (but in any event not in an amount greater than $15 million) to allow the Post-Effective Date Debtor to make Distributions (or reserve) for the estimated amount of unpaid Allowed Administrative Expense Claims, Professional Fee Claims (including to fund the Professional Fee Escrow Account), Priority Tax Claims, and Other Priority Claims, if any, and to fund the anticipated Post-Effective Date Debtor Expenses and any other acts necessary to wind down the Debtor and the Post-Effective Date Debtor. The Class 4 Distribution will be funded from the Liquidating Trust Assets and distributed by the Liquidating Trustee to the Class 4 Beneficiaries. The obligations arising under the Exit Financing will be paid by the Post-Effective Date Debtor solely from the proceeds of the Exit Financing Collateral.

5.    Exit Financing

As additional consideration for the releases provided under the Plan, the Sponsor has agreed to provide the Debtor with the Exit Financing. Confirmation of the Plan will be deemed to constitute approval of the Exit Financing and the Exit Financing Documents (including all transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtor in connection therewith) and, subject to the occurrence of the Effective Date, authorization for the Post-Effective Date Debtor to enter into and perform its obligations under the Exit Financing Documents. The Exit Financing Documents will be included in the Plan Supplement.

On the Effective Date, the Exit Financing Documents will constitute legal, valid, binding, and authorized obligations of the Post-Effective Date Debtor enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Financing Documents are being extended, and will be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, will not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and will not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Financing Documents on the Exit Financing Collateral (a) will be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents, (b) will be deemed automatically attached and perfected on the Effective Date, and (c) will not be subject to avoidance, recharacterization, or subordination (including equitable

26

subordination) for any purposes whatsoever and will not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtor, the Post-Effective Date Debtor, and the Sponsor are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection will occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents will not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

6.     The Liquidating Trust

a.     *Formation of the Liquidating Trust*

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Assets, (b) resolving all Class 4 Disputed Claims, (c) pursuing, to the extent it sees fit, the Retained Causes of Action, and (d) making all Distributions to the Class 4 Beneficiaries. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d) and the sole purpose of the Liquidating Trust will be to liquidate and distribute the Liquidating Trust Assets in accordance with United States Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to and consistent with its liquidating purpose.

b.     *Appointment of the Liquidating Trustee*

On or prior to the Confirmation Date, the Debtor will appoint the Liquidating Trustee. The identity of the Liquidating Trustee will be included in the Plan Supplement. The Liquidating Trustee will serve in accordance with the Liquidating Trust Agreement and the Plan.

c.     *Funding of the Liquidating Trust*

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust; *provided, however,* that any Excess Post-Effective Date Debtor Assets shall not vest in the Liquidating Trust unless and until the Post-Effective Date Officer determines that (a) the DIP Loan Claim, (b) all Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims, (c) the TMI Claim, (d) all obligations under the Exit Financing, and (e) all Post-Effective Date Debtor Expenses, have been paid in full or fully reserved for. The Plan shall be considered a motion pursuant to sections 105, 363, and 365 of the Bankruptcy Code for such relief, and the Confirmation Order shall be considered an order granting such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Class 4 Beneficiaries. For all federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall be treated as (1) a transfer of the Liquidating Trust Assets directly to the

27

Class 4 Beneficiaries (other than to the extent such Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer of such Liquidating Trust Assets by the Class 4 Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust.  The Class 4 Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust (other than the Liquidating Trust Assets as are allocable to Disputed Claims).  The Liquidating Trust Assets shall vest in the Liquidating Trustee solely in its capacity as such. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtor's right, title, and interest in the Liquidating Trust Assets and the Debtor shall have no further right or interest with respect to the Liquidating Trust Assets in the Liquidating Trust.

### d.      Rights and Powers of the Liquidating Trustee

The Liquidating Trustee will be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code with respect to the Liquidating Trust Fund, the Liquidating Trust Assets, the resolution of Disputed Class 4 – General Unsecured Claims, and the Retained Causes of Action, and the Liquidating Trustee will have all the rights and powers set forth in the Liquidating Trust Agreement, including the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, to (l) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan as they relate to the Liquidating Trust, including the Liquidating Trust Assets, (2) liquidate the Liquidating Trust Assets, (3) prosecute, settle, abandon or compromise the Retained Causes of Action, (4) make Distributions to the Class 4 Beneficiaries, (5) establish and administer any necessary reserves for Disputed Claims for Class 4 – General Unsecured Claims that may be required, (6) subject to the terms of the Plan, object to the Disputed Class 4 – General Unsecured Claims and prosecute, settle, compromise, withdraw or resolve any objections thereto, and (7) employ and compensate professionals and other agents; *provided*, *however*, that any such compensation will be made only out of the Liquidating Trust Assets, in each case to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of United States Treasury Regulation Section 301.7701-4(d) for federal income tax purposes.

### e.      Liquidating Trust Expenses

The Liquidating Trust Expenses incurred on or after the Effective Date will be paid out of the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement, without further order of the Bankruptcy Court.

### f.      Retention of Professionals by Liquidating Trustee

The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without the need for Bankruptcy Court approval.  Without limiting the foregoing, the Liquidating Trustee may retain any professional that represented parties in interest in the Chapter 11 Case.

g.      *Periodic Reports to Be Filed by the Liquidating Trust*

The Liquidating Trustee may file periodic reports regarding the liquidation or other administration of property comprising the Liquidating Trust, the Distributions made by it to the Class 4 Beneficiaries and other matters required to be included in the report in accordance with the Liquidating Trust Agreement.  In addition, the Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust (other than the Liquidating Trust Assets allocable to Disputed Claims) as a grantor trust pursuant to United States Treasury Regulation Section 1.671-4(a).

7.      <u>Directors, Officers, Managers, Members, and Authorized Persons of the Debtor</u>

On the Effective Date, the authority, power and incumbency of the persons then acting as directors, officers, managers, members and other authorized persons of the Debtor will be terminated and such persons will be deemed to have resigned.

8.      <u>The Post-Effective Date Debtor</u>

a.      *Appointment of the Post-Effective Date Officer*

On the Effective Date, the Post-Effective Date Officer will be appointed as the sole director, officer, manager, member and authorized Person of the Post-Effective Date Debtor pursuant to the terms of the Post-Effective Date Debtor Organizational Documents.  The identity of the Post-Effective Date Officer will be included in the Plan Supplement.  The Post-Effective Date Officer will serve in accordance with the Post-Effective Date Debtor Organizational Documents and the Plan.

b.      *Vesting of the Post-Effective Date Debtor Assets*

On the Effective Date, the Post-Effective Date Debtor Assets will vest automatically in the Post-Effective Date Debtor.  The Plan will be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for that relief, and the Confirmation Order will be considered an order granting that relief.  The transfer of the Post-Effective Date Debtor Assets to the Post-Effective Date Debtor will be made for the purpose of liquidating and collecting the proceeds of the Post-Effective Date Debtor Assets for the payment and satisfaction of the Post-Effective Date Debtor Expenses, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Secured Claims, Other Priority Claims, the TMI Claim, the Exit Financing, and the DIP Claim, all as more fully set forth in the Plan.

c.      *Rights and Powers of the Post-Effective Date Debtor*

The Post-Effective Date Debtor will be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code with respect to the Post-Effective Date Debtor Assets and the resolution of Disputed Claims (other than Class 4 – General Unsecured Claims) and will have all the rights and powers set forth in the Post-Effective Date Debtor Organizational Documents and the Plan, including, without limitation, the powers of a trustee

under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, and the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan, (2) liquidate the Post-Effective Date Debtor Assets, (3) liquidate the Exit Financing Collateral and indefeasibly pay all obligations of the Exit Financing from the proceeds thereof, (4) establish and administer any necessary reserves for Disputed Claims that may be required (other than with respect to reserves for Disputed Class 4 – General Unsecured Claims), (5) object to the Disputed Claims (other than Disputed Class 4 – General Unsecured Claims) and prosecute, settle, compromise, withdraw or resolve any objections thereto, (6) employ and compensate professionals and other agents from the Post-Effective Date Debtor Assets, (7) transfer any Excess Post-Effective Date Debtor Assets to the Liquidating Trust, and (8) any other acts necessary to wind down the Debtor and Post-Effective Date Debtor.

