# EXHIBIT K

**Transition Services Agreement**

TRANSITION SERVICES AGREEMENT

Between

GE CAPITAL US HOLDINGS, INC.

AND

WMC MORTGAGE, LLC

DATED December 12, 2019

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT, dated as of December 12, 2019, and effective as of the Effective Date (as defined below) (as amended, modified or supplemented from time to time in accordance with its terms, this "**Agreement**"), is made and entered into by and between GE Capital US Holdings, Inc., a Delaware corporation, with an office located at 901 Main Avenue, Norwalk, CT 06851 ("**GEC**"), and WMC Mortgage, LLC with an office located at 6320 Canoga Avenue, Suite 1420, Woodland Hills, CA 91367 ("**WMC**"). GEC and WMC hereinafter referred individually as "**Party**" and collectively as "**Parties**".

RECITALS

A.    WHEREAS, on April 23, 2019, WMC filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

B.    WHEREAS, on November 5, 2019, the Bankruptcy Court confirmed WMC's proposed First Amended Chapter 11 Plan of Liquidation (the "**Plan**"), pursuant to which WMC shall wind-down its operations; and

C.    WHEREAS, GEC has agreed to provide WMC certain services (as further described herein) to temporarily provide support during WMC's efforts to fully separate its infrastructure from GEC, such services to be provided on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, including the benefits received by GEC under the Plan, the receipt and sufficiency of which are acknowledged, the Parties, intending to be legally bound, agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01. Certain Defined Terms.

(a)    The following capitalized terms used in this Agreement shall have the meanings set forth below:

"Action" shall mean any action, suit, claim, complaint, arbitration or proceeding by or before any Government Authority.

"Affiliate" shall mean with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person. For the avoidance of doubt, as of the Effective Date, GEC is no longer an Affiliate of WMC.

"Agreement" shall have the meaning set forth in the Preamble.

2

"Baseline Period" shall mean the 6-month period prior to the Effective Date.

"Business Day" shall mean any day that is not a Saturday, a Sunday or other day on which commercial banks in the City of New York, New York are required or authorized by Law to be closed.

"Confidential Information" means any information furnished or obtained in connection with or as a result of this Agreement or performance or receipt of Services hereunder that is confidential, non-public, or proprietary about a Party, its Affiliates and any of their respective businesses, operations, clients, customers, prospects, personnel, properties, processes or products, financial, technical, commercial or other information (regardless of the form or format of the information (written, verbal, electronic or otherwise) or the manner or media in or through which it is furnished to or otherwise obtained by another Person or its Affiliates or Representatives), including all materials derived from, reflecting or incorporating, in whole or in part, any such information. "Confidential Information" shall not include information that (i) is or becomes generally available to the public through no direct or indirect act or omission by the Person receiving such information or by any of its Affiliates or Representatives; or (ii) is already available to, or is or becomes available on a non-confidential basis to, the Person receiving such information or its Affiliates or Representatives from a source, other than the Person receiving such information or its Affiliates or Representatives, who is not prohibited from disclosing such information by any contractual, legal or fiduciary obligation**.**

"Control" shall mean, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"Effective Date" shall mean the date established by WMC pursuant to Article IX.B of the Plan as the "Effective Date" of the Plan, as such term is defined in the Plan.

"Force Majeure Event" shall have the meaning set forth in Section 9.03.

"GEC" shall have the meaning set forth in the Preamble.

"Government Authority" shall mean any U.S. federal, state or local or any supranational or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body (whether public or private).

"Law" shall mean means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"Loss" and "Losses" shall mean all losses, damages, obligations, costs, expenses, settlements, awards and liabilities actually suffered, assumed or incurred and paid (including reasonable attorneys' fees and reasonable costs of investigation).

"Nonparty Affiliates" shall have the meaning set forth in Section 10.15.

"Order" shall mean any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination or award entered by or with any Government Authority.

"Parties" means GEC and WMC collectively, and, in each case, their respective permitted successors and assigns.

"Party" has the meaning set forth in the Preamble.

"Person" shall mean any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"Representatives" of a Party shall mean such Party's successors, assigns, Affiliates, officers, directors, principals, shareholders, members, partners, employees, managers, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals.

"Schedule" means Schedule A attached hereto, as amended, modified or supplemented from time to time in accordance with the terms hereof.

"Services" shall have the meaning set forth in Section 2.01(a). "Service" shall mean a subset of one or more of the Services.

"Services Manager" shall have the meaning set forth in Section 2.04.

"Service Period" shall have the meaning set forth in Section 2.02.

"Systems" shall have the meaning set forth in Section 4.01(a).

"Transition Plan" shall have the meaning set forth in Section 2.05(a).

"TSA Dispute" shall have the meaning set forth in Section 7.01(a).

"WMC" shall have the meaning set forth in the Preamble.


ARTICLE II
SERVICES, DURATION AND GOVERNANCE

Section 2.01.  Services.

(a)    Upon the terms and subject to the conditions of this Agreement, GEC shall provide, or shall cause to be provided, to WMC the services, and access to systems as set forth, respectively, in Schedule A attached hereto (the "**Services**").

(b)    For the avoidance of doubt, none of the Services listed on Schedule A shall require GEC to provide to WMC or its Representatives, in connection with the Services or otherwise, any (a) legal, regulatory, compliance or tax advice, (b) accounting or financial services

or arrangements, or (c) payroll and/or benefits services to the extent their provision is prohibited or restricted by applicable Law or puts the GEC or its Affiliates' existing plans or benefits at risk.

(c)    All Services shall be for the sole use and benefit of WMC.

Section 2.02. Duration of Services.  Upon the terms and subject to the conditions of this Agreement, GEC shall provide (or cause to be provided) to WMC each Service until the earliest to occur of, with respect to each such Service, (i) the expiration of the period of duration for such Service as set forth in Schedule A (including any extension periods permitted under this Agreement) (each with respect to each Service, a "**Service Period**"); (ii) the date on which such Service is terminated in accordance with Article IX; and (iii) the date on which this Agreement is terminated in accordance with Article IX; provided, however, that to the extent that GEC's ability to provide (or to cause to be provided) a Service is dependent on the continuation of a Service or continuation of access to a WMC facility, as the case may be, and such dependence has been made known to WMC, GEC's obligation to provide (or to cause to be provided) such dependent Service shall terminate automatically with the termination of such supporting Service or failure to access a WMC facility; and provided, further, that WMC shall use commercially reasonable efforts to transition itself to a replacement service, system or facility with respect to each Service as soon as reasonably practicable during the period for such Service as set forth in Schedule A.

Section 2.03. Changes to Services.  Revisions to Schedule A shall be solely as determined by mutual written agreement of GEC and WMC.

Section 2.04. Governance; Transition Services Manager; Change Process.  GEC hereby appoints and designates Joanna James to act as its initial services manager (the "**Services Manager**"), who will be directly responsible for coordinating and managing the delivery of the Services and have authority to act on GEC's behalf with respect to matters relating to this Agreement.  The Services Manager will work with the personnel of GEC to address any issues and matters raised by WMC relating to this Agreement.  All communications from WMC to GEC pursuant to this Agreement regarding routine matters involving the Services set forth in Schedule A shall be made through the Services Manager, or such other individual as specified by the Services Manager in writing and delivered to WMC by e-mail.  GEC shall notify WMC of the appointment of a different Services Manager, if necessary, in accordance with Section 10.06.