### d.    Post-Effective Date Debtor Expenses

The Post-Effective Date Debtor Expenses will be funded from the proceeds of the Post-Effective Date Debtor Assets.

### e.    Dissolution of the Post-Effective Date Debtor

Following (a) the liquidation and collection of the Post-Effective Date Debtor Assets, (b) the payment and satisfaction of the Exit Financing or the assignment of the Exit Financing Collateral to the Exit Lender, (c) the payment and satisfaction of the Post-Effective Date Debtor Expenses, (d) the Distributions authorized under the Plan to holders of Allowed Claims (other than Class 4 – General Unsecured Claims), (e) the transfer of any Excess Post-Effective Date Debtor Assets to the Liquidating Trust, and (f) the completion of all other actions necessary and appropriate under applicable law to wind-up the affairs of the Post-Effective Date Debtor, the Post-Effective Date Officer, on behalf of the Post-Effective Date Debtor, is authorized to and will (x) complete and file the Post-Effective Date Debtor's final federal, state and local tax returns and (y) file the Post-Effective Date Debtor's certificate of dissolution, cancellation, termination or such similar document, together with all other necessary documents, to effect the Post-Effective Date Debtor's dissolution and/or termination of its existence under the applicable laws of Delaware.  The filing of the Debtor's certificate of dissolution, cancellation, termination or such similar document will be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, members or the board of directors of the Post-Effective Date Debtor.

### 9.    Books and Records of the Debtor

On the Effective Date, the Debtor will be deemed to, and will take all necessary steps to, assign, transfer and distribute to (1) the Post-Effective Date Debtor the Post-Effective Date Debtor Assets, including all of the Debtor's books and records other than any books and records relating solely and directly to the Liquidating Trust Assets and Class 4 – General Unsecured Claims, and (2) the Liquidating Trust the Liquidating Trust Assets, including all of the Debtor's books and records relating solely and directly to the Liquidating Trust Assets and Class 4 – General Unsecured Claims.

10.     Preservation of Privileges of the Estate and Debtor

The Post-Effective Date Debtor will be the successor to all of the privileges of the Estate and the Debtor, including, but not limited to, the attorney/client privilege and any common interest privilege; *provided, however*, that the Liquidating Trustee will be the successor to all of the privileges of the Estate and the Debtor relating to the Retained Causes of Action and Disputed Class 4 – General Unsecured Claims.

11.     Operations of the Debtor Between the Confirmation Date and the Effective Date

The Debtor will continue to operate as a Debtor in Possession during the period from the Confirmation Date through and until the Effective Date.

12.     Establishment of the Administrative Bar Date

The Plan establishes the Administrative Bar Date, which will be thirty days after service of the notice of the Effective Date.  Except as otherwise provided in the Plan or the Confirmation Order, on or before 5:00 p.m. (Eastern Time) on the Administrative Bar Date, each holder of an Administrative Expense Claim (to the extent such holder has not previously been paid) must File with the Bankruptcy Court a request for payment of such Administrative Expense Claim.

Any holder of an Administrative Expense Claim that is required to File a request for payment of such Administrative Expense Claim that does not File such request with the Bankruptcy Court by the Administrative Bar Date, will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim against the Debtor, the Estate, the Liquidating Trust, the Post-Effective Date Debtor, and any of their assets and properties and such Administrative Expense Claim will be deemed waived and released as of the Effective Date.

13.     Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Chapter 11 Case is closed.

14.     Cancellation of Equity Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, and other documents evidencing the Equity Interests will be deemed automatically cancelled and will be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto, including any obligation of the Debtor to pay any type of taxes on account of the Equity Interests, will be discharged.

RLF1 21809021v.1

### J.    Provisions Governing Distributions Under the Plan

#### 1.    Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee will make, or will make adequate reserves for, the Distributions required to be made by it to holders of Class 4 – General Unsecured Claims under the Plan.  For the avoidance of doubt, the Post-Effective Date Debtor will make Distributions to the holders of Allowed Claims (other than Class 4 – General Unsecured Claims) at the times and in the manner specified in Article VI of the Plan.

#### 2.    Disputed Claims Reserves

##### a.    *Establishment of Disputed Claims Reserves*

On the Effective Date or as soon thereafter as practicable, the Liquidating Trustee, as Disbursing Agent for Class 4 – General Unsecured Claims, shall establish the Disputed Claims Reserve for Class 4 – General Unsecured Claims, and the Post-Effective Date Debtor, as Disbursing Agent for Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and  Secured Claims, may establish a Disputed Claims Reserve for all Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims.  To the extent a Disputed Claims Reserve is established, the applicable Disbursing Agent shall reserve in Cash or other property, for Distribution on account of each Disputed Claim, the amount of the Distribution that such Disputed Claim would be entitled to receive under the Plan if it were to become an Allowed Claim (or such lesser amount as may be determined by the applicable Disbursing Agent and the holder of such Disputed Claim or by the Bankruptcy Court in accordance with Article VII of the Plan).

##### b.    *Maintenance of Disputed Claims Reserves*

The Disbursing Agents will hold the property in their respective Disputed Claims Reserves in trust for the benefit of the holders of such Disputed Claims ultimately determined to be Allowed.  The Disputed Claims Reserves will be terminated by the Disbursing Agents when all Distributions and other dispositions of Cash or other property required to be made hereunder to each respective class of Claims have been made in accordance with the terms of the Plan. Upon termination of a Disputed Claims Reserve, all Cash or other property held in the Disputed Claims Reserve will revest in and become the property of the Post-Effective Date Debtor or the Liquidating Trust, as applicable, to be Distributed or otherwise treated in accordance with the terms of the Plan.

##### c.    *Federal Income Tax Treatment of Class 4 Disputed Claims Reserve*

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Liquidating Trustee may either (1) timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by United States Treasury Regulation section 1.468B-9 or (2) treat such Liquidating

Trust Assets as a "complex trust". All parties (including, without limitation, the Liquidating Trustee and the Class 4 Beneficiaries) will report consistently with the foregoing for federal, state, and local income tax purposes.

        3.      <u>Subsequent Distributions</u>

Any Distribution that is held in a Disputed Claims Reserve pursuant to Article VI.B of the Plan will be paid on the first Subsequent Distribution Date after such Claim is Allowed (with respect to Class 4 – General Unsecured Claims) or in accordance with the Plan (with respect to Administrative Expense Claims, Priority Tax Claims, Secured Claims or Other Priority Claims). Except as set forth in the Plan, no interest will accrue or be paid on the unpaid amount of any Distribution paid in accordance with Article VI.C of the Plan

The Liquidating Trustee shall, in its discretion, make additional Distributions to holders of Class 4 – General Unsecured Claims from time to time as a result of additional amounts becoming available due to disallowance of Disputed Claims and/or additional assets becoming part of the Liquidating Trust Fund; *provided, however*, in connection with any Distribution made on a Subsequent Distribution Date, the Liquidating Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidating Trust Assets or to meet Liquidating Trust Expenses.

        4.      <u>Record Date for Distributions</u>

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date, which will be the Confirmation Date, will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer might not have expired by the Record Date. The Post-Effective Date Debtor or the Liquidating Trust, as applicable, will have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Post-Effective Date Debtor or the Liquidating Trust, as applicable, will be entitled to recognize and deal with, for all purposes hereunder, only those holders of record as of the close of business on the Record Date.

        5.      <u>Delivery of Distributions</u>

        *a.*      *General Provisions; Undeliverable Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims will be made by the Disbursing Agent to (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on a proof of claim Filed by such holder or (b) the last known address of such holder if no proof of claim is Filed or if the Debtor has been notified in writing of a change of address. If any Distribution is returned as undeliverable, then the Disbursing Agent may, in its discretion, make reasonable efforts to determine the current address of the holder of the Claim with respect to which the Distribution was undeliverable, but no Distribution to any such holder will be made unless and until the Disbursing Agent has determined the then-current address of such holder, at

which time, or as soon as practicable thereafter, the Distribution to such holder will be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Post-Effective Date Debtor or the Liquidating Trust, as applicable, will be returned to, and held in trust by, the Post-Effective Date Debtor or the Liquidating Trust, as applicable, until the Distributions are claimed or are deemed to be unclaimed property as set forth in Article VI.E.3 of the Plan. The Post-Effective Date Debtor or the Liquidating Trust, as applicable, will have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided*, *however*, that the Liquidating Trust's or the Post-Effective Date Debtor's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan, the Liquidating Trust Agreement, and/or the Post-Effective Date Debtor Organizational Documents, as applicable.