Section 2.05. Transition Plan.

(a)    Within thirty (30) days after the Effective Date, the Parties shall jointly develop and deliver to the Services Manager a written plan (a "**Transition Plan**") setting out: (i) the steps that the Parties will take to transfer the Services to or obtain the Services from a substitute provider upon the expiration of the Service Period or the date on which such Service shall have been terminated; (ii) any inter-dependency between those steps and GEC's supply obligations in respect to the Services; and (iii) any additional and reasonable assistance that WMC requires from GEC in respect to the transfer to or obtaining from a substitute provider of those Services (e.g., assistance in identifying any additional information and activities, other than those listed in the Transition Plan, that are needed to transfer the Services to or obtain Services from a substitute provider efficiently).

5

(b)     The Transition Plan shall: (i) not be inconsistent with the terms of this Agreement (including the description in <u>Schedule A</u>); (ii) be reasonably detailed; and (iii) show the timetable and principal steps that the Parties will execute in order to complete the Transition Plan.

(c)     The Parties will work together in good faith to facilitate a timely transition of the relevant Services to the relevant substitute providers, which are required to give effect to them.

(d)     Each Party may propose to the other adjustments to the Transition Plan from time to time.  Any such adjustment(s) shall be subject to agreement of the Parties.

Section 2.06.  <u>Limitations on Provision of Services</u>.

(a)     Notwithstanding anything to the contrary set forth in this Agreement, (i) GEC shall not be required to provide or cause to be provided any Service for use in, and WMC shall not use any Service in or for, any business other than the wind-down of WMC's operations, and the Services shall be available to WMC only for purposes of conducting such wind-down.

(b)     GEC shall provide, or cause to be provided, only those Services that are expressly stated on <u>Schedule A</u>, and only to the extent such services were already provided to WMC by GEC or its Affiliates immediately prior to the Effective Date.  Any additional services required in connection with the performance or delivery of a Service shall be provided to, and accessible by, WMC only upon further agreement with GEC.

(c)     For avoidance of doubt, GEC is under no obligation to separate or otherwise re-format any of WMC's data that is stored or processed in connection with this Agreement: (i) in a different software instance than that currently used by WMC or GEC; or (ii) on different hardware than that currently used by WMC or GEC, except to the extent GEC is required under <u>Schedule A</u>.

ARTICLE III
THIRD PARTY CONSENTS AND LICENSES; OTHER ARRANGEMENTS; LOCAL AGREEMENTS

Section 3.01.  Third Party Consents and Licenses. [Reserved]

Section 3.02.  <u>IP License</u>. [Reserved]

ARTICLE IV
ADDITIONAL AGREEMENTS

Section 4.01.  <u>GEC Computer-Based and Other Resources</u>.

(a)     As of the Effective Date, and except as otherwise expressly provided herein, or unless required in connection with the performance, receipt or delivery of, a Service, WMC shall cease to use and shall have no further access to, and GEC shall have no obligation to

otherwise provide, GEC's intranet and other owned or licensed information technology related resources, including software, networks, hardware or technology of GEC and shall have no access to, and GEC shall have no obligation to otherwise provide, computer-based resources (including e-mail and access to GEC's computer networks and databases) which require a password or are available on a secured access basis.  From and after the date hereof, WMC shall cause all of its personnel having access to GEC's intranet or such other information technology related resources, including software (owned or licensed), networks, hardware, technology or computer based resources (collectively, the "**Systems**") in connection with performance, receipt or delivery of a Service (i) to comply with all security guidelines (including physical security, network access, internet security, confidentiality and personal data security guidelines, policies, standards and similar requirements) of GEC (of which GEC provides WMC written notice) and (ii) shall not tamper with, compromise or circumvent any security or audit measures employed by GEC (of which GEC provides WMC written notice); provided that, in the case of each of clauses (i) and (ii), no such prior notice shall be required to the extent the security guidelines or security or audit measures are materially the same as those applicable during the Baseline Period.  WMC shall ensure that such access shall be used by such personnel only for the purposes contemplated by, and subject to the terms of, this Agreement, and such personnel shall access and use only those Systems for which WMC has been granted the right to access and use.  WMC shall use commercially reasonable efforts to prevent unauthorized access, use, destruction, alteration or loss of information contained therein and to otherwise cooperate and fully implement this Section 4.01 fully, including notifying its personnel of the restrictions set forth in this Agreement.  GEC and WMC agree to use their respective commercially reasonable efforts to cooperate and fully implement this paragraph promptly.

(b)      In the event of a cyber incident for which GEC reasonably believes GEC's intranet or other information technology-related resources have been or could be compromised by a malicious threat actor, WMC agrees that GEC may take all steps it deems necessary and/or advisable in its sole and absolute discretion, with or without advance notice, to remediate the cyber incident, including termination of or blocking WMC and its personnel's access and connectivity to GEC  Systems.  If GEC reasonably believes WMC or its personnel have failed to comply with the security guidelines of GEC, that any unauthorized WMC personnel have  accessed the Systems, or that any personnel of WMC is a security concern or has engaged in activities that may lead to the unauthorized access, use, destruction, alteration or loss of data, information or software of GEC, WMC agrees that GEC may terminate or block WMC's  access and connectivity to the GEC Systems upon notice to WMC describing such non-compliance until such time as WMC has remedied such non-compliance in a manner satisfactory to GEC in its sole discretion.  WMC shall use commercially reasonable efforts to cooperate with GEC in investigating any apparent unauthorized access to the Systems.

Section 4.02.  Facilities Matters. [Reserved]

Section 4.03.  Access.  As a condition to GEC's obligations to provide the Services hereunder, WMC shall make available on a timely basis to GEC all information and materials reasonably requested by any such Person to enable GEC to provide the Services.

ARTICLE V
COSTS AND DISBURSEMENTS

Section 5.01. <u>Costs and Disbursements</u>. [Reserved]

Section 5.02. <u>Fees</u>. Except as otherwise provided in this Agreement or in the Schedules, GEC shall provide Services to WMC free of charge.

Section 5.03. <u>Other Costs and Disbursements</u>. [Reserved]

Section 5.04. <u>Tax Matters</u>. [Reserved]

ARTICLE VI
STANDARD FOR SERVICE

Section 6.01. <u>Standard for Service</u>.   Except as otherwise provided in this Agreement or the Schedules, GEC agrees to use commercially reasonable efforts to provide, or cause to be provided, the Services such that the nature, quality, standard of care and the service levels at which such Services are performed are not materially less than the nature, quality, standard of care and service levels at which the substantially same services were performed by or on behalf of GEC during the Baseline Period (or, if not so previously provided, then substantially the same nature, quality, standard of care and service levels as those applicable to similar services performed by or on behalf of GEC as of the Effective Date; <u>provided</u>, <u>however</u>, that, subject to <u>Section 6.02</u>, nothing in this Agreement shall require (a) GEC or its Affiliates to favor WMC's wind-down of its operations over any of GEC's or its Affiliates' own business operation or (b) WMC to favor GEC's or any GEC Affiliate's operation of its business over WMC's own wind-down.  For the avoidance of doubt, GEC shall only provide those Services to the extent consistent with GEC's applicable operating conditions, permits, licenses, business practices and any restrictions in any contract with any third-party as in effect on the Effective Date, and any changes or modifications to the foregoing, including as a result of any change in Law or requirements of any Governmental Authority, shall be considered a modification pursuant to <u>Section 6.05</u>.   WMC acknowledges and agrees that certain of the Services to be provided hereunder were, prior to the Effective Date, performed for GEC by individuals who may no longer be employed by GEC or its Affiliate.  Consequently, the Parties agree to cooperate in good faith to ensure that the manner of Services provided by GEC or a GEC Affiliate remains substantially similar to the manner in which such services were provided during the Baseline Period.