### b. Minimum Distributions

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any Subsequent Distribution Date would be $125 or less, no such Distribution will be made to that holder unless a request therefor is made in writing to the Post-Effective Date Debtor or the Liquidating Trustee, as applicable; *provided, however,* that if any Distribution is not made pursuant to Article VI of the Plan, it will be added to any subsequent Distribution to be made on behalf of the holder's Allowed Class 4 General Unsecured Claim. If the amount of any final Distribution to any holder of an Allowed Class 4 General Unsecured Claim would be $50 or less, then such Distribution will be made available for distribution to all holders of Allowed Class 4 General Unsecured Claims receiving final Distributions of at least $50.

### c. Unclaimed Property

Except with respect to property not distributed because it is being held in a Disputed Claims Reserve, Distributions that are not claimed by the expiration of six (6) months from the date of the relevant Distribution will be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and will vest or revest in the Post-Effective Date Debtor or the Liquidating Trust, as applicable, and the Claims with respect to which those Distributions were made will be automatically cancelled. After the expiration of that six month period, the claim of any Person to those Distributions will be discharged and forever barred. Nothing contained in the Plan will require the Post-Effective Date Debtor or the Liquidating Trust to attempt to locate any holder of an Allowed Claim. All funds or other property that vest or revest in the Post-Effective Date Debtor or the Liquidating Trust, as applicable, pursuant to Article VI.D of the Plan will be used to pay the Liquidating Trust Expenses or the Post-Effective Date Debtor Expenses, as applicable. To the extent any funds or property that vest or revest in the Liquidating Trust are remaining after payment or reserve in full of all such fees and expenses, such amounts will be distributed on a Pro Rata basis to holders of Allowed Class 4 – General Unsecured Claims. To the extent any funds or property that vest or revest in the Post-Effective Date Debtor are remaining after payment or reserve in full of (x) all Post-Effective Date Debtor Expenses, the DIP Claim and the Exit Financing, and (y) all Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Secured Claims and Other Priority Claims, such amounts shall be paid to the Liquidating Trust and constitute Excess Post-Effective Date Debtor Assets. In the event the Liquidating Trustee holds Liquidating Trust Assets after all

34

Liquidating Trust Expenses and Distributions have been made, such remaining Liquidating Trust Assets will be liquidated to Cash and distributed to a charitable organization of the Liquidating Trustee's choice, assuming such distribution is economically feasible.   Neither unclaimed property, any Post-Effective Date Debtor Assets nor Liquidating Trust Assets will escheat to any federal, state or local government or other Person.

6.      Time Bar to Cash Payments by Check

Checks issued by the Post-Effective Date Debtor or the Liquidating Trust on account of Allowed Claims will be null and void if not negotiated within ninety (90) days after the date of issuance thereof.   Requests for the reissuance of any check that becomes null and void pursuant to Article VI.G of the Plan must be made directly to the Post-Effective Date Debtor or the Liquidating Trust, as applicable, by the holder of the Allowed Claim to whom the check was originally issued.   Any Claim in respect of such voided check must be made in writing on or before the later of six (6) months from the Effective Date or ninety days after the date of issuance thereof.   After that date, all Claims in respect of void checks will be forever barred and the proceeds of those checks will revest in and become the property of the Post-Effective Date Debtor or the Liquidating Trust, as applicable, as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Article VI.E.3 of the Plan.

7.      Limitations on Funding of Disputed Claims Reserves

Except as expressly set forth in the Plan, neither the Debtor, the Post-Effective Date Debtor, nor the Liquidating Trustee will have any duty to fund a Disputed Claims Reserve.

8.      Compliance with Tax Requirements

In connection with making Distributions under the Plan, to the extent applicable, the Post-Effective Date Debtor or the Liquidating Trustee, as applicable, will comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant to the Plan will be subject to such withholding and reporting requirements.   The Post-Effective Date Debtor or the Liquidating Trustee, as applicable, may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any Governmental Unit.   Any property so withheld will then be paid by the Post-Effective Date Debtor or the Liquidating Trustee, as applicable, to the appropriate authority.   If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any Governmental Unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution will be treated as an undeliverable Distribution in accordance with Article V.E.1 of the Plan.

9.      No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars will be made pursuant to the Plan.   Whenever any payment of a fraction of a

RLF1 21809021v.1

dollar under the Plan would otherwise be required, the actual Distribution made will reflect a rounding down of that fraction to the nearest whole dollar.

10.    Post-Petition Interest on Claims

Except as specifically provided for in the Plan or the Confirmation Order, interest will not accrue on Claims and no holder of a Claim will be entitled to interest accruing on or after the Commencement Date on any Claim.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim will be Allowed to the extent that it is for post-petition interest or other similar charges.

11.    No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim will receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

12.    Setoff and Recoupment

The Post-Effective Date Debtor or the Liquidating Trust, as applicable, may, but will not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtor, the Estate, the Post-Effective Date Debtor, or the Liquidating Trust might have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtor, the Estate, the Post-Effective Date Debtor, or the Liquidating Trust of any right of setoff or recoupment that any of them may have against the holder of any Claim.

K.    **Procedures for Resolving and Treating Disputed Claims**

1.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, the Post-Effective Date Debtor or the Liquidating Trustee, as applicable, will not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

2.    Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as between the Liquidating Trustee and the Post-Effective Date Debtor, the Liquidating Trustee will have the exclusive right to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Class 4 – General Unsecured Claims and the Post-Effective Date Debtor will have the exclusive right to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to all other Claims. The costs of pursuing the objections to Claims will be borne by the Post-Effective Date Debtor or the Liquidating Trust, as applicable.  From and after the Effective Date, all objections with respect to Disputed Claims will be litigated to a Final Order except to the extent the Post-Effective Date Debtor or the Liquidating Trustee elects to withdraw any such

36

objection, or reaches an agreement with the claimant to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court. For the avoidance of doubt, the Liquidating Trustee and Post-Effective Date Debtor, as applicable, may compromise, settle, or otherwise resolve any Disputed Claim without Filing an objection to that Disputed Claim and without supervision or approval of the Bankruptcy Court.

3.    Estimation of Claims

At any time, (1) prior to the Effective Date, the Debtor, and (2) subsequent to the Effective Date, the Post-Effective Date Debtor or the Liquidating Trustee, as applicable, may request that the Bankruptcy Court estimate any Claim to the extent permitted by section 502(c) of the Bankruptcy Code.

4.    Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, provided that such Cause of Action is a Retained Cause of Action, will be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any Distributions on account of such Claims until such time as the Causes of Action against that Person have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Person have been turned over or paid to the Debtor, the Post-Effective Date Debtor or the Liquidating Trust, as applicable.

5.    Adjustment to Claims Without Objection

Any Claim or Equity Interest that has been paid or satisfied, or any Claim or Equity Interest that has been amended or superseded, may be marked as satisfied, adjusted or expunged on the Claims Register by the Noticing Agent at the direction of the Debtor, the Post-Effective Date Debtor, or the Liquidating Trust, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

6.    Amendments to Claims or Equity Interests

After the Confirmation Date, a Claim or Equity Interest may not be amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim or Equity Interest solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority of such Claim or Equity Interest.

**EXCEPT AS PROVIDED IN THE PLAN OR OTHERWISE AGREED, ANY AND ALL HOLDERS OF PROOFS OF CLAIM FILED AFTER THE GENERAL BAR DATE OR GOVERNMENTAL BAR DATE, AS APPLICABLE, SHALL NOT BE TREATED AS CREDITORS FOR PURPOSES OF VOTING AND DISTRIBUTION**

**PURSUANT TO BANKRUPTCY RULE 3003(c)(2) AND PURSUANT TO THE GENERAL BAR DATE ORDER.**

### L.    Treatment of Executory Contracts

####     1.    Rejection of Executory Contracts

*a.*    Subject to Article VIII.C of the Plan, on the Effective Date, except to the extent that the Debtor either previously has assumed, assumed and assigned or rejected an Executory Contract by an order of the Bankruptcy Court or has filed a motion to assume or assume and assign an Executory Contract prior to the Effective Date, each Executory Contract entered into by the Debtor prior to the Commencement Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code. Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract. The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a finding that the rejection thereof is in the best interest of the Debtor, its Estate and all parties in interest in the Chapter 11 Case.