Section 6.02. <u>Priorities</u>.  GEC shall have the right in its sole discretion to establish priorities, as between WMC, on the one hand, and GEC, on the other hand, as to the provision of any Service; <u>provided</u>, <u>however</u>, that GEC shall use commercially reasonable efforts to maintain sufficient resources to perform the Services in accordance with this Agreement.  GEC shall use commercially reasonable efforts to promptly advise WMC of any Services which shall be interrupted or delayed as a result of such prioritization.

Section 6.03. <u>Level of Use</u>.  Except as otherwise expressly provided in this Agreement, WMC's use of any Service shall not exceed the level of use required as of the Baseline Period.  In no event shall WMC be entitled to materially increase its use of any of the Services above such level of use without the prior written consent of GEC.

8

Section 6.04.  Third Parties.  Subject to compliance with Section 3.01, in the event any third-party consent, waiver or approval is required for a GEC or its designees to provide any Services and such consent, waiver or approval is not obtained, the Parties shall cooperate in good faith to identify a commercially reasonable alternative to such Services.  If the Parties are unable to identify such an alternative, GEC shall not be obligated to provide any such Services or to obtain replacement services therefor.  Except as set forth in Section 3.01, GEC shall not be required to obtain any consent, waiver or approval of any third-party in order to provide any Services.  GEC shall not be obligated to provide any Services which, if provided, would violate any third-party contract or agreement.

Section 6.05.  Maintenance.  GEC shall have the right to shut down temporarily the operation of any facilities or systems providing any Service whenever in GEC's judgment, reasonably exercised, such action is necessary or advisable for general maintenance or emergency purposes; provided that GEC shall use its commercially reasonable efforts to schedule non-emergency maintenance after consulting with WMC so as to not materially disrupt the business or operations of WMC.  GEC shall use commercially reasonable efforts to give WMC advance notice of any such shutdown.  With respect to the Services dependent on the operation of such facilities or systems, GEC shall be relieved of its obligations hereunder to provide such Services during the period that such facilities or systems are so shut down in compliance with this Agreement, but shall use commercially reasonable efforts to minimize each period of shutdown.

Section 6.06.  Modifications.  GEC may modify a Service (including, with respect to scope, timing and quality of such Service) (i) to the extent the same modification is made with respect to the entirety of GEC's provision of such Service to itself or to any of its Affiliates or any other Person to whom such GEC provides such Service; or (ii) if provision of such Service is prohibited or restricted by applicable Law or puts GEC's existing employee plans or benefits at risk; provided, however, that, in such event, (a) GEC shall use its commercially reasonable efforts to limit the disruption to the business or operations of WMC caused by such modification; (b) GEC must provide notice of the modification to WMC as soon as reasonably practicable; and (c) WMC may terminate such Service immediately upon notice to GEC.  GEC's responsibilities set forth herein shall be amended as reasonably necessary to conform to any such modifications made pursuant to this Section 6.06 and WMC shall use commercially reasonable efforts to comply with any such amendments.  Subject to the terms in this Agreement, in providing its Services hereunder, GEC may use any information systems, hardware, software, processes and procedures it deems necessary or desirable in its reasonable discretion.

Section 6.07. Disclaimer of Warranties.  Except as expressly set forth in Section 6.01 and subject to the limitations in Article VIII, the Parties acknowledge and agree that the Services are provided on an as-is, where-is basis, that WMC assumes all risks and liability arising from or relating to its use of and reliance upon the Services and GEC makes no representation or warranty with respect thereto. EXCEPT AS EXPRESSLY SET FORTH HEREIN AND IN THE CASE OF FRAUD, GEC HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, COMMERCIAL UTILITY, MERCHANTABILITY, FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE OR USE, TITLE, NON-INFRINGEMENT, ACCURACY, AVAILABILITY, TIMELINESS, COMPLETENESS, THE RESULTS TO BE

OBTAINED FROM SUCH SERVICES OR ARISING FROM COURSE OF PERFORMANCE, DEALING, USAGE OR TRADE, AND WMC, ON ITS BEHALF AND ON BEHALF OF ALL OF ITS AFFILIATES, HEREBY ACKNOWLEDGES SUCH DISCLAIMER AND WMC SPECIFICALLY DISCLAIMS THAT IT IS RELYING UPON OR HAS RELIED UPON ANY SUCH REPRESENTATION OR WARRANTY.   NEITHER GEC NOR ANY OF ITS AFFILIATES GUARANTEES OR WARRANTS THE CORRECTNESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY DATA OR OTHER INFORMATION PROVIDED TO WMC OR ITS AFFILIATES OR ITS REPRESENTATIVES IN CONNECTION WITH THE SERVICES.

Section 6.08. <u>Compliance with Laws and Regulations</u>.   Each Party shall be responsible for its own compliance with any and all Laws applicable to its performance under this Agreement.  No Party shall take any action in violation of any such applicable Law that would reasonably be likely to result in liability being imposed on the other Party, as the case may be. GEC shall not be obligated to provide any Service which, if provided, would violate any applicable Law.

Section 6.09. <u>No Professional Services</u>.  Notwithstanding anything to the contrary contained in this Agreement or in any Schedule hereto, neither GEC nor any of its Affiliates, nor any of its or their respective Representatives, shall be obligated to provide, or shall be deemed to be providing, any legal, regulatory, compliance, financial, payroll and benefits, accounting, treasury or tax advice or IT consulting services to WMC, or any of their respective Representatives, pursuant to this Agreement or any Schedule hereto, whether as part of or in connection with the Services provided hereunder or otherwise.

Section 6.10. <u>No Reporting Obligations</u>.   Notwithstanding anything to the contrary contained in this Agreement or in any Schedule, neither GEC nor any of its Affiliates, nor any of its or their respective Representatives, shall be obligated, pursuant to this Agreement or any Schedule, as part of or in connection with the Services provided hereunder, as a result of storing or maintaining any data referred to herein or in any Schedule hereto, or otherwise, to prepare or deliver any notification or report to any Governmental Authority (including any taxing authority) or other Person on behalf of WMC or any of its respective Representatives.

ARTICLE VII
DISPUTE RESOLUTION

Section 7.01. <u>Disputes</u>.

(a)    In the event of any dispute, controversy, claim or Action arising out of or relating to the transactions contemplated by this Agreement, including an Action seeking specific performance and related equitable relief, or the validity, interpretation, breach or termination of any provision of this Agreement, or calculation or allocation of the costs of any Service, including indemnification claims and claims seeking redress or asserting rights under any Law, whether in contract, tort, common law, statutory law, equity or otherwise, including any question regarding the negotiation, execution or performance of this Agreement (each, a "**TSA Dispute**"), GEC and WMC agree to negotiate in good faith in an attempt to resolve such TSA Dispute promptly and amicably. If the Parties are unable to resolve such TSA Dispute amicably within sixty (60) days,

then such TSA Dispute shall be resolved pursuant to Section 7.01(b) hereof, provided that such dispute resolution process shall not modify or add to the remedies available to the Parties under this Agreement.