*b.*    Notwithstanding anything contained in the Plan to the contrary, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the rights of the Debtor, the Post-Effective Date Debtor, or the Liquidating Trustee, as applicable, to move to assume or reject such contract or lease will be extended until the date that is thirty days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed rejection provided for in Article VIII.A.1 of the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

####     2.    Rejection Damages Claims

In the event that the rejection of an Executory Contract pursuant to Article VII.A of the Plan results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not previously evidenced by a timely filed proof of claim, will be forever barred and will not be enforceable against the Debtor, its Estate, the Post-Effective Date Debtor, the Liquidating Trustee, or the Liquidating Trust or their respective successors and assigns, assets and properties, unless a proof of claim is filed with the Bankruptcy Court and served upon the Debtor, the Post-Effective Date Debtor, the Liquidating Trustee, or the Liquidating Trust, as applicable, no later than thirty days after service of notice of the Effective Date. All such Claims will be subject to the permanent injunction set forth in Article X.D of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein will be treated as Class 4 General Unsecured Claims under the Plan and will be subject to the provisions of Article III of the Plan.

38

3.    Insurance Policies

Nothing in the Plan, the Confirmation Order, the Post-Effective Date Debtor Organizational Documents, or the Liquidating Trust Agreement alters the rights and obligations of the Debtor (and its Estate) and the Debtor's insurers (and third-party claims administrators) under the Debtor's insurance policies or modifies the coverage or benefits provided thereunder or the terms or conditions thereof or diminishes or impairs the enforceability of the Debtor's insurance policies.

4.    Prepetition Settlement Agreements

Notwithstanding the foregoing or anything in Article VIII of the Plan, nothing in the Plan abrogates the obligations of the non-debtor parties to the Prepetition Settlement Agreements to make payment of any amounts due to the Debtor under the Prepetition Settlement Agreements.

**M.    Conditions Precedent to Effective Date of the Plan**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

> *a.*    The Confirmation Order has become a Final Order.

> *b.*    The Confirmation Order shall be in full force and effect.

> *c.*    GEC shall have confirmed, in writing, that it is prepared to fund the Sponsor Settlement Amount immediately upon the occurrence of the Effective Date.

> *d.*    The Sponsor shall have confirmed, in writing, that it is prepared to provide the Exit Financing immediately upon the occurrence of the Effective Date.

Notwithstanding the foregoing, the conditions precedent to the Effective Date set forth in Article IX.A of the Plan, other than paragraph 2 thereof, may be waived, in whole or in part, by the Debtor with the consent of GEC and the Sponsor. Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**N.    Establishing the Effective Date**

The calendar date to serve as the Effective Date will be a Business Day on or promptly following the satisfaction or waiver of all conditions to the Effective Date, on which no stay of the Confirmation Order is in effect, which date will be selected by the Debtor. On or within two Business Days after the Effective Date, the Debtor will file and serve a notice of occurrence of the Effective Date. Such notice will include, among other things, the Administrative Bar Date, the Professional Fee Claims Bar Date and the deadline to file proofs of

Claim relating to damages from the rejection of any Executory Contract pursuant to the terms of the Plan.

**O.    Release, Injunction, and Related Provisions**

      1.    <u>Compromise and Settlement</u>

      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise and settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtor, the Estate, and holders of Claims and Equity Interests.

      2.    <u>Releases by the Debtor; Covenant Not to Sue</u>

      *a.*    **NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE DEBTOR FOREVER RELEASES, WAIVES AND DISCHARGES THE RELEASED PARTIES OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, OBLIGATIONS, INTERESTS, SUITS, DEMANDS, DAMAGES, RIGHTS, LOSSES, REMEDIES, AND LIABILITIES WHATSOEVER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, TORT, CONTRACT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT SUCH PERSON WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, (I) THE DEBTOR, ITS OPERATIONS, ITS PROPERTY, OR THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, (II) THE POTENTIAL CLAIMS, (III) THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, (IV) THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, (V) ANY INTERCOMPANY TRANSACTIONS, (VI) THE DEBTOR'S FILING OF THE CHAPTER 11 CASE, (VII) THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR CONSUMMATION OF (A) THE CHAPTER 11 CASE, (B) THE DISCLOSURE STATEMENT, (C) THE DIP CREDIT AGREEMENT, (D) THE TMI SETTLEMENT, (E) THE SPONSOR SETTLEMENT, (F) THE PLAN, (G) THE EXIT FINANCING, (H) THE PLAN SUPPLEMENT, OR (I) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT, INSTRUMENT, OR OTHER DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE TMI SETTLEMENT, THE SPONSOR SETTLEMENT, OR THE PLAN, THE FILING OF**

THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR (VIII) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

        *b.*    ON THE EFFECTIVE DATE AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE DEBTOR, ON BEHALF OF ITSELF AND ITS ESTATE, THE POST-EFFECTIVE DATE DEBTOR, THE LIQUIDATING TRUSTEE, AND THE LIQUIDATING TRUST SHALL COVENANT AND AGREE NOT TO SUE AND SHALL FORBEAR FROM INSTITUTING OR PROSECUTING ANY CAUSE OF ACTION OR PROCEEDING OF ANY KIND, NATURE, OR CHARACTER, AT LAW OR IN EQUITY, AGAINST ANY OF THE RELEASED PARTIES ON ACCOUNT OF, IN CONNECTION WITH, OR IN ANY WAY RELATED TO THE POTENTIAL CLAIMS, EXCEPT THAT THE DEBTOR WILL BE ENTITLED TO TAKE ALL APPROPRIATE STEPS, INCLUDING INSTITUTING PROCEEDINGS, TO ENFORCE THE PLAN AND THE SPONSOR SETTLEMENT.

        *c.*    ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE RELEASES AND COVENANT NOT TO SUE SET FORTH IN ARTICLE X.A OF THE PLAN PURSUANT TO BANKRUPTCY RULE 9019 AND ITS FINDING THAT THEY ARE: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, REPRESENTING A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION THEREBY RELEASED; (B) IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ALL OF THE DEBTOR, THE POST-EFFECTIVE DATE DEBTOR, THE LIQUIDATING TRUSTEE, AND THE LIQUIDATING TRUST FROM ASSERTING ANY CLAIM OR CAUSE OF ACTION, INCLUDING THE POTENTIAL CLAIMS, RELEASED PURSUANT TO THE RELEASES OR AGREED NOT TO PURSUE PURSUANT TO THE COVENANT NOT TO SUE SET FORTH IN ARTICLE X.A OF THE PLAN.

In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, Article X.A of the Plan contains a release of certain claims and Causes of Action of the Debtor against the Released Parties (the "**Debtor Release**"). As set forth below and will be addressed further in the Debtor's brief in support of confirmation of the Plan (the "**Confirmation Brief**") and, to the extent necessary, at the hearing on confirmation of the Plan, the Debtor believes that the facts and circumstances of this Chapter 11 Case justify approval of the Debtor Release as part of the Plan.

When considering releases by a debtor or its estate of claims and causes of action pursuant to section 1123(b)(3)(A), the applicable standard to apply is whether the proposed release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate. *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*,

426 B.R. 114 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of the plan").[5]

Here, the Debtor Release is an essential component of the Plan and granting the Debtor Release constitutes a sound exercise of the Debtor's business judgment.  In particular, the Debtor Release is appropriate because, among other things, (i) the Debtor (by and through the Special Committee) only agreed to provide such release after the Special Committee completed an extensive investigation and analysis of the facts, circumstances and law underlying the Potential Claims, which are proposed to be released pursuant to the Debtor Release, (ii) such release is an integral and non-severable component of the Sponsor Settlement and thus the Plan such that, without the Debtor Release, the Sponsor would not have agreed to the Sponsor Settlement or Plan, and (iii) absent the Sponsor Settlement Amount, which is being made in exchange for the Releases, including the Debtor Release, the Debtor believes that the holders of Allowed Claims would receive less, if any, recovery on account of such Claims.