(b)    Except as set forth in Section 7.01(c) hereof, any TSA Dispute not resolved by the Parties in accordance with Section 7.01(a) shall be determined by arbitration administered by the American Arbitration Association in accordance with its processes and procedures. The language to be used in this arbitration shall be English.  The seat, or legal place, of arbitration shall be New York City, New York. Where the claim amount is less than USD $5 million, the tribunal shall consist of a sole arbitrator. Where the claim amount is USD $5 million or greater, the tribunal shall consist of three arbitrators, with the claimant and the respondent each nominating a single arbitrator respectively, and the two party-nominated arbitrators appointing the third arbitrator within thirty (30) days of the last of their appointments, who shall be the chairman of the tribunal.

(c)    Notwithstanding any provision herein, GEC hereby agrees that WMC may also seek resolution of a TSA Dispute before the Bankruptcy Court.

ARTICLE VIII
LIMITED LIABILITY AND INDEMNIFICATION

Section 8.01. Limitation of Liability.

(a)    Except in connection with GEC's gross negligence, or intentional reckless misconduct, GEC shall have no liability in contract, tort or otherwise, for or in connection with any Services rendered or to be rendered by GEC or its Representatives (each, a "**GEC Servicing Party**") pursuant to this Agreement, the transactions contemplated by this Agreement or any GEC Servicing Party's actions or inactions in connection with any such Services, to WMC or its Representatives.

(b)    Notwithstanding any other provision contained in this Agreement, no GEC Servicing Party shall be liable for any consequential, special, incidental, indirect or punitive damages, any amount calculated based upon any multiple of earnings, book value or cash flow, or diminution in value, lost profits or similar items (including loss of revenue, business interruption, income or profits, diminution of value or loss of business reputation or opportunity or loss of customers, goodwill or use) regardless of whether such items are based in contract, breach of warranty, tort or negligence or any other theory, and regardless of whether a GEC Servicing Party has been advised of, knew or should have known of, anticipated or foreseen the possibility of such damages.  The Parties acknowledge that the Services to be provided hereunder are subject to, and that the remedies under this Agreement are limited by, the applicable provisions of Article VI, including the limitations on representations and warranties with respect to the Services.

(c)    WMC acknowledges that the GEC Servicing Parties are not in the business of providing Services of the type contemplated under this Agreement and the Services are to be provided at no charge and on a temporary basis to WMC with respect to the wind-down of WMC. Accordingly, except in connection with GEC's gross negligence, or intentional reckless misconduct, the aggregate liability and indemnification obligations of the GEC Servicing Parties (in each case, in connection with the provision of Services by such GEC Servicing Party) with

respect to this Agreement, the Services or the transactions contemplated by this Agreement shall be zero dollars (USD $0).

Section 8.02. <u>WMC Indemnification Obligation</u>. Except in connection with WMC's gross negligence, or intentional reckless misconduct, WMC shall have no indemnification obligations to GEC.

Section 8.03. <u>GEC Indemnification Obligation</u>. Except in connection with GEC's gross negligence, or intentional reckless misconduct, GEC shall have no indemnification obligations to WMC.

Section 8.04. <u>Indemnification Procedure</u>. [Reserved]

Section 8.05. <u>Liability For Payment Obligations</u>. [Reserved]

Section 8.06. <u>No Other Remedies</u>. The Parties acknowledge and agree that the remedies available to each Party shall be limited to those expressly set forth herein.

Section 8.07. <u>Mitigation</u>. Each Party shall use its commercially reasonable efforts to mitigate any Loss for which the other Party may be liable hereunder.

ARTICLE IX
TERM AND TERMINATION; EXTENSION OF SERVICE PERIOD

Section 9.01. <u>Term and Termination</u>.

(a)     This Agreement shall commence immediately upon the Effective Date and shall terminate in its entirety upon the earlier to occur of: (i) the last date on which either Party is obligated to provide any Service to the other Party in accordance with the terms hereof; (ii) the filing by WMC of a certificate of cancellation or dissolution to terminate the corporate existence of WMC; and (iii) the mutual written agreement of the Parties to terminate this Agreement in its entirety.

(b)     WMC may terminate this Agreement with respect to one or more Services, in whole (by Service line item) or in part, at any time upon at least fifteen (15) days' prior written notice to GEC.

(c)     GEC may terminate this Agreement with respect to one or more Services, in whole (by Service line item) or in part, at any time (i) if WMC has failed to perform any of its material obligations under this Agreement relating to such Services, and such failure shall continue to exist for a period of thirty (30) days after receipt by WMC of a written notice of such failure from GEC.

(d)     Both Parties may terminate this Agreement with respect to one or more Services immediately upon mutual written agreement.

Section 9.02. <u>Effect of Termination of Services</u>.

(a)     Upon a full termination of this Agreement pursuant to Section 9.01 above,

      (i)     GEC's obligation to provide any of the Services shall immediately terminate; and

      (ii)     WMC shall promptly:

            (A)     Return all GEC hardware and software loaned to WMC with respect to the Services within thirty (30) days of the effective date of such termination. For avoidance of doubt, loaned software does not include LoanQuest; and

            (B)     Shall destroy (with certification of the same) all GEC Confidential Information, excluding one (1) copy of the same as WMC may be required to retain by applicable Law. For avoidance of doubt, all such retained GEC Confidential Information shall be subject to the Confidentiality provisions of this Agreement for so long as such Confidential Information is retained by WMC or its permitted successors or assigns.

(b)     Upon termination of any Service(s) in accordance with Section 9.01 above, GEC's obligation to provide such Service(s) shall immediately terminate.

(c)     For avoidance of doubt, any expiry or termination of this Agreement or of any Service(s) shall not affect a Party's accrued rights and obligations under this Agreement as at the date of such expiry or termination.


Section 9.03. <u>Force Majeure</u>.  Neither Party (nor any Person acting on its behalf) shall be liable to the other Party for any Loss as a result of any delay or failure in the performance of any obligation hereunder which is due to fire, flood, war, acts of God, strikes, riots, plague, Governmental Authority, or other causes beyond its reasonable control (a "**Force Majeure Event**"); <u>provided</u> that the Party so affected shall notify the other Party in writing promptly upon the onset of any Force Majeure Event, shall use commercially reasonable efforts to mitigate the effect of any Force Majeure Event, and notify the other Party in writing promptly upon the termination of any Force Majeure Event.  As soon as practicable following the cessation of such Force Majeure Event, GEC shall resume its performance of the Service(s) affected thereby unless WMC has indicated in writing to GEC that the affected Services shall not be resumed, in which case the affected Services shall terminate as if terminated in accordance with <u>Section 9.01(b)</u> hereof.

Section 9.04. <u>Extension of Service Period</u>.  Upon thirty (30) days' advance written notice of the expiration of the Service Period for any Service, WMC may request a service extension.  For avoidance of doubt, GEC is not obligated to extend any Service.

ARTICLE X
GENERAL PROVISIONS

Section 10.01.    <u>Independent Contractors</u>.    Nothing contained herein is intended or shall be deemed to make any Party the agent, employee, partner or joint venture of any other Party or its Affiliates or be deemed to provide such Party with the power or authority to act on behalf of the other Party or to bind the other Party to any contract, agreement or arrangement with any other individual or entity.  GEC shall act as an independent contractor and not as the agent of WMC in performing Services.