Therefore, the Debtor believes that the Debtor Release should be approved and will demonstrate that such approval is appropriate in the Confirmation Brief and, to the extent necessary, at the hearing on confirmation of the Plan.

3.    Exculpation

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE, THE EXCULPATED PARTIES SHALL NOT HAVE OR INCUR ANY LIABILITY FOR ANY ACT OR OMISSION TAKEN OR NOT TAKEN PRIOR TO THE EFFECTIVE DATE IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASE, THE NEGOTIATION AND FILING OF THE DISCLOSURE STATEMENT, THE PLAN OR ANY DOCUMENT IMPLEMENTING THE PLAN, THE SPONSOR SETTLEMENT, THE TMI SETTLEMENT, THE FILING OF THE CHAPTER 11 CASE,**

---

[5] In considering whether a debtor's release of claims and causes of action is appropriate, some courts have also applied the following list of non-exclusive and disjunctive factors (the "***Master Mortgage* Factors**") : (i) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically if the impaired class or classes "overwhelmingly" votes to accept the plan; and (v) a provision in the plan for payment of all or substantially all of the claims of the class or classes. *In re Zenith Elec. Corp.*, 241 B.R. 92, 110–11 (Bankr. D. Del. 1999) (citing *Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)).  To the extent the *Master Mortgage* Factors are also relevant to determining whether the Bankruptcy Court should approve the Debtor Release, the Debtor believes that an application of the relevant facts to such factors supports the approval of the Debtor Release given, among other things, the substantial contribution that GE is providing pursuant to the Sponsor Settlement and the Plan and that the Debtor Release is an essential component of the Sponsor Settlement and thus the Plan.

THE SETTLEMENT OF CLAIMS OR TREATMENT OF EXECUTORY CONTRACTS, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OR ANY OBLIGATIONS THAT THEY HAVE UNDER OR IN CONNECTION WITH THE PLAN OR THE TRANSACTIONS CONTEMPLATED IN THE PLAN, AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

4.    Third-Party Releases

AS OF THE EFFECTIVE DATE EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER (OTHER THAN THE RIGHTS OF THE DEBTOR TO ENFORCE THE PLAN, AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENT OR DOCUMENTS DELIVERED THEREUNDER), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, TORT, CONTRACT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR ITS ESTATE, THAT SUCH PERSON WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, (I) THE DEBTOR, ITS OPERATIONS, ITS PROPERTY, OR THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, (II) THE POTENTIAL CLAIMS, (III) THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, (IV) THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, (V) ANY INTERCOMPANY TRANSACTIONS, (VI) THE DEBTOR'S FILING OF THE CHAPTER 11 CASE, (VII) THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR CONSUMMATION OF (A) THE CHAPTER 11 CASE, (B) THE DISCLOSURE STATEMENT, (C) THE DIP CREDIT AGREEMENT, (D) THE TMI SETTLEMENT, (E) THE SPONSOR SETTLEMENT, (F) THE PLAN, (G) THE EXIT FINANCING, (H) THE PLAN SUPPLEMENT, OR (I) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT, INSTRUMENT, OR OTHER DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE DIP CREDIT AGREEMENT, THE TMI SETTLEMENT, THE SPONSOR SETTLEMENT, OR THE PLAN, THE FILING OF

43

THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR (VIII) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR PERSON UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ASSUMED OR EXECUTED IN CONNECTION WITH THE PLAN.

Article X.C of the Plan contains a release of certain claims and Causes of Action that certain non-Debtor third parties may have against the Released Parties (the "**Third Party Release**").  As set forth below and will be addressed further in the Confirmation Brief and, to the extent necessary, at the hearing on confirmation of the Plan, the Debtor believes that the facts and circumstances of this Chapter 11 Case justify approval of the Third Party Release as part of the Plan.

Initially, the Debtor seeks approval of the Third Party Release on a consensual basis with respect to the following holders of Claims and Equity Interests and their respective Related Parties:

    i.     each holder of a Claim that votes in favor of the Plan; and

    ii.    all other holders of Claims and Equity Interests that do not timely File an objection (each, a "**Release Objection**") to the Third Party Release (each, a "**Non-Consenting Party**").

As will be set forth in greater detail in the Confirmation Brief, each of the foregoing releases are consensual or, under applicable case law in this District, deemed consensual and therefore should be approved. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304–06 (Bankr. D. Del. 2013) (citation omitted); *see also In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) [Docket No. 252 at 214:6–12] (holding that third-party releases are consensual where parties must party must file an objection to opt out of such releases);  *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) [Docket No. 1050 at 67:16–19] (holding that "you don't need affirmative conduct to get a third-party release . . . [o]pt-out releases are fine").

The Plan also seeks to bind each Non-Consenting Party to the Third Party Release unless such party's Release Objection is sustained by a Final Order of the Bankruptcy Court. Under applicable Third Circuit law, non-consensual third party releases may be approved where such releases are fair, necessary to the reorganization and supported by specific factual findings. *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 573 (D. Del. 2018) (citing *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000)).

Here, the Debtor believes that the Third Party Release satisfies the applicable standard articulated in *Continental*.  GE, which is a Released Party and thus a beneficiary of the Third Party Release, is funding the Plan, including Distributions thereunder. In other words, the

44

holders of Allowed Claims that are providing the Third Party Release are receiving Distributions on account of their Claims as a direct and proximate result of the funding being provided by GE pursuant to the Sponsor Settlement, the Exit Financing and the DIP Financing. Moreover, the Third Party Release is an integral, non-severable component of the Sponsor Settlement and thus the Plan such that, without the Third Party Release, the Sponsor would not have agreed to the Sponsor Settlement or Plan. As a result, unless the Third Party Release is approved, the Debtor will be unable to confirm and consummate the Plan. Finally, GE is providing substantial consideration in exchange for the Releases, including the Third Party Release, consisting of (i) $192.6 million in Cash plus the total amount necessary to satisfy the DIP Loan Claim as of the Effective Date, (ii) Exit Financing in the aggregate principal amount of $39.5 million and (iii) the waiver of Intercompany Claims in excess of $93 million.

Therefore, the Debtor believes that the Third Party Release should be approved and will demonstrate that such approval is appropriate in the Confirmation Brief and, to the extent necessary, at the hearing on confirmation of the Plan.

5.    Injunction

*a.*    **In accordance with section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Debtor;** *provided*, *however*, **upon confirmation of the Plan and the occurrence of the Effective Date, the holders of Claims or Equity Interests may not seek payment or recourse against or otherwise be entitled to any distribution from the Debtor, the Estate, the Liquidating Trust, the Post-Effective Date Debtor and any of their assets and properties except as expressly provided in the Plan and the Liquidating Trust Agreement.**

*b.*    **Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest, from:**

(i)    **commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Estate, the Liquidating Trust, the Post-Effective Date Debtor, their successors and assigns, and any of their assets and properties;**

(ii)    **enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Estate, the Liquidating Trust, the Post-Effective Date Debtor, their successors and assigns, and any of their assets and properties;**

(iii)    **creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Estate, the Liquidating Trust, the Post-Effective Date Debtor, their successors and assigns, and any of their assets and properties;**

(iv)    **asserting any right of setoff or subrogation of any kind against any obligation due to the Debtor, the Estate, the Liquidating Trust,**

**the Post-Effective Date Debtor, or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted in a timely-filed proof of Claim; or**

(v)    **commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled under the Plan.**

*c.*    **From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Released Parties, their respective successors and assigns, and any of their assets and properties, any suit, action or other proceeding, on account of or respecting any Claim, Potential Claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

6.    <u>Releases of Liens</u>

Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, to the extent such security interests exist, all mortgages, deeds of trust, liens, pledges or other security interests (other than any liens or other security interests granted to the Exit Lender pursuant to the Exit Financing Documents) against property of the Estate shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Post-Effective Date Debtor or the Liquidating Trustee, as applicable.