Section 10.02.    <u>Subcontractors</u>.    GEC may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement; <u>provided</u> that (a)  GEC shall use the same degree of care in selecting any such subcontractor as it would if such subcontractor was being retained to provide similar services to GEC; and (b)  GEC shall in all cases remain primarily responsible for all of its obligations hereunder with respect to the scope of the Services, the standard for Services as set forth in <u>Article VI</u> hereof and the content of the Services provided to WMC.

Section 10.03.    <u>Treatment of Confidential Information</u>.

(a)    The Parties shall not, and shall cause all other Persons providing or receiving Services hereunder not to, disclose to any other Person or use, except for purposes of this Agreement, any Confidential Information of the other Party; <u>provided</u>, <u>however</u>, that each Party may disclose Confidential Information of the other Party, to the extent permitted by applicable Law: (i) to its Representatives on a need-to-know basis in connection with the performance of such Party's obligations under this Agreement; (ii) in any report, statement, testimony or other submission to any Governmental Authority having jurisdiction over the disclosing Party; or (iii) in order to comply with applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing Party in the course of any litigation, investigation or administrative proceeding.  In the event that a Party becomes legally compelled (based on advice of counsel) by deposition, interrogatory, request for documents subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information of the other Party, such disclosing Party (to the extent legally permitted) shall provide the other Party with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other Party (at such other Party's expense) to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege.  In the event that such protective order or other similar remedy is not obtained, the disclosing Party shall furnish only that portion of the Confidential Information that has been legally compelled and shall exercise its commercially reasonable efforts (at such other Party's expense) to obtain assurance that confidential treatment shall be accorded such Confidential Information.

(b)    Each Party shall, and shall cause its Representatives to, protect the Confidential Information of the other Party by using the same degree of care to prevent the unauthorized disclosure of such Confidential Information as the Party uses to protect its own confidential information of a like nature.

14

(c)     Each Party shall cause its Representatives to agree to be bound by the same restrictions on use and disclosure of Confidential Information as bind the Party in advance of the disclosure of any such Confidential Information to them.

(d)     Each Party shall comply with all applicable Laws (including state, federal and foreign Laws) that are or that may in the future be applicable to the provision of Services hereunder.

Section 10.04.     <u>Further Assurances</u>.     From time to time following the Effective Date, the Parties shall execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the transactions contemplated hereby as may be reasonably requested by the other Party; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 10.04</u> shall require either Party to pay money to, commence or participate in any action or proceeding with respect to, or offer or grant any accommodation (financial or otherwise) to, any third-party following the date hereof.

Section 10.05.     <u>Rules of Construction</u>.  For purposes of this Agreement:

(a)     In the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender.

(b)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in the beginning the calculation of such period shall be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken before the end of the day Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c)     The division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," and "Schedule" are references to the Articles, Sections, subsections, subclauses, clauses, and Schedules to this Agreement unless otherwise specified;

(d)     The terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules hereto; the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified; the term "any" means "any and all"; the term "or" shall not be exclusive and shall mean "and/or"; and the "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not simply mean "if."

(e)     Each Party has participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise

15

favoring or burdening either Party by virtue of the authorship of any provision in this Agreement; the language used herein will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party. Further, prior drafts of this Agreement or any ancillary agreements hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements hereto shall not be used as an aid of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

Section 10.06.    Notices.  Except with respect to routine communications by WMC and the Services Manager under Section 2.04, all notices and other communications under this Agreement shall be made as follows:

(a)    Any notice, approval, request, authorization, direction or other communication required or permitted under this Agreement shall be given in writing and shall be deemed to have been delivered (i) on the delivery date, if delivered by electronic mail with a read-receipt, or personal delivery, (ii) one business day after deposit with commercial overnight courier with written verification of receipt.

(b)    All notices and other communications under this Agreement shall be given to the Party to which such notice is directed at the following addresses:

If to WMC:

Mark V. Asdourian
President & General Counsel
WMC Mortgage, LLC
6320 Canoga Avenue, Suite 1420
Woodland Hills, CA 91367

If to GEC:

Joanna James
Senior Research Coordinator
c/o Monica Zarba
GE Capital Global Legacy Solutions
901 Main Avenue
Norwalk, CT 06851

or addressed to a person or party at such other address as that Party may have given by written notice in accordance with this provision.

Section 10.07.    Severability.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement shall not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court

making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 10.08.    <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  Neither Party may assign (whether by operation of law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Party, except that (a) GEC may assign this Agreement or any or all of its rights, interests and obligations under this Agreement to any of its Affiliates upon prior written notice to WMC; <u>provided</u> that no such assignment shall release GEC from any liability or obligation under this Agreement occurring prior to the effective date of such assignment, and (b) GEC may assign and novate any or all of its rights and obligations under this Agreement in connection with a sale or disposition of any assets or lines of business of GEC; <u>provided</u> that in the case of this clause (b), the transferee of such assets shall agree in writing to be bound by the terms of this Agreement as if named as a Party hereto; and <u>provided</u>, <u>further</u>, that GEC, without its prior written consent, shall not be obligated to materially increase the scope, volume, or duration or materially change the nature of the Services it provides under this Agreement as a result of any such sale or disposition.

Section 10.09.    <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party to this Agreement.

Section 10.10.    <u>Entire Agreement</u>.  Except as otherwise expressly provided in this Agreement, this Agreement (including the Exhibits and Schedules), collectively constitutes and contains the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, between or among any of the Parties, Representatives respecting the subject matter hereof and thereof.

Section 10.11.    <u>Amendment</u>.  This Agreement (including all Exhibits and Schedules) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 10.12.    <u>Waiver</u>.  Each Party may (a) waive any breaches or inaccuracies in the representations and warranties of the other Person contained in this Agreement or in any document delivered pursuant to this Agreement or (b) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Any such waiver shall be in a written instrument duly executed by the waiving party.  No failure on the part of either Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof,

nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 10.13.    <u>Governing Law</u>.  This Agreement, and any TSA Dispute, shall be governed by, construed and enforced in accordance with the internal Laws of the State of New York, including its statutes of limitations, without giving effect to any choice of law rules that would cause the application of Laws of any jurisdiction other than those of the State of New York.

Section 10.14.    <u>Waiver of Jury Trial</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY TSA DISPUTE AND COVENANTS THAT NEITHER IT NOR ANY OF ITS REPRESENTATIVES SHALL ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO SUCH TRIAL BY JURY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (B) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY AND (C) SUCH WAIVER CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THE OTHER PARTY IS RELYING AND SHALL RELY IN ENTERING INTO THIS AGREEMENT.  EACH PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.14</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 10.15.    <u>Non-Recourse</u>.  All claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as Parties to this Agreement.  No Person who is not a Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, agent, attorney, or representative of, and any financial advisor or lender to, any Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing ("**Nonparty Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach; and, to the maximum extent permitted by law, each Party hereby knowingly and voluntarily waives and releases all such liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.