7.    <u>Preservation of Rights of Action</u>

*a.*    *Vesting of Causes of Action*

(i)    Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Debtor may hold against any Person will vest upon the Effective Date in the Liquidating Trust.

(ii)    Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee will have the exclusive right to institute, prosecute, abandon, settle or compromise any Retained Causes of Action, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.

(iii)    Retained Causes of Action and any recoveries therefrom shall remain the sole property of the Liquidating Trust (for the sole benefit of the holders of Allowed Class 4 – General Unsecured Claims).

      *b.      Preservation of All Retained Causes of Action not Expressly Settled or Released*

      (i)      Unless a Retained Cause of Action against a holder or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtor and the Liquidating Trustee expressly reserve such Retained Cause of Action for later adjudication by the Liquidating Trustee (including, without limitation, Retained Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances which may change or be different from those the Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Retained Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in Articles X.A and X.C thereof) or any other Final Order (including the Confirmation Order).  In addition, the Liquidating Trustee expressly reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Person, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

      (ii)      Subject to the immediately preceding paragraph, any Person to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased property from the Debtor, should assume that any such obligation, transfer or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Person has filed a proof of Claim against the Debtor in the Chapter 11 Case; (ii) the Debtor or Liquidating Trustee has objected to any such Person's proof of Claim; (iii) any such Person's Claim was included in the Schedules; (iv) the Debtor or Liquidating Trustee has objected to any such Person's scheduled Claim; or (v) any such Person's scheduled Claim has been identified by the Debtor or Liquidating Trustee as disputed, contingent or unliquidated.

## P.    Retention of Jurisdiction

      Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Persons with respect to all matters related to the Chapter 11 Case,

the Debtor, the Estate, the Liquidating Trust, the Post-Effective Date Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor might be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XII.B of the Plan;

4.    ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    resolve any disputes concerning the Disputed Claims Reserve;

6.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that might be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date; *provided*, *however*, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

7.    enter such orders as might be necessary or appropriate to implement or consummate the provisions of the Plan, the Sponsor Settlement and/or the TMI Settlement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection therewith;

8.    resolve any cases, controversies, suits or disputes that might arise in connection with the Effective Date, interpretation or enforcement of the Plan, the Sponsor Settlement and/or the TMI Settlement or any Person's obligations incurred in connection therewith;

9.    issue and enforce injunctions, enter and implement other orders, or take such other actions as might be necessary or appropriate to restrain interference by any Person with the Effective Date or enforcement of the Plan, the Sponsor Settlement and/or the TMI Settlement, except as otherwise provided therein;

10.    enforce Article IX.A, Article X.A, Article X.B, and Article X.C of the Plan;

11.    enforce the injunction set forth in Article X.D of the Plan;

12.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in the Plan, the Sponsor Settlement and/or the TMI Settlement, and enter such orders as might be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14.      resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Sponsor Settlement, the TMI Settlement or any contract, instrument, release, indenture or other agreement or document adopted in connection therewith;

15.      recover all assets of the Debtor and property of the Estate, including all claims and Causes of Action of the Debtor and the Liquidating Trust;

16.      enforce all orders previously entered by the Bankruptcy Court;

17.      determine such other matters as may be provided in the Confirmation Order;

18.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code; and

19.      enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Case.

**Q.     Miscellaneous Provisions**

1.      <u>Payment of Statutory Fees</u>

All fees due and payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date will be paid by the Debtor on the Effective Date.  After the Effective Date, the Post-Effective Date Debtor will pay any and all such fees when due and payable, and will file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  The Debtor or the Post-Effective Date Debtor, as applicable, will remain obligated to pay quarterly fees to the U.S. Trustee until the Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

2.      <u>Modification of Plan</u>

Subject to the limitations contained in the Sponsor Settlement, the TMI Settlement, or the Plan: (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtor may amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any

49

defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

3.    Revocation of Plan

Subject to the limitations contained in the Sponsor Settlement, the Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, rejection of Executory Contracts effected by the Plan, allowance of Claims provided in the Plan, and any document or agreement executed pursuant thereto shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or against, or any Equity Interests in, the Debtor or any other Person; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission of any sort by the Debtor or any other Person.

4.    Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

5.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

6.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained therein, nor the taking of any action by the Debtor or any Person with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

7.    Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental

assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

8.    Section 1125(e) Good Faith Compliance

The Debtor and each of its Related Parties shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

9.    Further Assurances

The Debtor, the Post-Effective Date Debtor, the Liquidating Trustee, all holders of Claims receiving Distributions hereunder, the holders of Equity Interests in the Debtor and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

10.    Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor will be sent by first class U.S. mail, postage prepaid as follows:

WMC Mortgage, LLC
6320 Canoga Avenue
Suite 1420
Woodland, California  91367
Attn:  Mark V. Asdourian

*with a copy to:*

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Attn.:  Mark D. Collins, Esq. and Russell C. Silberglied, Esq.

11.    Filing of Additional Documents

On or before the Effective Date, the Debtor may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.    No Stay of Confirmation Order

The Confirmation Order will contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

13.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Equity Interest in the Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Equity Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

14.    Aid and Recognition

The Debtor, the Post-Effective Date Debtor, or the Liquidating Trustee, as the case may be, shall, as needed to effect the terms of the Plan, request the aid and recognition of any court or judicial, regulatory or administrative body in any other nation or state.

## IV.    ALTERNATIVES TO THE PLAN

### A.    Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under section 1129(a) of the Bankruptcy Code, then the Chapter 11 Case might be converted to a case under chapter 7 of the Bankruptcy Code.  If that occurs, then a trustee would be elected or appointed to liquidate any remaining assets of the Debtor for Distribution to creditors pursuant to chapter 7 of the Bankruptcy Code.  A hypothetical chapter 7 liquidation analysis is attached to this Disclosure Statement as **Exhibit B**.[6]  As shown in the liquidation analysis, the value of any Distributions under a chapter 7 liquidation would be less than the value of the Distributions under the Plan.  This is because a chapter 7 trustee would be entitled to statutory fees (3%) relating to the Distributions of the already-monetized assets.  Accordingly, a portion of the Cash currently available, or that would be available upon the Effective Date under the Plan, for Distribution to holders of Allowed Claims would instead have to be paid to a chapter 7 trustee.

In addition to the statutory chapter 7 trustee fees and fees of new professionals, conversion to a case under chapter 7 creates a material risk that there might be less Cash available for Distributions because conversion would be a default under the Sponsor Settlement. Although a chapter 7 trustee might be able to negotiate with the Sponsor to honor the Sponsor Settlement despite the default, there are no assurances it would do so and, in any event, the resultant costs and administrative expense associated with the default and negotiations thereon, in addition to the chapter 7 trustee's fee, would decrease the available Cash for Distributions.  At a minimum, it would delay Distributions.

Further, if a trustee is appointed and the remaining assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, then holders of certain Allowed Claims also would likely have to wait a longer period of time to receive any Distributions than they would under the Plan, which would further reduce recoveries.  A chapter 7 trustee likely would retain its own professionals, which would necessitate a learning curve because the trustee and its

---

[6] [The Debtor will file the liquidation analysis prior to the hearing to consider approval of the Disclosure Statement.]

professionals would not have the historical knowledge of the Debtor and its advisors. This learning curve could prolong resolution of any Disputed Claims and be detrimental to recoveries in litigation on the Retained Causes of Action. Those delays, in addition to being generally adverse to the interests of creditors, likely would cause extra administrative expenses to be incurred, including for counsel to the new trustee to educate itself regarding all the relevant background facts.

### B.    Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtor or any other party in interest might attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation and Distribution of the Debtor's assets other than as provided in the Plan. However, absent the Sponsor Settlement, which might not be available in such circumstances, the Debtor would lack the funds necessary to make any Distributions to creditors. Specifically, the filing of an alternative chapter 11 plan on terms different than the Plan runs the risk that the Sponsor will terminate the Sponsor Settlement. If that happens, then creditor recoveries necessarily would be delayed and possibly jeopardized. In addition, given that the Plan is an orderly plan of liquidation that seeks to distribute the Debtor's assets in accordance with the priority scheme set forth in the Bankruptcy Code, the Debtor believes that any alternative chapter 11 plan will be substantially similar to the Plan. Therefore, any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of Distributions and, due to the incurrence of additional administrative expenses during the period of delay, might provide for smaller Distributions to holders of Allowed Claims than are currently provided for in the Plan.