Section 10.16.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

Section 10.17.    <u>Survival</u>. Any provision of this Agreement that in accordance with its terms is intended to survive the expiration or termination of this Agreement shall survive such expiration or termination.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**GE CAPITAL US HOLDINGS, INC.**                     **WMC MORTGAGE, LLC**


By: _____    By: _____
          *(Signature)*                                             *(Signature)*

_____    _____
        *(Printed Name)*                                     *(Printed Name)*

_____    _____
            *(Title)*                                                 *(Title)*

_____    _____
            *(Date)*                                                 *(Date)*


Schedule A: Services

19

# SCHEDULE A

# SERVICES

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| IT2 | General Security | General Security | GEC will provide (or cause to be provided) General Security Services used by WMC prior to Effective Date, including:<br><br>• Security Incident management, tracking, and metrics; security incident reports provided upon request.<br>• Infrastructure security; including server & workstation anti-virus, logging, intrusion detection, laptop encryption, firewall & proxy administration<br>• Identity & access management and governance technologies<br>• Enterprise Vulnerability Management (EVM); vulnerability scanning, reporting and remediation (patching).<br>• Supplier risk management; supplier security assessments as required.<br>• Data loss prevention technologies; insider threat monitoring and investigations | 3 months |
| TSA0025 | US HR Operations Administration | US HR Operations Administration | GEC will continue to maintain and update (or cause to be maintained and updated) employee data including SSO ID in GEC's human capital management system.  This service must remain in effect for same duration as TSA0132.<br><br>Note: Changing or terminating this Service will not be permitted from January 2, 2020 through February 29, 2020 due to GEC's transition to Workday. | 3 months |
| TSA0132 | HR IT Systems | HR IT Systems | GEC will continue to provide (or cause to be provided) to WMC with access to and support for the following systems, applications and content: Core HR systems, Employee Development, HR Analytics & Reporting, and Global Absence Management.<br><br>All existing WMC inbound and outbound interfaces in current form will be supported during the duration of this TSA item. Under this agreement, WMC will be required to comply with any/all data configuration modifications and relevant system updates including the planned transition of GEC's HR IT systems to Workday. Once GEC transitions to Workday as an HCM solution, WMC will no longer have access to legacy HR systems. HR IT systems will be supported through Workday after GEC transitions from legacy systems.<br><br>Note:  Changing or terminating this Service will not be permitted from January 2, 2020 through February 29, 2020 due to GEC's transition to Workday. | 3 months |
| TSA0502 | Infrastructure - Hosting Products | Infrastructure - Hosting Products | GEC will provide (or cause to be provided) to WMC with continued access to Infrastructure Hosting Products, including: | 3 months |

1

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | (Physical, Virtual & Engineering Labs) | (Physical, Virtual & Engineering Labs) | • Physical & virtual hosting and server management, providing secure, business level storage, data protection and backup options for data and applications.<br>• Continued connectivity to GEC network and services, global 24x7 monitoring, incident response & issue resolution from the Digital Operations Center (DOC) & Cyber Incident Response Team (CIRT).<br>• OS support, OS and Firmware Patching & OS level monitoring/diagnostic tools, and utilization statistic gathering.<br>• Virtualization software and support (i.e. VMWare).<br><br>This Service also includes multiple cybersecurity and technology risk features such as the following (some features are dependent on OS type, existence of agents, and assets being registered accurately in CMDB):<br><br>• Continuous monitoring for key cyber components.<br>• Infrastructure security operations: Infrastructure monitoring, detection, and agreed upon response process with WMC.<br>• Vulnerability management: Servers are scanned at a set frequency which may be weekly but at a minimum is monthly to determine what server vulnerabilities exist and that information is then communicated to the appropriate GE Business Unit for remediation.<br>• Privileged Session Management.<br><br>Engineering Labs includes agreed upon response process with WMC, however is limited based on inclusion of computer endpoint sensoring add on. | |

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| TSA0504 | Digital Workplace - Site as a Service | Digital Workplace - Site as a Service | GEC will provide (or cause to be provided) to WMC:<br><br>• Continued secure connectivity to GEC services & internet, as necessary. Access is provided through the DIVNET or 3rd Party Rail infrastructure allowing connectivity to the GE network through connections that are actively inspected and remediated to assure security. Outbound Internet traffic from the GE network is routed through the same infrastructure. Service Includes 24×7 capacity measurement, management, and monitoring.<br><br>• Access to and use of GE network services, such as:<br>• LAN/WAN/Wireless device management, maintenance and monitoring;<br>• Incident, Problem, Change and Bill processing;<br>• DNS/DHCP management and maintenance;<br>• Secure Outbound internet access including Proxy service;<br>• External Cloud & Co-location peering point infrastructure to preferred Cloud providers.<br><br>WMC should be off 3.x address space before end of TSA. 3.x address space is no longer registered to GE. Failure to do so could result in loss of access to internet facing applications and resources being unreachable.<br><br>• Continued access to Site-as-a-Service additional offerings which include but are not limited to: A MyTech District Partner aligned to the site, On demand, local, technical dispatch service through Smart Hands, MyTech Lounge and Manufacturing Site Support, etc.<br><br>• Access to and use of Domain Name Service, Domain Name redirect service; Enhanced Domain Name (EDNS) and Global Traffic Manager (GTM) Services for rules-based fail-over and load balancing. GE branded domains will not be transferred to WMC.<br><br>• Multiple cybersecurity and technology risk features such as the following. Some features are dependent on site type, product release date and assets being registered accurately in CMDB. Coworking and Edge sites to not include all items listed below.<br>• Network security operations - Network monitoring, detection, and agreed upon response process with WMC.<br>• Vulnerability management - Network devices are scanned at a set frequency which may be weekly but at a minimum is monthly to determine if any vulnerabilities exist and that information is then communicated to WMC contact for remediation.<br>• Radius User (site secure wireless access). | 3 months |
| TSA0505 | Digital Workplace - PC Leases | Digital Workplace - PC Leases | GEC will provide (or cause to be provided) to WMC access to and use of pre-Effective Date leases for PC assets used by WM employees. | 3 months |

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | | | WMC is responsible for physical return of PC assets to the rightful lessor.<br><br>All PC assets must be wiped in line with GE cybersecurity requirements upon return to lessor. | |
| TSA0506 | Digital Workplace - Microsoft Office Suite & Email Service | Digital Workplace - Microsoft Office Suite & Email Service | GEC will provide (or cause to be provided) to WMC the following:<br>• Continued access to Microsoft Office Suite and GE Email Services.<br>• Continued access to and use of the GE email service, as-is and where-is as used by the WMC before Effective Date.<br>• Use of the employee email address.<br>• 60 days of forwarding only of @ge.com mail to corresponding WMC email accounts after GEC mailboxes are deleted, up to the end of the TSA period.<br>• Ending GE email usage once dependence on GE email accounts is removed.<br>• Making available access to mail data from mailboxes existing at the end of the TSA to future email system. WMC is wholly responsible for any export or transfer as well as data fidelity in selected target system.<br>    o Following the mailbox data transition: (a) such email mailboxes and all contents and data of the items within such email mailboxes will be deleted; (b) GEC will no longer act as the custodian and archiver of any contents or data in such email mailboxes; (c) GEC will not be able to provide any copies of such contents or data; and (d) WMC will be solely responsible for all applicable data retention requirements pertaining to such contents and data.  Notwithstanding the foregoing, if WMC has identified any contents or data in email mailboxes of the specified individuals as subject to a legal hold, and notified GEC in writing of the existence and location thereof and the duration of such legal hold, GEC will retain such contents and data until the expiration of such period or such earlier time in the event the legal hold is lifted.  Notwithstanding the foregoing, legal holds can only be applied to GEC mailboxes that reside in the GE 0365 Exchange online service.  If an in-scope mailbox is determined to reside on an a GEC on-premise mail database, it must be moved to GE 0365 before a legal hold can be applied.  Further, WMC hereby acknowledges that mailbox exports in .PST files are only available for those mailboxes flagged as subject to a legal hold prior to the end of the TSA.<br>• Provide continued access to & use of instant messaging and office suite tools.<br><br>The following services are not included:<br>• Email Store & Forward | 3 months |
| TSA0509 | Digital Workplace - Personal Computing, Mobility & | Digital Workplace - Personal Computing, Mobility & | GEC will provide (or cause to be provided) to WMC continued access to Digital Workplace as in existence prior to the Effective Date, including end user consumed products necessary for WMC's employees to be productive (e.g., products associated with owning SSO, the secure delivery of PC & mobile technology, access to internal & web-based tools and software, and the local and virtual support of these products). Some features | 3 months |