Thus, the Debtor believes that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims.

## V.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE CONFIRMATION AND EXECUTION OF THE PLAN MIGHT HAVE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. THE DEBTOR DOES NOT OFFER AN OPINION AS TO ANY FEDERAL, STATE, LOCAL OR OTHER TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AS A RESULT OF THE CONFIRMATION OF THE PLAN. <u>ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.</u> THE PLAN IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR, EQUITY INTEREST HOLDER, OR OTHER PARTY IN INTEREST.**

## VI.    SOLICITATION AND VOTING PROCEDURES

On [●], 2019, the Bankruptcy Court entered the Disclosure Statement Order approving the adequacy of the Disclosure Statement and approving certain procedures for the solicitation and tabulation of votes on the Plan (the "**Solicitation Procedures**"). In addition to approving the Solicitation Procedures, the Disclosure Statement Order established certain dates

and deadlines, including the date of the hearing on confirmation of the Plan (the "**Confirmation Hearing**"), the deadline for parties to object to confirmation (the "**Plan Objection Deadline**"), the record date for purposes of determining which creditors are entitled to receive Solicitation Packages and, where applicable, vote on the Plan (the "**Voting Record Date**"), and the date by which ballots must be properly executed, completed, and delivered to Epiq Corporate Restructuring, LLC (the "**Voting Agent**") to be counted as votes to accept or reject the Plan (the "**Voting Deadline**").  The Disclosure Statement Order also approved the form of ballot and certain confirmation-related notices.  The Disclosure Statement Order and the Solicitation Procedures should be read in conjunction with the Disclosure Statement.

The discussion of the Solicitation Procedures herein is qualified in its entirety by the actual terms of the Solicitation Procedures that are set forth in the Disclosure Statement Order.

### A.    Distribution of the Solicitation Materials

Pursuant to the Disclosure Statement Order, holders of Claims in Class 3 (TMI Claim), Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims) and Equity Interests in Class 6 that are entitled to vote on the Plan will receive the following (collectively, the "**Solicitation Package**"):

- A disc containing the Disclosure Statement, the Plan and the Disclosure Statement Order in PDF format;

- a notice containing, among other things, the Voting Deadline, the date and time of the Confirmation Hearing and the Plan Objection Deadline (the "**Confirmation Hearing Notice**"); and

- a ballot.

In addition, the Debtor will cause all of the materials in the Solicitation Package (except ballots): to be served on: (i) the U.S. Trustee; (ii) the holders of the Debtor's top 20 largest unsecured claims (to the extent such holders do not already receive the Solicitation Package in their capacity as holders of eligible Claims in Class 3, Class 4, or Class 5); (iii) the Internal Revenue Service; (iv) the Securities and Exchange Commission; and (v) all Entities who have requested notice pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

Finally, the Debtor will cause the Confirmation Hearing Notice to be served on: (i) state and local taxing authorities in which the Debtor did business; (ii) holders of Claims or Equity Interests that are not entitled to vote on the Plan; (iii) all counterparties to executory contracts and leases with the Debtor; and (iv) all persons or entities listed on the Debtor's creditor matrix.

### B.    Voting Instructions and General Tabulation Procedures

1.    <u>Voting Record Dates</u>

The Bankruptcy Court has approved [●], 2019, as the Voting Record Date.  Only holders of Claims or Equity Interests in Class 3, Class 4, Class 5, and Class 6 as of the Voting Record Date are eligible to vote on the Plan.

    2.    <u>Voting Deadline</u>

The Bankruptcy Court has approved [●], 2019 at 5:00 p.m. (Eastern Time), as the Voting Deadline.  The Debtor may extend the Voting Deadline in accordance with the Disclosure Statement Order.

Subject to the tabulation procedures approved by the Disclosure Statement Order, any ballot that is timely and properly submitted will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Plan.

**If you are a holder of a Claim in Class 3, Class 4, or Class 5, or a holder of an Equity Interest in Class 6, and you did not receive a ballot, received a damaged ballot, lost your ballot, or if you have any questions regarding the procedures for voting on the Plan, please contact the Voting Agent by emailing wmc@epiqglobal.com with a reference to "WMC Mortgage" in the subject line.**

To obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except ballots), please refer to the Voting Agent's case management website at <u>https://dm.epiq11.com/case/WMC/info</u> or request a copy from the Voting Agent, by writing via first-class mail to WMC Mortgage, LLC, c/o Epiq Corporate Restructuring, LLC, P.O. Box 4420, Beaverton, OR  97076-4420.

**VII.    CONFIRMATION PROCEDURES**

    **A.**    **Confirmation Hearing**

**The Confirmation Hearing will commence on [●], 2019 at [●] (Eastern Time)**, before The Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtor in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice filed with the Bankruptcy Court.

<u>**The Plan Objection Deadline is 4:00 p.m. (Eastern Time) on [●], 2019**</u>.

All objections to the Plan (the "**Plan Objections**") must be Filed with the Bankruptcy Court before the Plan Objection Deadline and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order.

---

**THE BANKRUPTCY COURT MIGHT NOT CONSIDER
PLAN OBJECTIONS UNLESS THEY ARE TIMELY FILED
IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

---

**B.      Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code, including, among other things, the following:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation Date is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after the Confirmation Date.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to Section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims or Equity Interests has either voted to accept the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent the holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims are Unimpaired.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

1.     Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property with a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtor liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court usually: (a) estimates the Cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's chapter 11 case were converted to a chapter 7 case and the assets of the debtor's estate were liquidated; (b) determines the liquidation Distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compares such holder's liquidation Distribution to the plan Distribution that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

The Debtor believes that the value of any Distributions if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Plan because, among other reasons, (a) conversion to chapter 7 would require appointment of a chapter 7 trustee, which likely would delay and reduce the present value of Distributions; (b) the fees and expenses of a chapter 7 trustee and its professionals would likely further reduce Cash available for Distribution; and (c) the Sponsor Settlement might not be available in the chapter 7 context. *See also* Section IV(A), *supra*; **Exhibit B** hereto.

2.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the plan). Because the Plan proposes a liquidation of all of the Debtor's assets, for purposes of this test, the Debtor have analyzed the ability of the Liquidating Trust and the Post-Effective Date Debtor to meet their respective obligations under the Plan. Given that the Debtor shut down its operating business and is no longer operating, there is not anticipated to be any need for further financial reorganization. Moreover, based on the Debtor's analysis, each of the Liquidating Trust and the Post-Effective Date Debtor will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtor believes that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

3.      Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described below, each class of claims or equity interests that is impaired under a plan, accepts the plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance of the Plan.

Subject to the terms of the Sponsor Settlement, the holders of Claims in Class 5 (Intercompany Claims) and Equity Interests in Class 6 (Equity Interests) have agreed, and are required, to accept the Plan.  Subject to the terms of the TMI Settlement, the Separate Trustee of the TMI Trust is required to accept the Plan.

4.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it; *provided, however*, that the plan has been accepted by at least one impaired class (without regard to the votes of insiders).  Given that Class 3 is Impaired and the trustee of the TMI Trust will accept the Plan, this requirement will be satisfied.  Pursuant to Section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.  These concepts are described immediately below.

*a.      No Unfair Discrimination*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly by reviewing its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).

The Debtor does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtor believes that the Plan and the

treatment of all Classes of Claims and Equity Interests satisfy the foregoing requirements for non-consensual confirmation.

<em>b.    Fair and Equitable Test</em>

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than one-hundred percent (100%) of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens. Although the Debtor believes there are no secured claims, the treatment provided to Class 1 Claims under the Plan satisfies this requirement with respect to Class 1.

Unsecured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property. The Plan provides for option (2) and therefore meets this test.

Equity Interests:  To the extent relevant, the condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a Distribution under the plan. The treatment of Equity Interests here meets this test.