4

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | Conferencing, Productivity Software & Tools; Identity Management | Conferencing, Productivity Software & Tools; Identity Management | are dependent on Persona type. Software/license transferability is dependent on divested affiliate rights per supplier requirements.<br><br>These products include but are not limited to:<br>• Productivity & collaboration tools<br>• Client Technology including PC, OS & management<br>• Unified Communication tools like Email & Skype<br>• User connectivity products like MyApps and VPN, including relevant hard/soft tokens, client software, through GE's current remote access application<br>• GE Support Tools like SmartHelp & MyTech<br>• Permitted On Demand software such as Adobe, Aha, etc. and peripherals, such as keyboards, mice, etc., provided that they were ordered through MyTech prior to the Effective Date<br>• Mobility services for access to & use of mobile devices to access GE Enterprise applications such as email, chat, etc, but only if in use immediately prior to the Effective Date. Includes device, plan & management. Account Carrier must comply with Vendor requirements<br><br>GEC will provide (or cause to be provided) to WMC continued access to and use of personal desk phone audio services from TechCo.<br><br>GEC will also provide (or cause to be provided) multiple cybersecurity and technology risk features such as the following until the time the relevant asset is no longer managed by GE. Some features are dependent on Persona and/or OS type, product release date, existence of agents, and assets being registered accurately in CMDB.<br><br>Included in vulnerability response program:<br>• Data protection:  Provides DLP capabilities as well as utilize WMC agreed upon processes when events are triggered<br>• Workstation security operations: monitoring, detection & agreed upon response process with WMC<br>• Continuous monitoring for key cyber components<br><br>Included in Security Awareness campaigns:<br>• Identity lifecycle services for supported applications & employee types including provisioning self-service & automated deprovisioning if initiated through GE termination processes<br>• Authentication & authorization services for applications utilizing SSO<br>• HPA & MFA capabilities for supported technologies & in scope use cases as defined by GE security standards | |

5

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | | | • Continued use of digital certificates issued by central GE PKI team (dependency on network/DNS services)<br><br>Note: GEC reserves the right to change technologies supporting the above capabilities & it is the responsibility of WMC to make any required changes to relevant assets to maintain support & usage of these capabilities. New integrations or features requests post-Effective Date will be treated as change requests & can be refused by GEC. During migration, GEC will provide data extracts or exports as technically feasible & allowed by security requirements<br><br>The following services are not included:<br>• MyGE access<br>• Remote Office | |
| TSA0519 | Digital Workplace - Support Central | Digital Workplace - Support Central | GEC will provide (or cause to be provided):<br>• Continued access to & use of Support Central Legacy & NextGen<br>• Support for Central Legacy access to WMC-only items (workflows, libraries & communities) that exist on the Effective Date. Items owned and run outside of WMC will be subject to approval by item owner.<br>• Support Central NextGen access is on condition that users, objects & data owned by WMC be migrated to a new tenant.  Object based exceptions subject to approval by GE BU CISO. WMC will have specific admin rights to their tenant. It is the responsibility of WMC to validate the objects & data prior to migration to new tenant.  GEC will not be liable for maintaining NextGen data that is not migrated by the end of the TSA period. | 3 months |
| TSA0520 | TechCo Professional Services | TechCo Professional Services | GEC will provide (or cause to be provided) professional consultation and projects associated with TechCo products. GEC reserves the right to refuse any professional service request. No work will be carried out without obtaining prior approval by WMC and TechCo. | 3 months |
| TSA0601 | Cyber Subscription-Business Application Cyber | Cyber Subscription-Business Application Cyber | GEC will provide (or cause to be provided) multiple cybersecurity and technology risk features such as the following:<br><br>• Identity lifecycle services for supported applications & employee types including provisioning self-service & automated deprovisioning if initiated through<br>• GEC termination processes<br>• Authentication & authorization services for applications utilizing SSO<br>• Directory Services<br><br>These are features that enable IAM self-service integrations, application access and access review capabilities<br><br>Note: GEC reserves the right to change technologies supporting the above capabilities & it is the responsibility of WMC to make any required changes to relevant assets to maintain support & usage of these capabilities. | 3 months |

6

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | | | New integrations or features requests post-Effective Date will be treated as change requests & can be refused by GEC. During migration, GE will provide data extracts or exports as technically feasible & allowed by security requirements. | |
| TSA0602 | Cyber Subscription-Assessment Services | Cyber Subscription-Assessment Services | GEC will provide (or cause to be provided) the following services:<br>A)   Vulnerability Management (Application) - External facing Applications are typically scanned monthly to determine if any application vulnerabilities exist and that information will then be communicated to WMC for remediation. This feature is dependent on the asset information being correctly registered in CMDB<br>B)   SAST scanning - The evaluation of an application by utilizing automated software tools that scans application's source code. This practice in the context of information security focuses on coding defects that could cause security vulnerabilities. This testing is typically performed repeatedly during the active coding phase of application development<br>C)   DAST scanning - Automated security testing of an application in runtime state (against dev/stage environment) based on OWASP Top 10 and SANS Top 20 vulnerability categories. This testing is typically performed repeatedly as part of application's secure development lifecycle. | 3 months |
| TSA0603 | Cyber Subscription-Identity & Access Management | Cyber Subscription-Identity & Access Management | GEC will provide (or cause to be provided) the following services:<br>A)   Crypto Key Management - The product is made up of two, distinct consumable services; crypto key backup and crypto key hosting. Both services offer the ability to store sensitive keys within a safe and secure hardware-based vault while providing protected access when the customer needs them for operations.<br>B) Digital Certificates (Network, server, or app) - Continued use of digital certificates issued by the central GE PKI team (dependency on network / DNS services)<br>C) Legacy Auth and Auth Solutions - To support clients on legacy platforms.<br>D) Legacy Directory Solutions - To support clients on legacy platforms.<br>E) Legacy IDM Solutions - To support clients on legacy platforms.<br>F) SSH Key Mgmt (CyberArk) - SSH Key Manager allows you to secure, store, rotate and protect privileged SSH Keys as well as the lifecycle management of the keys<br><br>Note: GE reserves the right to change technologies supporting the above capabilities & it is the responsibility of WMC to make any required changes to relevant assets to maintain support & usage of these capabilities. | 3 months |
| TSA0604 | Cyber Subscription-Threat Management | Cyber Subscription-Threat Management | GEC will provide (or cause to be provided) the following services:<br>A) Data as a service / data pipeline (business requested splunk hosting) - This service offers a way to consume data for your security or operations use cases.<br>B) Network Sensoring - Network Sensoring is a custom Intrusion Detection Sensor which enables the security teams to perform deep packet inspection of network traffic and identify possible breaches within the enterprise. | 3 months |
| TSA0607 | Cyber On Demand - OT Security | Cyber On Demand - OT Security | GEC will provide (or cause to be provided) the following services:<br>A) Threat Modeling - Securely hosted service that enables digitized mapping of products, sites, and processes including the components, data movement, trust boundaries, potential attack vectors, and known vulnerabilities. | 3 months |