## VIII.   CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims in Class 3 (TMI Claim), Class 4 (General Unsecured Claims), and Class 5 (Intercompany Claims) and holders of Equity Interests in Class 6 (Equity Interests) should read and consider carefully the risk factors below, as well as the other information set forth in the Disclosure Statement, the documents delivered together with this Disclosure Statement, and the documents referred to or incorporated by reference in this Disclosure

59

Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Plan and its implementation.

### A.    Risk Factors that Might Affect the Debtor's Ability to Consummate the Plan

#### 1.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, at the Confirmation Hearing, confirmation of the Plan. In the event that sufficient votes are not received, and the Debtor is unable to confirm the Plan under section 1129(b) of the Bankruptcy Code, the Debtor might seek to accomplish an alternative chapter 11 plan or amend the Plan. The risks associated with pursuing an alternative chapter 11 plan are described in section IV.B herein. There can be no assurance that the terms of any alternative chapter 11 plan or amended Plan would be similar or as favorable to the holders of Allowed Claims as those currently proposed in the Plan.

#### 2.    Debtor Might Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the bankruptcy court that: (a) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless that liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under the proposed plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

As set forth above, the Debtor believes that the Plan satisfies all of these requirements. However, there can be no assurance the Bankruptcy Court will agree. A non-accepting holder of an Allowed Claim might challenge whether the Solicitation Procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Debtor, subject to the terms and conditions of the Plan, the Sponsor Settlement, and the TMI Settlement, reserves the right to modify the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class than the treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property to the Class affected by the modification of a lesser amount than that currently provided in the Plan or no Distribution of property whatsoever under the Plan.

#### 3.    Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

As indicated above, in the event that the Holders of Claims in Class 3, Class 4 or Class 5 vote to reject the Plan, the Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the Plan and to seek to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

4.    The Level of Administrative Expense Claims and Priority Tax Claims Could Make the Plan Lack Feasibility

The Plan sets an Administrative Bar Date and the General Bar Date Order set a Governmental Bar Date for Governmental Units to, among other things, file Priority Tax Claims. The Debtor believes that the Debtor's Cash on hand as of the Effective Date will exceed the estimated levels of Allowed Administrative Expense Claims and Allowed Priority Tax Claims. However, because the bar dates for those claims have not yet expired, there can be no assurances that the estimates are correct. If unexpected, significant Administrative Expense Claims and Priority Tax Claims are asserted and ultimately Allowed, then the Debtor might have to revise the Plan to reduce Distributions to holders of other Allowed Claims.

5.    Parties-in-Interest Might Object to the Debtor's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created six Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

6.    Releases, Injunctions, and Exculpation Provisions Might Not Be Approved

The Plan provides for certain releases, injunctions, and exculpations. However, parties in interest might object to these provisions or the Bankruptcy Court might not approve them. If the Bankruptcy Court does not approve the releases, among other things, then the Sponsor might terminate the Sponsor Settlement, which is the fundamental foundation of the Plan.

7.    Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date might occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur given the conditions precedent thereto.

8.    Risks Related to the DIP Financing

The DIP Financing was intended to provide liquidity to the Debtor during the pendency of the Chapter 11 Case. If the Chapter 11 Case takes longer than expected to conclude, or in the event of a breach of a milestone or another event of default under the DIP Financing, then the Debtor might exhaust or lose access to its financing. There is no assurance that the Debtor would be able to obtain additional financing from the DIP Lender or otherwise. In either case, the liquidity necessary for the orderly functioning of the Debtor in this Chapter 11 Case, and for administrative expenses of the Chapter 11 Case, might be materially impaired.

9.    Termination or Non-Approval of the Sponsor Settlement

The Sponsor Settlement contains certain provisions that allow the parties thereto to terminate the Sponsor Settlement if various events occur or do not occur. Additionally, although the Debtor believes that the Sponsor Settlement is fair, reasonable, and in the best interest of its Estate, the Bankruptcy Court might not approve the Sponsor Settlement under Bankruptcy Rule 9019. As noted in section III.I.2, *supra*, the Sponsor Settlement is integral to the Plan, including because the consideration provided to the Debtor thereunder will allow for Distributions to holders of Allowed Claims. Without the Sponsor Settlement, the Debtor would not be able to provide Distributions for Allowed Claims in the amounts estimated in this Disclosure Statement.

10.    TMI Settlement Might Not Be Approved

Although the Debtor believes that the TMI Settlement is fair, reasonable, and in the best interest of its Estate, the Bankruptcy Court might not approve the TMI Settlement under Bankruptcy Rule 9019. Without approval of the TMI Settlement, the treatment of Class 3, and potentially other Classes, would be in doubt. Further, because the Sponsor Settlement contemplates the TMI Settlement, the Bankruptcy Court's denial of the TMI Settlement could affect the consummation of the Sponsor Settlement and, therefore, consummation of the Plan.

**B.    Risk Factors that may Affect Distributions under the Plan**

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or recoveries thereon might vary significantly from the estimates contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences might materially and adversely affect, among other things, the recoveries to Holders of Allowed General Unsecured Claims under the Plan. Below is a description of a number of significant contingencies that could have a material impact on the recoveries that holders of Allowed General Unsecured Claims will receive under the Plan.

62

1.      Debtor, Post-Effective Date Debtor, or Liquidating Trustee Might Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, under the Plan the Debtor, the Post-Effective Date, and the Liquidating Trustee reserve the right to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus might not receive its expected share of the estimated Distributions described in this Disclosure Statement.

2.      Allowed Amounts of Claims Could be More than the Debtor's Estimates

This Disclosure Statement contains the Debtor's good faith estimates of the Allowed amount of Claims in each Class.  However, the eventual Allowed amounts of Claims could exceed these estimates, which would reduce Distributions to holder of Claims in Class 4 – General Unsecured Claims.  Similarly, Distributions to holders of General Unsecured Claims might be diluted by Disputed General Unsecured Claims becoming Allowed General Unsecured Claims.

3.      Retained Causes of Action

Under the Plan, the Retained Causes of Action will vest in the Liquidating Trust.  The Debtor has not performed an analysis of the potential value, if any, of the Retained Causes of Action.  The quantum, if any, of the proceeds of such litigation and the timing thereof is unknown.  However, any proceeds of the Retained Causes of Action would benefit the Class 4 Beneficiaries, although the prosecution of the Retained Causes of Action might increase the Liquidating Trust's expenses and thereby reduce the funds available for Distributions to the Class 4 Beneficiaries.

4.      Liquidating Trust Expenses

If the Liquidating Trust's expenses, or fees for its counsel, are greater than expected, such costs might reduce the amount available for Distribution to holders of Allowed Class 4 Claims.

**C.      Disclosure Statement Disclaimer**

1.      Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      No Legal or Tax Advice is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest.  This

Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

3.      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

4.      Failure to Identify Claims, Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular Claim, litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtor, Post-Effective Debtor, or Liquidating Trustee, as applicable, may seek to investigate Claims, File and prosecute objections to Claims, or bring Causes of Action irrespective of whether the Disclosure Statement identifies such Claims, Causes of Action, or objections to Claims.

5.      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor, the Post-Effective Date Debtor, or the Liquidating Trustee, as applicable, to object to that holder's Allowed Claim, or to bring Causes of Action, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

6.      Information was Provided by the Debtor and was Relied upon by the Debtor's Advisors

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

7.      Potential Exists for Inaccuracies, and the Debtor has no Duty to Update

The Debtor makes the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor might subsequently update the information

64

in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

## IX.    CONCLUSION

**THE DEBTOR SUBMITS THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE.**

**THE DEBTOR RECOMMENDS THAT THE HOLDERS OF CLAIMS IN CLASS 3, CLASS 4, CLASS 5, AND EQUITY INTERESTS IN CLASS 6 VOTE TO ACCEPT THE PLAN.**

Dated: August 2, 2019
      Wilmington, Delaware

                WMC MORTGAGE, LLC

                By:    */s/ Mark V. Asdourian*
                        Mark V. Asdourian
                        Chief Executive Officer, President, and
                        General Counsel

**<u>EXHIBIT A</u>**

**PLAN**

**[See Docket No. 168]**

**EXHIBIT B**

**LIQUIDATION ANALYSIS**

**[To Be Filed]**