7

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | | | B)  Code signing and cryptography - Secure, efficient cryptographic services that enable engineering teams to easily consume code signing, device identity, and trusted supply chain capabilities.  Includes hosting, management, and brokerage of key material for software and hardware platforms.<br>C)  In the event GEC is made aware of relevant externally reported GE product vulnerability (ies) through security@ge.com, this service includes processes agreed upon with divested entity for vulnerability notification. | |
| TSA0608 | Cyber On Demand - Identity & Access Management | Cyber On Demand - Identity & Access Management | GEC will provide (or cause to be provided) the following services:<br>A)  Role Based Access Controls - An add-on feature to the Identity Governance product that facilitates a method of access security that is based on a person's role within a business.<br>B)  New Application Integration, Manual (IDM) - A custom integration between IdM and a business application for the purpose of managing user access requests, applicable required approvals, and execution of a provisioning process in order to keep approved access up to date and relevant for users of the application.<br>C)  New Application integration, Manual - SSO - This is for teams that cannot establish or manage their integrations in our self-service portals. This is white glove support and will be engaged anytime application needs escalated integration support. | 3 months |
| TSA0609 | Cyber On Demand - Professional Services | Cyber On Demand - Professional Services | GEC will provide (or cause to be provided) professional consultation associated with Cybersecurity products. GEC reserves the right to refuse any professional service request. | 3 months |
| | Oracle GL | Oracle GL | GEC will provide (or cause to be provided) to WMC with continued access (including application support) to the WMC component of the Treasury General Ledger (Capital MMFP90) including:<br>• Assistance with application access<br>• Application Monitoring<br>• Application uptime management<br>• Bug Fixes<br>• L1/L2/L3 technical application support<br>• Discoverer reporting support<br>• Scheduled feeds monitoring/support<br>• Workflow management support (ticket management)<br>• Use of Capital Oracle EBS licenses | 3 months |

| TSA Item | Title | Summary | Description | Duration |
|----------|-------|---------|-------------|----------|
| TSA0048 | Payment & Bank Reporting Infrastructure | Payment & Bank Reporting Infrastructure | GEC will provide (or cause to be provided) to WMC an IT Application Service in relation to the payment and bank reporting applications as used by WMC prior to the Effective Date.<br><br>Service Inclusions:<br>As part of this Service, GEC will also provide to WMC Second-Level Support in relation to the payment and bank reporting applications.  This IT Application Service also includes all hosting and application management services.<br><br>GEC will provide (or cause to be provided) to WMC payment and bank reporting infrastructure, to monitor balances in WMC's account at Deutsche Bank, and to allow WMC to deliver to banks payment instructions from such account. Service may include use of Webcash, Enterprise Mapper, Trax, & Support Central depending on how the account is set up on such applications prior to the Effective Date.<br><br>WMC will be responsible for performing all cash management/reconciliation, legal and due diligence review associated with any funds, balances, accounts or payments made using the payment and reporting infrastructure.<br><br>Subject to WMC demonstrating its reasonable best-efforts to transition as soon as possible to its own infrastructure, payment & reporting infrastructure services include:<br>1. Payment & reporting platform (in place prior to the Effective Date) to deliver payment instructions from the WMC to the relevant financial institutions, and to obtain balance and transaction reporting, funds transfers and related data from such financial institutions; and<br>2. Use by WMC of bank account infrastructure (in place prior to the Effective Date) to submit and receive instructions and electronic messages to and from certain financial institutions, which instructions may be processed with General Electric Company's Swift Business Identifier Code (BIC) [GENEUS33].  Processing instructions with General Electric Company's Swift BIC and/or over the SWIFT network is subject to separate bank and/or Swift confirmations which may be required, and throughout the term of the TSA, ongoing agreement from such third parties to provide the network/bank services.<br><br>This service covers only accounts that are set up on the payment and bank reporting infrastructure prior to the Effective Date, and does not cover any other accounts. This service does not include any check payment or FX applications or infrastructure.<br><br>In no event shall any payment made using GEC's payment & reporting infrastructure or the GE BIC from WMC's accounts be construed to be a payment from GE or its Affiliates.  GE and its Affiliates, may, in their sole discretion, decline to allow any requests via the payment and reporting infrastructure that may, in their opinion, violate any applicable law or regulation. | 3 months |

9

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | | | **Service Exclusions:**<br>Services below are not included. Those will require a separate Project Order with scope, resources and cost assessments approved by GEC and WMC billed in addition to the TSA service:<br>- data extracts<br>- changes in relation to trademark edits<br>- enhancements/new functionality or any other changes requested by WMC<br>- Infrastructure or application changes (architecture, migrations, etc.) are at the discretion of GEC. | |
| TSA0327 | Payment & Bank Reporting Infrastructure Operations Functional Support | Payment & Bank Reporting Infrastructure Operations Functional Support | With respect to payment & bank reporting infrastructure, which may include, Webcash, Enterprise Mapper, Trax, SSS, APEX, Support Central and EBTPS – Online Banking Portals, depending on how the applicable accounts were set up on applications prior to the Effective Date,* GEC will provide (or cause to be provided) the following system & payment process support for such applications consistent with pre-Effective Date practices:<br>1.  Monitoring Payment Files are properly recorded in system<br>   A.  Support Existing Interfaces/ reporting to ledger/ other systems<br>   B. User Training<br>   C. Investigation and providing of information related to payments that were not timely processed by counter party banks or otherwise, for WMC to resolve directly with the bank or as may be required.<br><br>2.  System administration for the relevant payment and bank reporting infrastructure including:<br>   A. User Maintenance<br>   B. User Access & Static Data Management<br><br>3.  Balance Reporting – Balance report based on existing process & bank connectivity in place on the Effective Date (no new accounts or bank connections will be established thereafter)<br><br>4. General adhoc cash management inquiries and best practice sharing<br><br>5. Payment and bank reporting application system access recovery will be managed in line with overall user population<br><br>6. EBTPS (Electronic Banking Third Party System) administrative support consistent with pre-Effective Date activities. | |

| TSA Item | Title | Summary | Description | Duration |
|---|---|---|---|---|
| | | | This includes the following:<br>A.  System Administration, including:<br>(i) Adding and deleting users or accounts to the shared EBTPS<br>(ii) Adding and deleting necessary accounts to user profiles<br>(iii) Periodic review of authorized users; WMC shall cooperate in periodic audits of authorized users to ensure correct personnel have correct authority<br>B.  Comply with normal user audits consistent with GEC audit practices.<br><br>The service does not include any services related to bank account administration for any accounts.<br>*Infrastructure or application changes (architecture, migrations, etc.) are at the discretion of GEC. | |